1  Scott F. Gautier (State Bar No. 211742)
   *sgautier@pwkllp.com*
2  Lorie A. Ball (State Bar No. 210703)
   *lball@pwkllp.com*
3  Thor D. McLaughlin (State Bar No. 257864)
   *tmclaughlin@pwkllp.com*
4  PEITZMAN, WEG & KEMPINSKY LLP
   10100 Santa Monica Boulevard, Suite 1450
5  Los Angeles, CA  90067
   Telephone: (310) 552-3100
6  Facsimile: (310) 552-3101

7  Proposed Attorneys for Debtor and Debtor-in-
   Possession

8              **UNITED STATES BANKRUPTCY COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA**

10             **SAN FERNANDO VALLEY DIVISION**

| | |
|---|---|
| In re: | Case No.: |
| | |
| SEXY HAIR CONCEPTS, LLC, | Chapter 11 |
| | |
| Debtor and Debtor-in-Possession. | **EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS UNDER 11 U.S.C. §§ 361, 363 AND 364: (A) AUTHORIZING USE OF CASH COLLATERAL, (B) AUTHORIZING DEBTOR TO INCUR POST-PETITION INDEBTEDNESS, (C) GRANTING SECURITY INTERESTS, (D) AUTHORIZING ADEQUATE PROTECTION, AND (E) GRANTING OTHER RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES** |
| | |
| | **DECLARATION OF T. SCOTT AVILA FILED SEPARATELY** |
| | **DECLARATION OF BARRY STRATTON FILED SEPARATELY** |
| | <u>Hearing:</u> |
| | Date:  To Be Scheduled by the Court |
| | Time:  To Be Scheduled by the Court |
| | Place:  Courtroom ___ |
| |       21041 Burbank Blvd. |
| |       Woodland Hills, CA |

Sexy Hair Concepts, LLC  ("Sexy Hair Concepts" or the "Operating Debtor"), Luxe Beauty

Midco Corporation ("Midco") and Ecoly International, Inc. ("Ecoly" and together with Midco, each a

"Postpetition Guarantor" and collectively, "Postpetition Guarantors") (collectively, Sexy Hair

Concepts, Midco and Ecoly are referred to herein as "Debtors") hereby move for an interim order under 11 U.S.C. §§ 361, 363 and 364: (a) authorizing use of cash collateral, (b) authorizing the Debtors to incur post-petition indebtedness, (c) granting security interests, (d) authorizing adequate protection, and (e) granting other relief (the "Motion"). In support of this Motion, the Debtors submit the attached Memorandum of Points and Authorities, the separately filed Declaration of T. Scott Avila in Support of First Day Motions (the "Avila Declaration") and the separately filed Declaration of Barry Stratton (the "Stratton Declaration"), and state the following:

## EMERGENCY RELIEF IS REQUIRED

Pursuant to Local Bankruptcy Rules 2081-1(a), 4001-2(e) and 9075-1, the Debtors request that the Court consider the Debtor's Motion on an emergency interim basis so that any relief granted may take effect as soon as possible, thereby authorizing the Debtors immediately upon Court approval to enter into a post-petition financing agreement and for the Operating Debtor to use its cash collateral, both of which will allow the Debtors to continue their business operations in the ordinary course. If the post-petition financing agreement is not approved and/or the Operating Debtor is not authorized to use cash collateral on an interim basis, the Operating Debtor's operations may be interrupted, resulting in irreparable harm to the Operating Debtor's business and the estate.

## JURISDICTION AND VENUE

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter relates to obtaining credit and the use of property of the estate and is, accordingly, a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(D) and (M). Venue of this case is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are sections 361, 363 and 364 of title 11 of the United States Code (the "Bankruptcy Code"), Rule 4001 of the Federal Rules of Bankruptcy Procedure ("FRBP") and Local Bankruptcy Rule 4001-2.

## RELIEF REQUESTED

By this Motion, the Debtors seek authority, on an interim basis, to obtain post-petition financing, to use cash collateral and to provide adequate protection to the secured lender for such use. A proposed order providing the terms on which the Debtors seek to use cash collateral and obtain post-

petition financing is attached hereto as Exhibit 1 (the "Proposed Order").  In addition, the Debtors

request that, given the speed at which this case is expected to proceed, the Court set a final hearing

on the Motion approximately twenty-one (21) days after the service of this motion, or such other time

as is convenient to the Court.

Dated: December 21, 2010                 PEITZMAN, WEG & KEMPINSKY LLP


                                         By:____/s/ Scott F. Gautier_____
                                               Scott F. Gautier
                                               Lorie A. Ball
                                               Thor D. McLaughlin
                                         Proposed Attorneys for Debtors and Debtors-in-
                                         Possession

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## FACTS

### A.    GENERAL BACKGROUND

Sexy Hair Concepts, LLC ("SHC" or the "Operating Debtor") is an operating company engaged in the development, distribution and marketing of hair care products and brands.  SHC outsources the production and manufacture of its various lines of premier hair care products and operates from a single facility in Chatsworth, California that houses its corporate offices and distribution warehouse. SHC works with several distributors domestically and internationally, but does not maintain any other offices.

### B.    Prepetition Credit Facility

Prior to the Petition Date, the Operating Debtor financed its operations and growth through the proceeds from the sales of its products, the use of a secured credit facility maintained with the Bank of Montreal ("BMO"), as the Administrative and Collateral Agent for the secured lender group ("Senior Secured Lenders"), pursuant to the terms of a Credit Agreement dated April 9, 2008 (the "Credit Agreement"), and the use of a subordinated credit facility with Northwestern Mutual Life Insurance Company ("NML") pursuant to the terms of the Securities Purchase and Guaranty Agreement of the same date (the "SPGA").  Copies of the Credit Agreement and the SPGA are attached to the Avila Declaration as Exhibits B and F, respectively.

Pursuant to the terms of an executed Security Agreement between Debtors and Senior Secured Lenders, as security for the advances under the Credit Agreement, the Debtors granted the Senior Secured Lenders a security interest in substantially all of the Debtors' assets.  Copies of the Security Agreement and the UCC-1 Financing Statement filed by the Bank of America, N.A., the former Administrative Agent and Collateral Agent for the Senior Secured Lenders, for each of the Debtors, are attached to the Avila Declaration as Exhibits C and D, respectively.  In addition, Luxe Beauty Holdings Corporation (the "Parent"), Midco and Ecoly guaranteed repayment of advances under the Credit Agreement.  As of the date hereof, the outstanding pre-petition amount owing under the Credit Agreement is not less than $62,580,138.16.  The Senior Secured Lenders assert valid, perfected and

enforceable security interest in all of the Debtors' assets, including assets that constitute "cash collateral" as defined in section 363(a) of the Bankruptcy Code (the "Cash Collateral").

**C.**    **The Operating Debtor's Need To Use Cash Collateral**

In order to continue to operate and preserve the value of its going concern enterprise, the Operating Debtor requires use of Cash Collateral, including the cash generated in the ordinary course of its operations. Attached hereto as Exhibit 2 is a 13-week cash budget prepared by the Operating Debtor (the "Budget"). The Budget sets forth the Operating Debtor's anticipated cash needs through mid-March 2011, and may be amended or modified during the interim period until a final hearing on the Motion can be held. As set forth in the Budget, the Operating Debtor requires cash for, among other things: (1) payroll, (2) office expenses, (3) purchasing inventory, and (4) other ordinary course obligations. With respect to the purchase of inventory, the Operating Debtor historically has contracted with independent facilities that manufacture and package the Operating Debtor's products, and the Operating Debtor intends to continue that practice post-petition.

Because budget projections are forward-looking, they can never be entirely accurate. Thus, to protect the Operating Debtor against unpredictable fluctuations in expenses and costs, the Operating Debtor requests that, to the extent it is permitted to use Cash Collateral subject to the Budget, it be permitted the flexibility to increase expenditures by up to 15% for any particular line item in the Budget, or 10% in the aggregate. Under this structure, the Operating Debtor will have the flexibility to operate its business without disruption.

**D.**    **Proposed Adequate Protection For The Use of Cash Collateral**

Subject to the protections afforded the Senior Secured Lenders under the Proposed Order, the Senior Secured Lenders have agreed to consent to the use of Cash Collateral to pay (i) the Operating Debtor's operating expenses, (ii) the allowable 506(b) claims and (iii) the post-petition charges identified in the Budget. The principal terms of the agreement allowing for the use of Cash Collateral are set forth in detail in the Proposed Order and are summarized below. To the extent the summary language below is ambiguous or contradicts the Proposed Order, the language of the Proposed Order controls. For the purpose of this section, all capitalized terms, not otherwise defined in this Motion, shall have the meaning ascribed thereto in Exhibit A, attached to the Proposed Order.

The procedure for the use of Cash Collateral, as agreed upon by the Senior Secured Lenders and the Operating Debtor, provides that the Operating Debtor will retain the Cash Collateral in its possession and any additional Cash Collateral generated from the operation of its business up to a Minimum Cash Threshold, which threshold amount should be sufficient to allow the Operating Debtor to continue to operate its business without interruption.  The Operating Debtor shall deposit any Cash Collateral in excess of the Minimum Cash Threshold in a Blocked Account under the control of the Prepetition Agent.  The Operating Debtor is authorized to use all of the Cash Collateral to fund Budget expenses, subject to the terms of the Proposed Order.  Except as provided in the Proposed Order, the Operating Debtor will not otherwise seek to use Cash Collateral, unless (i) it satisfies Bankruptcy Code section 363 and the Senior Secured Lenders consent to such order, (ii) there is no obligation of the Senior Secured Lenders to extend Postpetition Debt, or (iii) Cash Collateral has been provided to Prepetition Agent in an amount sufficient to enable Postpetition Agent to repay in full all outstanding Postpetition Debt plus all outstanding Postpetition Charges.

In connection with the Senior Secured Lenders' consent to the use of Cash Colalteral, the Proposed Order provides the following findings:

- The Prepetition Liens of the Senior Secured Lenders shall constitute Priority Liens (subject only to Permitted Priority Liens);
- The Prepetition Debt constitutes a legal, valid and binding obligation of the Debtors;
- No offsets, defenses or counterclaims to the Prepetition Debt exist; and
- The Senior Secured Lenders' prepetition claim with respect to the Prepetition Debt constitutes an allowed secured claim within the meaning of Bankruptcy Code section 506.

To provide adequate protection for the Senior Secured Lenders, the Proposed Order provides that:

- The Senior Secured Lenders will be granted Replacement Liens as security for the payment of the Prepetition Debt.
- The Operating Debtor shall make all interest payments in respect of the Prepetition Debt that accrued prior to the Filing Date and will accrue subsequent to the Filing Date;

- To the extent the Prepetition Collateral is insufficient to adequately protect the interests of the Senior Secured Lenders, they shall have an allowable claim under Bankruptcy Code section 507(b), with priority over administrative costs and expenses of the case and claims of any other party in interest under 507(b).

**E.**    **Incurring Post-Petition Debt and the Need for Post-Petition Financing**

As of the Petition Date, the actual and projected income to the Operating Debtor generated from the sales of its products is not likely sufficient to cover the Operating Debtor's business operations post-petition, with the additional costs of effectuating the restructuring. Over the next thirteen weeks, as set forth in the Budget, the Operating Debtor anticipates that it will need to borrow at least $3.2 million under the DIP Agreement (as defined below) to continue to operate as a going concern and preserve value. Fluctuations in the market and unforeseen business circumstances could lead to additional cash flow requirements. In addition to the projected cash flow needs, to instill confidence in the Operating Debtor's creditors, vendors, customers, employees and other parties in interest, the Operating Debtor desires to have debtor-in-possession financing in place to draw upon in the event of an emergency or an unexpected adverse change in its business. As provided for in the DIP Agreement, the cost of establishing a $5 million DIP financing facility with the DIP Lenders will be $100,000. The Operating Debtor believes this cost is reasonable considering the benefits to the Debtors' Estates of having such financing available.

Concurrent with the filing of this Motion and subject to the Court's approval, the Operating Debtor, the Postpetition Guarantors, BMO and certain other lenders that may become party thereto from time to time (collectively, the "DIP Lenders") have negotiated, and are prepared to execute a Debtor-In-Possession Credit Agreement (the "DIP Agreement"), on the terms set forth in the Proposed Order, and the Debtor-In-Possession Security Agreement (the "DIP Security Agreement"). A true and correct copy of the DIP Agreement, the DIP Security Agreement, the detailed disclosures required by FRBP Rules 4001(b) and 4001(c) and Local Bankruptcy Rule 4001-2, are attached hereto as Exhibits 3, 4, 5, 6, and 7, respectively. Without acquiring post-petition financing, the Operating Debtor may not be able to continue to operate its business in the ordinary course and consummate a plan of

reorganization to maximize recovery for its creditors and stakeholders.

**F.**     **Proposed Agreement to Incur Post-Petition Debt**

Subject to the Proposed Order, the DIP Lenders have agreed to authorize the Debtors to incur post-petition debt and enter into a post-petition credit agreement.   The principal terms of the DIP Agreement are set forth in detail in the Proposed Order and are summarized below.  To the extent the summary language below is ambiguous or contradicts the Proposed Order, the language of the Proposed Order controls.  For the purpose of this section, all capitalized terms, not otherwise defined in this Motion, shall have the meaning ascribed thereto in Exhibit A to the Proposed Order.

- In the event that the Operating Debtor has insufficient Cash Collateral available, the Operating Debtor will be allowed to incur Postpetition Debt to pay expenses and allowable claims as set forth in the Budget.

- If the DIP Lenders advance money to the Operating Debtor and the money is not used in accordance with the terms of the Proposed Order, such advances shall still be considered Postpetition Debt.

- The DIP facility shall have an interim borrowing limit of $2,500,000 and a final maximum borrowing limit of $5,000,000.

- Advances under the DIP facility shall accrue interest at a rate equal to the Base Rate (as defined in the DIP Agreement), plus 5.0% per annum and shall be payable monthly.

- All Postpetition Debt will mature and become due on the Termination Date.

- The Guaranty, as set forth in the DIP Agreement, shall remain in effect notwithstanding the entry of the Proposed Order and each Guarantor shall remain jointly and severally liable on the Postpetition Debt.

- The Postpetition Debt will be granted superpriority administrative expense status under Bankruptcy Code section 364(c)(1).

- The Postpetition Debt will be secured by the Postpetition Liens granted to the DIP Lenders, which, in addition to other terms set forth in paragraph 3(d) of the Proposed Order, are priority liens pursuant to Bankruptcy Code sections 364(c)(2) and (c)(3)(subject only to Prepetition Liens and Permitted Priority Liens).

- The Debtors will not incur, or seek to incur, additional debt secured by a lien equal or superior to the Prepetition Liens, Postpetition Liens or which is given superpriority administrative status, unless either (1) in addition to complying with Bankruptcy Code section 364, the DIP Lenders consent or (2) at the time an order approving such additional debt is entered, (x) Postpetition Agent has no obligation to extend Postpetition Debt, (y) Cash Collateral has been provided to Prepetition Agent in an amount sufficient to enable Postpetition Agent to repay in full all outstanding Postpetition Debt plus all outstanding Postpetition Charges, and (z) effective upon entry of the Final Order, the Aggregate Debt is paid in full in cash.

- The repayment of the Postpetition Debt and the Prepetition Debt shall be subject to the terms of any subordination agreement, intercreditor agreement or other agreement among lenders consented to in writing by Agents, the Prepetition Lenders and the Postpetition Lenders.

1.    <u>Further Terms Related to the Use of Cash Collateral and Consent to Incur Post-Petition Debt</u>

Unless extended by the Court, the consent of the Senior Secured Lenders for the Operating Debtor's use of Cash Collateral and the agreement to extend Postpetition Debt will automatically terminate on the Termination Date.  On such date, all Prepetition Debt, all of which shall be an administrative expense, shall immediately become due and, at the Postpetition Agent's election, the Postpetition Debt shall be immediately due and payable in full.  On the Termination Date, the Operating Debtor must cease use of all Cash Collateral, any of which in the Agents possession may be applied to the Prepetition Debt or the Postpetition Debt.  Five business days following the Termination Date, the Agents will have automatic and immediate relief from the automatic stay, shall be entitled to exercise all rights and remedies available to them, and the Operating Debtor shall surrender to the Agents all Prepetition and Postpetition Collateral and cooperate with the Agents in the exercise of Agents' rights, including the right on behalf of the Lenders to sell such collateral.  However, the Debtors may seek an order from the Court determining that an Event of Default did not occur.

The Operating Debtor may use Cash Collateral and funds advanced under the DIP Agreement

facility to pay the professionals employed by the estate, but such fees shall be, among other things, paid out of the prepetition retainers before payments are made from the Postpetition Debt or Aggregate Collateral.  No Postpetition Debt or Aggregate Collateral may be used to pay any professional of the estate in connection with claims adverse to the Agents or Lenders.  Further, the Operating Debtor shall, upon request by the Postpetition Agent, provide a written estimate of unpaid professional fees and costs and an estimate of professional fees and costs for the upcoming 30-day period.  The Operating Debtor also agrees that there shall be no surcharge of the Aggregate Collateral for any purpose, unless agreed to by the Agents and Lenders.

Any party in interest (other than the Debtors) may determine whether a basis exists to challenge the Prepetition Debt, Prepetition liens or any other claims or causes of action against the Senior Secured Lenders during the Investigation Period, which is the earlier of: (1) 75 days after the Filing Date, (2) 60 days after the date that any committee is formed, and (3) the effective date of any chapter 11 plan confirmed in the Cases.  Any challenge must comply with the Challenge Procedure set forth in paragraph 8(a) of the Proposed Order.  In connection with any sale of the Operating Debtor's assets the Agents shall have the right to use the Prepetition Debt and Postpetition Debt to credit bid with respect to any bulk or piecemeal sale of its assets.  No order confirming a plan may be entered in the case unless it provides for the complete repayment of the total debt owed to the Agents and the Lenders.  Furthermore, the Agents, Lenders and Aggregate Collateral shall not be subject to the doctrine of marshaling, all Postpetition Charges shall be paid by the Debtors in accordance with the Proposed Order and the Debtors shall indemnify the Agents and Lenders in accordance with the DIP Agreement and Prepetition Credit Agreement.

## II.

## ARGUMENT

**A.    The DIP Agreement Should Be Approved On An Interim Basis On The Terms Proposed**

The DIP Agreement should be approved because the availability of the DIP facility is in the best interests of the Debtors' estates, the terms thereof are fair and reasonable and satisfy the requirements of section 364(c) of the Bankruptcy Code.  If a debtor-in-possession is unable to obtain

credit on an unsecured basis, it may seek approval to obtain credit or incur debt with an administrative

expense "superpriority," secured by a first priority lien on property of the estate that is not otherwise

subject to a lien, or secured by a junior lien on property of the estate that is subject to an existing lien.

11 U.S.C. § 364(c).  It is well-established that the "statute imposes no duty to seek credit from every

possible lender before concluding that such credit is unavailable."  *See, e.g., Bray v. Shenandoah*

*Savings and Loan Association (In re Snowshoe Co., Inc.)*, 789 F.2d 1085, 1088 (4th Cir. 1986).

Rather, in determining whether to approve a post-petition financing transaction, the Court should give

broad deference to the business decision of a chapter 11 debtor, particularly with respect to a debtor's

business judgment regarding the need for and proposed use of funds.  *See, e.g., In re Simasko*

*Production Co.*, 47 B.R. 444, 448-9 (D. Co. 1985) (authorizing interim financing agreement where

debtor's best business judgment indicated financing was necessary and reasonable for the benefit of the

estate); *In re Ames Dept. Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to post-petition

credit, courts "permit debtors in possession to exercise their basic business judgment consistent with

their fiduciary duties").  FRBP Rule 4001(c)(2) provides that the court may conduct an interim hearing

on less than 14 days notice, and, at such hearing, "may authorize the obtaining of credit only to the

extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing."

Further, FRBP Rule 4001(c)(2) provides that the court may conduct a final hearing on the motion 14

days after service of the motion.

The Debtors have demonstrated the need and the benefits of the proposed post-petition

financing under the circumstances of this case.  Post-petition financing will allow the Operating Debtor

to continue its business operations uninterrupted, which will enable the Operating Debtor to maximize

the value of the business as a going concern with the goal of a successful reorganization.  The

Operating Debtor does not believe it can obtain postpetition financing on better terms than the DIP

Agreement.  While the Operating Debtor has received two other offers for debtor-in-possession

financing, as more fully discussed below, one precluded the pursuit of the proposed plan of

reorganization currently before the Court, and the other would have tainted the proposed plan process.

Specifically, NML also offered debtor-in-possession financing to the Operating Debtor

pursuant to Bankruptcy Code section 364(c), the term sheet for which is attached to the Avila

Declaration as Exhibit P.  However, the current form of NML's proposed debtor-in-possession

financing prohibits the Operating Debtor from entering into an agreement with the current plan sponsor

(the "Plan Sponsor") to effect the consummation of the proposed plan of reorganization (the "Plan").[1]

Moreover, given NML's prior threat of litigation against the Plan Sponsor, any future debtor-in-

possession financing proposal by NML would also likely prevent the proposed Plan.  As such, any

NML debtor-in-possession financing would almost certainly prevent the Operating Debtor from

maximizing the value of the estate for all stakeholders.

Additionally, in conjunction with previous negotiations regarding an asset sale process, the Plan

Sponsor offered to allow the Operating Debtor to use the Plan Sponsor's $2.3 million deposit that

would have been made in connection with the potential asset sale as debtor-in-possession financing on

a super-priority administrative basis.  Not only was such deposit less than half the amount provided

under the DIP Agreement and not likely to cover the expenses over the next thirteen weeks (13), but

the Operating Debtor's use of such debtor-in-possession financing would have made the Plan Sponsor

a super-priority administrative creditor, which may have created unforeseen issues in the sale process.

Moreover, it would likely have taken significant time to negotiate an acceptable agreement with the

Plan Sponsor.

After considering all reasonably available options, the Operating Debtor determined that the

DIP Agreement was the best option available.  Therefore, having satisfied the requirements of section

364(c), and having exercised reasonable business judgment in negotiating the terms of the DIP

Agreement, the Debtors should be authorized to enter into the DIP Agreement on an interim basis

pending a final hearing.

**B.**      **The Court Should Authorize The Use Of Cash Collateral**

      1.      The Court Should Authorize The Operating Debtor's Use Of Cash Collateral Because
          The Senior Secured Lenders Have Given Their Consent

---

1 NML's proposed debtor in possession financing also contained several other objectionable terms.

The Court should authorize the Operating Debtor's use of Cash Collateral because BMO has consented to such use in the ordinary course of the Operating Debtor's business.  Section 363(c)(1) of the Bankruptcy Code authorizes a debtor-in-possession to enter into transactions and to use property of the estate in the ordinary course of business.  Section 363(c)(2), however, prohibits a debtor-in-possession's use of cash collateral under subsection (c)(1) unless each entity that has an interest in such cash collateral consents or the Bankruptcy Court authorizes such use, sale, or lease after notice and a hearing.

The Operating Debtor has obtained the consent of the Senior Secured Lenders to use the Cash Collateral pursuant to a prepared budget and the terms of the Proposed Order.  *See* Stratton Declaration filed concurrently herewith.  Because the Senior Secured Lenders have consented to the Operating Debtor's use of the Cash Collateral in the ordinary course of business, such use is allowed and should be approved pursuant to section 363(c)(2).

2.    The Court May Authorize Use Of Cash Collateral On An Interim And Emergency Basis

The Court may authorize the Operating Debtor's interim use of Cash Collateral to avoid immediate and irreparable harm to the Operating Debtor's business and estate.  Pursuant to FRBP 4001(b)(2), the Court may commence a final hearing on a motion for authorization to use cash collateral no earlier than 14 days after service of the motion, but, before the 14 day period expires, the court may conduct a preliminary hearing to authorize the use of cash collateral to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing. *See generally, In re Center Wholesale, Inc.*, 759 F.2d 1440, 1449 n.21 (9th Cir. 1985) (discussion of importance of emergency relief granting use of cash collateral at the commencement of a case).

As set forth above, it is critical that the Operating Debtor be authorized to pay its expenses, pursuant to the Budget, immediately and uninterrupted in the ordinary course of its business.  Most significantly, the Operating Debtor has a payroll due on December 24, 2010] and must continue to pay for inventory to generate new accounts receivable.  This includes payment for the purchase and packaging of inventory in accordance with the terms of its agreements with the independent manufacturing facilities.  Without the use of Cash Collateral, the development, manufacturing and

shipment of inventory will cease.  If the Operating Debtor is not permitted to pay its employees and the other critical expenses immediately and in the ordinary course of its business, the Operating Debtor likely will be required to cease operations temporarily, which will be extremely damaging, if not fatal, to the Operating Debtor's business. Therefore, the Operating Debtor's interim use of Cash Collateral is necessary to avoid immediate and irreparable harm to the Operating Debtor and its bankruptcy estate.

Under the circumstances, the Operating Debtor requests that the Court set a final hearing as soon as the Court's calendar permits on a date approximately twenty-one (21) days from the date of the service of the Motion, and authorize the Operating Debtor to use Cash Collateral in accordance with the Budget on an interim basis pending a final hearing.

## C.  **The Protections Afforded The Senior Secured Lenders Are Reasonable And Necessary**

The Proposed Order and DIP Agreement provide the Senior Secured Lenders adequate protection of their interest in the Cash Collateral in the form of replacement liens and payment of interest, fees, costs and other charges in respect to the prepetition debt and all allowable 506(b) amounts.  Moreover, the Postpetition Agent is authorized to cause such amounts to be paid by making advances under the DIP Agreement.  These protections are reasonable and necessary to induce the Senior Secured Lenders to consent to the use of Cash Collateral for the benefit of the Debtors' Estates. Section 363(e) provides that a court may condition the debtor-in-possession's use of cash collateral on the debtor-in-possession providing "adequate protection" of the secured party's interest in the collateral being used.  Section 361 states that, when adequate protection is required under section 363, such adequate protection may be satisfied by providing the lender with an additional or replacement lien to the extent that the proposed use of the estate's property results in a decrease in the value of the lender's interest in such property.  The type of adequate protection that is appropriate in a particular case will depend on the nature of the case.  *See In re O'Connor*, 808 F.2d 1393, 1396-97 (10th Cir. 1987) ("Adequate protection [is] a concept which is to be decided flexibly on the proverbial case-by-case basis.").

In this case, the Operating Debtor requires the use of the Cash Collateral to continue its business operations.  The Operating Debtor has agreed to offer the Senior Secured Lenders adequate protection in the form of first priority liens in the Debtor's Postpetition Collateral granted to the

Prepetition Agent.  By granting such replacement liens in favor of the Senior Secured Lenders as adequate protection, the Operating Debtor offers security to the Senior Secured Lenders with respect to their interest in the Cash Collateral and is able to maintain the liquidity necessary to meet its business needs, including payroll obligations.

Thus, in consideration for the use of the Cash Collateral, the Operating Debtor requests that the Court enter an order providing the Senior Secured Lenders with replacement liens on all the assets of the Operating Debtor in the form of first priority liens in the Debtor's Postpetition Collateral granted to the Prepetition Agent.  The grant of this replacement lien and the payment of the prepetition interest adequately protect the Senior Secured Lenders' security interests in the Operating Debtor's assets under section 361.  Accordingly, the Court may approve the use of the Cash Collateral pursuant to sections 363(c) and 363(e) of the Bankruptcy Code.

## IV.

## CONCLUSION

**WHEREFORE**, the Debtors request that the Bankruptcy Court enter an Order:

A.      Authorizing the Debtors to enter into the post-petition financing agreement on an interim basis;

B.      Approving the use of Cash Collateral on an interim basis;

C.      Granting the Senior Secured Lenders replacement liens as adequate protection for the use of Cash Collateral;

///

///

///

D.      Setting a final hearing to consider approval of the post-petition financing agreement

and the use of the Cash Collateral on a final basis in approximately twenty-one (21) days from the

date of service of the Motion; and

E.      Granting such other and further relief as may be appropriate under the circumstances.

Dated: December 21, 2010                    PEITZMAN, WEG & KEMPINSKY LLP

By:      ____/s/ Scott F. Gautier_____
                                                    Scott F. Gautier
                                                    Lorie A. Ball
                                                    Thor D. McLaughlin
                                        Proposed Attorneys for Debtors and Debtors in Possession

Exhibit 1

1  Scott F. Gautier (State Bar No. 211742)
   *sgautier@pwkllp.com*
2  Lorie A. Ball (State Bar No. 210703)
   *lball@pwkllp.com*
3  Thor D. McLaughlin (State Bar No. 257864)
   *tmclaughlin@pwkllp.com*
4  PEITZMAN, WEG & KEMPINSKY LLP
   10100 Santa Monica Boulevard, Suite 1450
5  Los Angeles, CA  90067
   Telephone: (310) 552-3100
6  Facsimile: (310) 552-3101

7  Proposed Attorneys for Debtor and Debtor in
   Possession

8              UNITED STATES BANKRUPTCY COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10             SAN FERNANDO VALLEY DIVISION

11 | In re: | Case No.: |

   SEXY HAIR CONCEPTS, LLC,            Chapter 11
12
           Debtor and Debtor in Possession.   **ORDER AUTHORIZING THE DEBTORS TO:**
13                                             **(A) USE CASH COLLATERAL PENDING A**
                                               **FINAL HEARING; (B) INCUR**
14                                             **POSTPETITION DEBT PENDING A FINAL**
                                               **HEARING; AND (C) GRANT ADEQUATE**
15                                             **PROTECTION AND PROVIDE SECURITY**
                                               **AND OTHER RELIEF TO**
16                                             **BANK OF MONTREAL, AS AGENT, AND**
                                               **THE LENDERS**
17

18                                             Hearing:

19                                             Date:  To Be Scheduled by the Court
                                               Time:  To Be Scheduled by the Court
20                                             Place: Courtroom ___
                                                      21041 Burbank Blvd.
21                                                    Woodland Hills, CA

22

23         This matter came before this Court on the motion (the "Motion") of Sexy Hair Concepts, LLC

24 (the "Operating Debtor"), Ecoly International, Inc. ("Ecoly") and Luxe Beauty Midco Corporation

25 ("Midco"; Ecoly and Midco, collectively, the "Postpetition Guarantors"; the Operating Debtor and the

26 Postpetition Guarantors, collectively, the "Debtors") requesting that this Court enter an order

27 authorizing:  (a) the Operating Debtor to use certain Cash Collateral pending a Final Hearing; (b) the

28 Debtors to incur Postpetition Debt pending a Final Hearing; and (c) the Debtors to grant adequate

                                          1

Exhibit 1 - 17

1  protection and provide security and other relief to Bank of Montreal ("BMO"), in its capacity as

2  administrative agent ("Prepetition Agent") for the lenders party to the Prepetition Credit Agreement

3  ("Prepetition Lenders"), and BMO in its capacity as administrative agent ("Postpetition Agent";

4  together with Prepetition Agent, "Agents") for the lenders party to the Postpetition Credit Agreement

5  ("Postpetition Lenders"; together with Prepetition Lenders, the "Lenders").  Unless otherwise indicated,

6  all capitalized terms used as defined terms herein have the meanings ascribed thereto in Exhibit A

7  attached hereto and by this reference are made a part hereof.

8       This Order shall constitute findings of fact and conclusions of law pursuant to Fed. R. Bankr.

9  P. 7052 and shall take effect and be fully enforceable as of the Filing Date.

10       Having examined the Motion, being fully advised of the relevant facts and circumstances

11  surrounding the Motion, and having completed a hearing pursuant to Code §§ 363 and 364 and Fed. R.

12  Bankr. P. 4001(b) and (c), and objections, if any, having been withdrawn, resolved or overruled by the

13  Court, **THE MOTION IS GRANTED, AND THE COURT HEREBY FINDS THAT:**

14      A.    On the Filing Date, each Debtor filed a voluntary petition for relief under chapter 11 of

15  the Code.  Each Debtor has retained possession of its property and continues to operate its business as a

16  debtor in possession pursuant to Code §§ 1107 and 1108.

17      B.    The Court has jurisdiction over the Cases and this proceeding pursuant to 28 U.S.C. §

18  1334.  Determination of the Motion constitutes a core proceeding as defined in 28 U.S.C. § 157(b)(2).

19  Venue over this Motion is proper under 28 U.S.C. § 1409(a).

20      C.    No Committee has been appointed in any Case.

21      D.    Subject to Paragraph 8 of this Order, each Debtor admits, stipulates and agrees that:

22         1.    the Prepetition Documents evidence and govern the Prepetition Debt, the

23  Prepetition Liens and the prepetition financing relationship among the Debtors, Prepetition Agent and

24  Prepetition Lenders;

25         2.    the Prepetition Debt constitutes the legal, valid and binding obligation of the

26  Debtors, enforceable in accordance with the terms of the Prepetition Documents;

27         3.    as of the Filing Date, the Debtors are liable for payment of the Prepetition Debt,

28  and the Prepetition Debt shall be an allowed secured claim in an amount not less than $62,580,138.16,

Exhibit 1 - 18

exclusive of accrued and accruing Allowable 506(b) Amounts;

4.    no offsets, defenses or counterclaims to the Prepetition Debt exist, and no portion of the Prepetition Debt is subject to contest, objection, recoupment, defense, counterclaim, offset, avoidance, recharacterization, subordination or other claim, cause of action or challenge of any nature under the Code, under applicable non-bankruptcy law or otherwise;

5.    the Prepetition Liens are Priority Liens, subject to other Permitted Priority Liens, and secure payment of all of the Prepetition Debt;

6.    upon the entry of this Order, Prepetition Agent's interests in the Prepetition Collateral will be adequately protected, and for purposes of Code §§ 506(c) and 507(b) and Fed. R. Bankr. P. 3012, as of the Filing Date, the value of the Prepetition Lenders' interest in the Prepetition Collateral was not less than $68,838,151.98; provided, however, that nothing herein shall prejudice Prepetition Agent's and any Prepetition Lender's right to later:  (1) assert that their respective interests in the Prepetition Collateral lack adequate protection; and (2) seek a higher valuation of the Prepetition Collateral; and

7.    The Debtors do not have, and hereby release, and are forever barred from bringing any claims, counterclaims, causes of action, defenses or setoff rights relating to the Prepetition Documents, the Prepetition Liens, the Prepetition Debt or otherwise, against the Prepetition Agent, the Prepetition Lenders and their respective affiliates, subsidiaries, agents, officers, directors, employees, advisors, consultants, predecessors in interest, successors and assigns.

E.    Prepetition Agent and Prepetition Lenders have consented to the terms of this Order and are entitled to the protections afforded a party acting in "good faith" under Code § 363(m), and adequate protection as set forth herein pursuant to Code §§ 361, 362, 363 and 364 for any decrease in the value of such interests in the Prepetition Collateral from and after the Filing Date.

F.    The Operating Debtor needs to use Cash Collateral and incur Postpetition Debt as provided herein through the conclusion of the Final Hearing, in order to prevent immediate and irreparable harm to its estate and minimize disruption to and avoid the termination of its business operations.  Entry of this Order will also enhance the possibility of maximizing the value of the Operating Debtor's business in connection with the consummation of a plan of reorganization under

3

Exhibit 1 - 19

chapter 11 of the Code.

G.     The Debtors are unable to obtain unsecured credit allowable under Code § 503(b)(1) sufficient to finance the operations of the Operating Debtor's business. Except as provided below, the Debtors are unable to obtain credit allowable under Code §§ 364(c)(1), (c)(2) or (c)(3) on terms more favorable than those offered by Postpetition Agent and Postpetition Lenders.

H.     The terms of the Postpetition Debt have been negotiated at arm's length, and the Postpetition Debt is being extended in good faith, as that term is used in Code § 364(e).

I.     The terms and conditions of the Postpetition Documents are fair and reasonable, the best available under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and consideration.

J.     Under the circumstances of each Case, this Order is a fair and reasonable response to the Debtors' request for Agents' and Lenders' consent to the use of Cash Collateral by the Operating Debtor and the provision of Postpetition Debt, and the entry of this Order is in the best interest of each Debtor's estate and its creditors.

K.     The notice provided by the Debtors of the Motion, the hearing on the Motion, and the entry of this Order satisfy the requirements of Fed. R. Bankr. P. 2002, 4001(b) and (c) and 9014 and Code §§ 102(1), 363, 364(c) and were otherwise sufficient and appropriate under the circumstances.

**WHEREFORE, IT IS HEREBY ORDERED THAT THE MOTION IS GRANTED, AND THAT:**

1.     <u>Authorization to Use Cash Collateral.</u> The Operating Debtor is authorized to use Cash Collateral solely in accordance with the terms and provisions of this Order, to the extent required to pay when due those expenses enumerated in the Budget, including the Carveout, and to pay Allowable 506(b) Amounts.

2.     <u>Procedure for Use of Cash Collateral.</u>

    (a)     <u>Delivery of Cash Collateral to Postpetition Agent.</u> Each Debtor shall deposit all Cash Collateral in excess of the Minimum Cash Threshold now or hereafter in its possession or control into the Blocked Account (or otherwise deliver such Cash Collateral to Postpetition Agent in a manner satisfactory to Postpetition Agent) promptly upon receipt thereof. Agents authorize the

Exhibit 1 - 20

Operating Debtor to use Cash Collateral, in lieu of incurring Postpetition Debt, to fund Budget

expenses, subject to the terms and conditions of this Order.

(b)     Cash Collateral in Agents' or Lenders' Possession. Postpetition Agent is

authorized to collect upon, convert to cash and enforce checks, drafts, instruments and other forms of

payment now or hereafter coming into its or any Lender's possession or control which constitute

Aggregate Collateral or proceeds thereof.

(c)     Application of Cash Collateral. Except as Postpetition Agent may

otherwise elect and subject to the terms of the Agreement Among Lenders, upon entry of this Order,

Agent is authorized to apply all Cash Collateral now or hereafter coming into Agent's or any Lender's

possession or control as follows:  (1) first, to payment of the Postpetition Debt in respect of any

Postpetition Charges due to Agent, until paid in full; (2) second, ratably to pay the Postpetition Debt in

respect of any other Postpetition Charges then due the Postpetition Lenders; (3) third, solely for the

period prior to the Termination Date, payments of Allowable 506(b) Amounts permitted pursuant to

Section 4(c) hereof, and (4) fourth, to the payment of principal of the Postpetition Debt and (5) fifth, to

the payment of all other Obligations under the Postpetition Agreement.  All such applications shall be

final, subject only to the right of parties in interest to seek a determination in accordance with

Paragraph 8 below that such applications to any Prepetition Debt resulted in the payment of any

unsecured prepetition claim of Prepetition Agent and Prepetition Lenders.  Any amounts disgorged in

connection with any such objection or determination shall be first applied to reduce the Postpetition

Debt, dollar-for-dollar, to the extent incurred by reason of repayment of the Prepetition Debt as

authorized hereunder.  All applications to Postpetition Debt shall be final and not subject to challenge

by any person, including any Trustee.

(d)     Prohibition Against Use of Cash Collateral. Except as provided for in

this Order, the Debtors may not use or seek to use Cash Collateral, unless, in addition to the

satisfaction of all requirements of Code § 363, (1) Agents have consented to such order; or (2) at the

time such order is entered, (x) Postpetition Agent has no obligation to extend Postpetition Debt and

(y) Cash Collateral has been provided to Prepetition Agent in an amount sufficient to enable

Postpetition Agent to repay in full all outstanding Postpetition Debt plus all outstanding Postpetition

Exhibit 1 - 21

Charges.

3.    Authorization To Incur Postpetition Debt.

(a)    Postpetition Documents.  The Debtors are hereby authorized and have agreed to:  (1) execute the Postpetition Documents, including all documents that Postpetition Agent and Postpetition Lenders find reasonably necessary to implement the transactions contemplated by the Postpetition Documents; and (2) perform their obligations under and comply with all of the terms and provisions of the Postpetition Documents and this Order.  Upon execution and delivery thereof, the Postpetition Documents shall constitute valid and binding obligations of the Debtors enforceable in accordance with their terms.  To the extent there exists any conflict among the terms of the Motion, the Postpetition Documents, and this Order, this Order shall govern and control.

(b)    Permitted Uses of Postpetition Debt.  To the extent that there is insufficient Cash Collateral, the Operating Debtor is authorized and has agreed to incur Postpetition Debt solely:  (1) in accordance with the terms and provisions of this Order, (2) to the extent required to pay those expenses enumerated in the Budget, including the Carveout, as and when such expenses become due and payable, subject to the Permitted Variance, and (3) prior to the Termination Date, to pay Allowable 506(b) Amounts.  If Postpetition Lenders advance monies to the Operating Debtor and the Operating Debtor uses such monies other than in accordance with the terms or provisions of this Order, such advances shall be considered Postpetition Debt for purposes of this Order.

(c)    Additional Terms of Postpetition Debt.

(i)    Maximum Amount.  The maximum principal amount of Postpetition Debt outstanding shall not at any time exceed $5,000,000.00, excluding Postpetition Charges; provided, however, that pending the Final Hearing, the maximum principal amount of Postpetition Debt outstanding shall not at any time exceed the Interim DIP Amount.

(ii)    Interest.  The Postpetition Debt shall bear interest at a per annum rate equal to (i) the Base Rate (as such terms is defined in the Postpetition Credit Agreement) plus (ii) 5.00% per annum, and shall be payable monthly.

(iii)    Closing Fee.  The Operating Debtor shall pay to Postpetition Agent, for the benefit of Postpetition Lenders, a closing fee (the "Closing Fee") in an amount equal to

6

Exhibit 1 - 22

1    $100,000.00, of which (1) $50,000.00 shall be fully earned, due and payable immediately upon the

2    closing of the Postpetition Credit Agreement, and (2) $50,000.00 shall be fully earned, due and payable

3    upon entry of the Final Order.

4                            (iv)    Maturity.  The Postpetition Debt shall mature and be due and

5    payable in full by the Debtors on the Termination Date.

6                            (v)    Prepetition Guarantors.  The Prepetition Guaranty and all related

7    security documents shall remain in full force and effect notwithstanding the entry of this Order and any

8    subsequent orders amending this Order or otherwise providing for the use of Cash Collateral consented

9    to by Agents and Lenders pursuant to Code § 363 or additional financing by Postpetition Agent and

10   Postpetition Lenders pursuant to Code § 364.  Each Prepetition Guarantor is and shall remain liable,

11   jointly and severally with each other Prepetition Guarantor, for the guaranteed obligations under the

12   Prepetition Guaranty, including, without limitation, all Postpetition Debt, and any refinancing thereof.

13   As a condition precedent to making any loans available to the Debtors under the Postpetition Credit

14   Agreement, the Debtors shall provide Postpetition Agent with reaffirmation of each Prepetition

15   Guaranty in accordance with the foregoing (other than from Luxe Beauty Holdings Corporation).

16                           (d)    Superpriority Administrative Expense Status; Postpetition Liens.  The

17   Postpetition Debt is hereby granted superpriority administrative expense status under Code § 364(c)(1),

18   with priority over all costs and expenses of administration of the Cases that are incurred under any

19   provision of the Code.  In addition, Postpetition Agent is hereby granted the Postpetition Liens, for the

20   benefit of Postpetition Lenders to secure the Postpetition Debt.  The Postpetition Liens:  (1) are in

21   addition to the Prepetition Liens; (2) pursuant to Code §§ 364(c)(2) and (c)(3) are Priority Liens

22   (subject only to Permitted Priority Liens) without any further action by the Debtors or Postpetition

23   Agent and without the execution, filing or recordation of any financing statements, security

24   agreements, mortgages or other documents or instruments; (3) shall not be subject to any security

25   interest or lien which is avoided and preserved under Code § 551; (4) shall remain in full force and

26   effect notwithstanding any subsequent conversion or dismissal of any of the Cases; (5) shall not be

27   subject to Code § 510(c); (6) upon approval of the Final Order, shall not be subject to, and shall have

28   priority over, any bank right of setoff arising after the Filing Date; and (7) upon approval of the Final

7

Exhibit 1 - 23

1    Order, shall not be subject to any landlord's lien, bailee's rights, right of distraint or levy, security

2    interest or other interest that any landlord, bailee, warehousemen or landlord's mortgagee may have in

3    the Aggregate Collateral located on such leased premises.  Notwithstanding the foregoing, each Debtor

4    shall execute and deliver to Postpetition Agent such financing statements, mortgages, instruments and

5    other documents as Postpetition Agent may request from time to time, and any such documents filed by

6    Postpetition Agent shall be deemed filed as of the Filing Date.  Further, Prepetition Agent shall serve

7    as agent for Postpetition Agent for purposes of perfecting Postpetition Agent's security interest in any

8    Postpetition Collateral that requires perfection by possession or control, and all Prepetition Third Party

9    Documents shall be deemed to be for the benefit of Postpetition Agent and Postpetition Lenders

10    without further action by any party.  Notwithstanding any provision of this Order relating to the

11    priority of the Postpetition Liens granted pursuant to Code § 364, the Prepetition Agent and Prepetition

12    Lenders have entered into the Agreement Among Lenders with respect to the Postpetition Agent and

13    Postpetition Lenders and the priority with respect to proceeds of the Aggregate Collateral and

14    repayment of the Aggregate Debt.  The Agreement Among Lenders shall constitute a subordination

15    agreement within the meaning of Code § 510.

16            (e)    Prohibition Against Additional Debt.  The Debtors may not incur or seek

17    to incur debt secured by a lien which is equal to or superior to the Prepetition Liens or the Postpetition

18    Liens, or which is given superpriority administrative expense status under Code § 364(c)(1), unless, in

19    addition to the satisfaction of all requirements of Code § 364:  (1) Agents have consented to such order;

20    or (2) at the time such order is entered, (x) Postpetition Agent has no obligation to extend Postpetition

21    Debt, (y) Cash Collateral has been provided to Postpetition Agent in an amount sufficient to enable

22    Postpetition Agent to repay in full all outstanding Postpetition Debt plus all outstanding Postpetition

23    Charges, and (z) effective upon entry of the Final Order, the Aggregate Debt is paid in full in cash.

24            4.    Adequate Protection of Interests of Prepetition Agent and Prepetition Lenders in

25    the Prepetition Collateral and the Prepetition Liens.  Prepetition Agent and Prepetition Lenders have

26    consented to the terms of this Order and are entitled to the protections afforded a party acting in "good

27    faith" under Code § 363(m) and §  364(e) and adequate protection as set forth herein and to the extent

28    required under Code §§ 361, 362, 363 or 364 (including for any decrease in the value of such interests

8

Exhibit 1 - 24

1   in the Prepetition Collateral from and after the Filing Date).

2          (a)     Priority of Prepetition Liens/Allowance of Prepetition Lenders' Claim.

3   Subject to the terms of Paragraph 8 of this Order: (1) the Prepetition Liens shall constitute Priority

4   Liens, subject only to the other Permitted Priority Liens; (2) the Prepetition Debt constitutes the legal,

5   valid and binding obligation of the Debtors, enforceable in accordance with the terms of the Prepetition

6   Documents; (3) no offsets, defenses or counterclaims to the Prepetition Debt exist, and no portion of

7   the Prepetition Debt is subject to avoidance, recharacterization or subordination pursuant to the Code

8   or applicable nonbankruptcy law; and (4) Prepetition Agent's and Prepetition Lenders' claim with

9   respect to the Prepetition Debt shall for all purposes constitute an allowed secured claim within the

10  meaning of Code § 506 in an amount not less than $62,580,138.16, exclusive of accrued and accruing

11  Allowable 506(b) Amounts.

12         (b)     Replacement Liens.  Prepetition Agent is hereby granted the

13  Replacement Liens, for the benefit of Prepetition Lenders, as security for payment of the Prepetition

14  Debt. The Replacement Liens:  (1) are and shall be in addition to the Prepetition Liens; (2) are and

15  shall be properly perfected, valid and enforceable liens without any further action by the Debtors or

16  Prepetition Agent and without the execution, filing or recordation of any financing statements, security

17  agreements, mortgages or other documents or instruments; and (3) shall remain in full force and effect

18  notwithstanding any subsequent conversion or dismissal of any of the Cases.  Notwithstanding the

19  foregoing, the Debtors are authorized to and shall execute and deliver to Prepetition Agent such

20  financing statements, mortgages, instruments and other documents as Prepetition Agent may request

21  from time to time in respect of the Replacement Liens.

22         (c)     Payment of Interest on Prepetition Debt.  As additional adequate

23  protection of the interests of Prepetition Agent and Prepetition Lenders in the Prepetition Collateral and

24  the Prepetition Liens, the Debtors are hereby authorized and directed to make payments in respect of

25  accrued and unpaid interest, fees, costs and other charges in respect of the Prepetition Debt that accrued

26  prior to the Filing Date and all Allowable 506(b) Amounts, whether or not set forth in the Budget.

27  Postpetition Agent shall be authorized hereby to cause such amounts to be paid by making advances

28  under the Postpetition Credit Agreement, all of which when made shall be deemed to be Postpetition

1    Debt for purposes of this Order.

2    (d)    Allowed Code § 507(b) Claim. If and to the extent the adequate

3    protection of the interests of Prepetition Agent and Prepetition Lenders in the Prepetition Collateral

4    granted pursuant to this Order proves insufficient, Prepetition Agent and Prepetition Lenders shall have

5    an allowed claim under Code § 507(b), subject to the Carveout, in the amount of any such

6    insufficiency, with priority over: (1) all costs and expenses of administration of the Cases that are

7    incurred under any provision of the Code; and (2) the claims of any other party in interest under Code

8    § 507(b).

9    5.    Termination Date; Rights and Remedies.

10    (a)    Effect of Termination Date. Unless extended by the Court upon the

11    written agreement of Postpetition Agent, upon the Termination Date, and without further notice or

12    order of Court: (1) this Order and the authorization of the Operating Debtor to use Cash Collateral and

13    the Debtors to incur Postpetition Debt hereunder will automatically terminate; (2) all Prepetition Debt

14    shall be immediately due and payable in full and such payment obligations shall constitute an

15    administrative expense claim for purposes of Code §§ 503(b), 507 and 1129; and (3) at Postpetition

16    Agent's election: (i) the Postpetition Debt shall be immediately due and payable in full, (ii) the Debtors

17    shall be prohibited from using Cash Collateral for any purpose, and (iii) Agents shall be entitled to

18    setoff any cash in any Lender's possession or control and apply such cash to the Aggregate Debt.

19    (b)    Rights and Remedies. On the fifth (5th) business day after the

20    Termination Date, at Postpetition Agent's election without further order of the Court: (1) Agents shall

21    have automatic and immediate relief from the automatic stay with respect to the Aggregate Collateral

22    (without regard to the passage of time provided for in Fed. R. Bankr. P. 4001(a)(3)), and shall be

23    entitled to exercise all rights and remedies available to them under the Prepetition Documents, the

24    Postpetition Documents and applicable nonbankruptcy law; and (2) the Debtors shall surrender the

25    Aggregate Collateral and otherwise cooperate with Agents and Lenders in the exercise of their rights

26    and remedies under the Prepetition Documents, the Postpetition Documents and applicable

27    nonbankruptcy law, including, without limitation, by filing a motion to retain one or more agents to

28    sell, lease or otherwise dispose of the Aggregate Collateral upon the request and subject to terms and

conditions acceptable to Agents.  Notwithstanding the foregoing, during the five (5) business day

period following the Termination Date, the Debtors may seek an order of this Court determining that

an Event of Default alleged to have given rise to the Termination Date did not occur; provided,

however, that during such five (5) business day period, Postpetition Lenders shall have no obligation to

advance Postpetition Debt to any Debtor.

(c)    Access to Collateral.  Upon approval of the Final Order, notwithstanding

anything to the contrary herein, upon written notice to the landlord of any of the Debtors' leased

premises that an Event of Default has occurred and is continuing, Agents may enter upon such leased

premises for the purpose of exercising any right or remedy with respect to the Aggregate Collateral

located thereon and shall be entitled to each such Debtor's rights and privileges under such lease(s)

without interference from such landlord; provided that Postpetition Agent shall pay to such landlord

rent first accruing after the above referenced written notice and during the period of occupancy by

Postpetition Agent, calculated on a per diem basis.

6.    Carveout.

(a)    Carveout Terms.  The Carveout with respect to each Carveout

Professional: (1) shall equal an aggregate amount not to exceed the lesser of (i) the aggregate amount

provided in the Budget for such Carveout Professional for the period commencing on the Filing Date

and ending on the Termination Date and (ii) the aggregate amount of allowed fees and expenses that

accrue during the period commencing on the Filing Date and ending on the Termination Date; (2) shall

be reduced dollar-for-dollar by any payments of fees and expenses to such Carveout Professional; and

(3) shall be paid out of any prepetition retainer or property of the estate (other than property subject to

an unavoidable lien in favor of the Prepetition Agent or the Postpetition Agent) before such payments

are made from proceeds of the Postpetition Debt or the Aggregate Collateral.  Further, Postpetition

Agent shall have the right to reserve against the DIP Commitment an amount equal to the sum of the

aggregate amount of unpaid fees and expenses set forth in the Budget for the Carveout Professionals.

Upon the Termination Date, and notwithstanding anything herein to the contrary, Postpetition Lenders

shall provide Postpetition Debt to the Operating Debtor in an amount equal to (a) the Carveout amount

for each Carveout Professional determined in clause (1) above and (b) an amount equal to $50,000.00,

Exhibit 1 - 27

1    which Postpetition Debt shall be used by the Operating Debtor for the sole purpose of funding the

2    Carveout Professionals after the Termination Date. Except as set forth in the preceding sentence, no

3    Agent or Lender shall have any obligation to fund any fees or expenses of Carveout Professionals

4    accrued on, prior to, or after the Termination Date.

5              (b)    Carveout Usage. No portion of the Carveout and no Postpetition Debt or

6    Aggregate Collateral may be used to pay any fees or expenses incurred by any entity, including the

7    Debtors, any Committee or the Carveout Professionals, in connection with claims or causes of action

8    adverse to Agents' or Lenders' interests in the Aggregate Collateral, including (1) preventing, hindering

9    or delaying Agents' or Lenders' enforcement or realization upon any of the Aggregate Collateral once

10   an Event of Default has occurred; (2) using or seeking to use Cash Collateral or incurring indebtedness

11   in violation of the terms hereof, or selling any Aggregate Collateral without Agents' and Lenders'

12   consent; or (3) objecting to or contesting in any manner, or in raising any defenses to, the validity,

13   extent, amount, perfection, priority or enforceability of the Aggregate Debt or any mortgages, liens or

14   security interests with respect thereto or any other rights or interests of Agents and Lenders, or in

15   asserting any claims or causes of action, including, without limitation, any actions under chapter 5 of

16   the Code, against Agents or Lenders; provided, however, that the foregoing shall not apply to costs and

17   expenses, in an amount not to exceed $25,000.00, incurred by the Committee's professionals in

18   connection with the investigation of a potential Challenge in accordance with Paragraph 8 of this

19   Order; provided, further, however, that the Carveout may be used to pay fees and expenses incurred by

20   the Carveout Professionals in connection with the negotiation, preparation and entry of this Order or

21   any amendment hereto consented to by Postpetition Agent.

22             (c)    Carveout Procedure. The Operating Debtor shall periodically, upon the

23   request of the Postpetition Agent, provide to the Postpetition Agent a written report (the "Carveout

24   Report"), in which the Operating Debtor discloses its then current estimate of (1) the aggregate amount

25   of unpaid professional fees, costs and expenses accrued or incurred by the Carveout Professionals,

26   through the date of the Carveout Report, and (2) projected fees, costs and expenses of the Carveout

27   Professionals for the 30-day period following the date of such Carveout Report. Nothing herein shall

28   be construed as consent by Agents and Lenders to the allowance of any fees or expenses of the

Carveout Professionals or shall affect the right of Agents or any Lender to object to the allowance and payment of such fees, costs or expenses, or the right of Agents or any Lender to the return of any portion of the Carveout that is funded with respect to fees and expenses for a Carveout Professional that are approved on an interim basis that are later denied on a final basis.  For the avoidance of doubt, no Carveout Professional shall be entitled to any portion of the Carveout allocated for any other Carveout Professional in the Budget.

       7.    <u>No Surcharge.</u>  In the exercise of its business judgment, subject to entry of the Final Order, each Debtor (or any Trustee) agrees that there shall be no surcharge of the Aggregate Collateral for any purpose, unless agreed to by Agents and Lenders.  Further, each Debtor represents that the Budget contains all expenses that are reasonable and necessary for the operation of its business and the preservation of the Aggregate Collateral through the period for which the Budget runs, and therefore includes all items potentially chargeable to Agents and Lenders under Code § 506(c).  Therefore, effective upon entry of the Final Order, each Debtor (or any Trustee) shall be deemed to have waived any rights, benefits or causes of action under Code § 506(c), the enhancement of collateral provisions of Code § 552, or any other legal or equitable doctrine (including, without limitation, unjust enrichment) as they may relate to or be asserted against the Agents, the Lenders or the Aggregate Collateral.  In reliance on the foregoing, Agents and Lenders have agreed to the entry of this Order.

       8.    <u>Reservation of Rights; Bar of Challenges and Claims.</u>  The stipulations and representations contained in this Order, including, without limitation, in Paragraphs D, shall be binding on all Challenge Parties and other parties in interest, unless and solely to the extent that (i) a Debtor receives notice of a potential Challenge during the Investigation Period from any Challenge Party and (ii) the Court rules in favor of the plaintiff in any such timely and properly filed Challenge.

       (a)    <u>Challenge Procedure.</u>  During the Investigation Period, a Challenge Party (other than the Debtors) shall be entitled to determine whether a basis to assert a Challenge exists.  If a Challenge Party (other than the Debtors) identifies a basis to assert a Challenge, it must notify the applicable Debtor during the Investigation Period of its demand that such Debtor initiate an action or adversary proceeding relating thereto and from the date that such Debtor is so notified, such Debtor shall have five (5) days to notify the Challenge Party of whether such Debtor intends to initiate such

Exhibit 1 - 29

1    action and ten (10) days to initiate such action.  If such Debtor notifies such Challenge Party that such

2    Debtor does not intend to initiate an action or adversary proceeding, the Challenge Party shall have ten

3    (10) days from the receipt of such notice to initiate an action or adversary proceeding.  Nothing herein

4    shall be deemed to grant standing in favor of any Challenge Party absent further order of this Court.

5    Each Debtor, if timely notified of a potential Challenge, shall retain authority to prosecute, settle or

6    compromise such Challenge in the exercise of its business judgment and subject to any applicable

7    further order of court.

8                    (b)    Bar of Challenges and Claims.  If a Debtor does not receive notice of a

9    potential Challenge during the Investigation Period (or such later date as agreed in writing by

10   Prepetition Agent and Prepetition Lenders, solely with respect to a potential Challenge against such

11   party, or for cause shown by an order of this Court), without further order of the Court, (1) the claims,

12   liens and security interests of the Prepetition Agent and the Prepetition Lenders shall be deemed to be

13   allowed for all purposes in these Cases and shall not be subject to challenge by any party in interest as

14   to extent, validity, priority or otherwise, and (2) such Debtor and its estate shall be deemed to have

15   waived, released and discharged Prepetition Agent, Prepetition Lenders and their respective officers,

16   directors, principals, attorneys, consultants, predecessors in interest, and successors and assigns of and

17   from any and all claims and causes of action, indebtedness, and obligations, of every type, which

18   occurred on or prior to the date of entry of this Order with respect to or in connection with the

19   Prepetition Debt, the Prepetition Liens, the Prepetition Documents or otherwise.

20                   9.    Right to Credit Bid.  In connection with the sale or other disposition of all or any

21   portion of the Aggregate Collateral, whether under Code § 363, Code § 1129 or otherwise, pursuant to

22   Code § 363(k), (a) Postpetition Agent shall have the right to use the Postpetition Debt or any part

23   thereof to credit bid with respect to any bulk or piecemeal sale or other disposition of all or any portion

24   of the Aggregate Collateral, and (b) Prepetition Agent shall have the right to use the Prepetition Debt or

25   any part thereof to credit bid with respect to any bulk or piecemeal sale or other disposition of all or

26   any portion of the Aggregate Collateral, so long as any such credit bid by Prepetition Agent provides

27   for cash in an amount not less than the aggregate amount of the Postpetition Debt plus the Postpetition

28   Charges plus the Termination Fee (as such term is defined in that certain Investment Agreement dated

Exhibit 1 - 30

1    as of December 20, 2010).

2    　　　　　10.    Plan.  Unless Agents consent thereto, at no time may any plan be confirmed in

3    any of the Cases unless such plan and the order confirming such plan requires that the Aggregate Debt

4    is paid in full in cash on the earlier of (a) the effective date of such plan, and (b) the Termination Date.

5    　　　　　11.    Application of Sale Proceeds.  All proceeds from sales or other dispositions of

6    all or any portion of the Aggregate Collateral other than in the ordinary course shall be remitted to

7    Agents for application in accordance with Paragraph 2(c) of this Order.

8    　　　　　12.    Waiver of Right to Return/Consent to Setoff.  Each Debtor hereby waives its

9    rights: (a) to return any of the Aggregate Collateral pursuant to Code § 546(h); (b) to consent to any

10    order permitting any claims pursuant to Code § 503(b)(9); and (c) to consent to setoff pursuant to Code

11    § 553.

12    　　　　　13.    Indemnification.  Each Debtor shall indemnify and hold harmless Agents and

13    Lenders in accordance with the Postpetition Credit Agreement and the Prepetition Credit Agreement.

14    　　　　　14.    No Marshaling.  No Agent, Lender or any of the Aggregate Collateral shall be

15    subject to the doctrine of marshaling.

16    　　　　　15.    Postpetition Charges.  All Postpetition Charges are hereby approved and shall be

17    promptly paid by the Debtors in accordance with this Order and the Postpetition Documents, without

18    need for filing an application with the Court for approval or payment of the Postpetition Charges.

19    　　　　　16.    Force and Effect of Prepetition Documents.  Except as modified herein and

20    subject to the other provisions of this Order and the Code, the Prepetition Documents shall remain in

21    full force and effect with respect to the Prepetition Debt.  To the extent there exists any conflict among

22    the terms of the Motion, the Prepetition Documents and this Order, this Order shall govern and control.

23    　　　　　17.    Intercreditor Agreement.  The Postpetition Debt shall constitute "Senior Debt"

24    (as such term is defined in the Intercreditor Agreement) under the Intercreditor Agreement.

25    　　　　　18.    Modification of Stay.  The automatic stay of Code § 362 is hereby modified with

26    respect to Agents and Lenders to the extent necessary to effectuate the provisions of this Order,

27    including, after the Termination Date, to permit Agents and Lenders to exercise their respective rights

28    contemplated by Paragraph 5 above.

Exhibit 1 - 31

19.    <u>No Waiver.</u>  Agents and Lenders shall not be deemed to have suspended or waived any of their rights or remedies under this Order, the Prepetition Documents, the Postpetition Documents, the Code, and applicable nonbankruptcy law unless such suspension or waiver is in writing, signed by a duly authorized officer of Agents or the Lenders, as applicable, and directed to the applicable Debtor.  No failure of Agents or Lenders to require strict performance by any Debtor (or by any Trustee) of any provision of this Order shall waive, affect or diminish any right of Agents or Lenders thereafter to demand strict compliance and performance therewith, and no delay on the part of Agents or Lenders in the exercise of any right or remedy under this Order, the Prepetition Documents, the Postpetition Documents, the Code, or applicable nonbankruptcy law shall preclude the exercise of any right or remedy.  Further, this Order shall not constitute a waiver by Prepetition Agent or the Prepetition Lenders of any of their rights under the Prepetition Documents, the Code or applicable nonbankruptcy law, including, without limitation their right to later assert: (1) that, any of their interests in the Aggregate Collateral lack adequate protection within the meaning of Code §§ 362(d) or 363(e) or any other provision thereof; or (2) a claim under Code § 507(b).

20.    <u>"Responsible Person."</u>  By taking any actions pursuant to this Order, Postpetition Agent and Postpetition Lenders shall not:  (a) be deemed to be in control of the operations or liquidation of any Debtor; or (b) be deemed to be acting as a "responsible person" with respect to the operation, management or liquidation of any Debtor.  The foregoing provision of this Paragraph 20 shall not be effective until entry of the Final Order.

21.    <u>Release.</u>  Upon the date that the Postpetition Debt is paid in full in cash and prior to the release of the Postpetition Liens, each Debtor shall execute and deliver to Postpetition Agent and Postpetition Lenders a general release of any and all claims and causes of action that could have been asserted or raised under or in connection with the Postpetition Documents.

22.    <u>Amendments.</u>  The Debtors, Postpetition Agent and the Postpetition Lenders required under the Postpetition Credit Agreement may enter into amendments or modifications of the Postpetition Documents or the Budget without further notice and hearing or order of this Court; provided, that (a) such modifications or amendments do not materially and adversely affect the rights of any creditor or other party in interest and (b) notice of any such amendment or modification is filed

16

Exhibit 1 - 32

1    with this Court.

2        23.    Proof of Claim.  Neither the Prepetition Agent nor any of the Prepetition Lenders

3    shall be required to file a proof of claim with respect to any of the Prepetition Debt and the stipulations

4    and findings set forth in this Order shall constitute an informal proof of claim in respect thereof.

5    Notwithstanding the foregoing or any subsequent order of the Court concerning proof of claim filing

6    requirements, Prepetition Agent is authorized (but not obligated) to file a proof of claim in the Cases on

7    behalf of itself and the Prepetition Lenders on account of their claims arising under the Prepetition

8    Documents and hereunder.  Any proof of claim filed in any Case by Prepetition Agent shall be deemed

9    to have been filed in each of the other Cases.

10        24.    Binding Effect.  Except as provided in Paragraph 8 herein, this Order shall be

11    binding on all parties in interest in the Cases and their respective successors and assigns, including any

12    Trustee, except that any Trustee shall have the right to terminate this Order after notice and a hearing.

13    If, in accordance with Code § 364(e), this Order does not become a final nonappealable order, if a

14    Trustee terminates this Order, or if any of the provisions of the Order are hereafter modified, amended,

15    vacated or stayed by subsequent order of this Court or any other court, such termination or subsequent

16    order shall not affect: (a) subject to Paragraph 8 of this Order, the stipulations, representations, and

17    findings contained in this Order and the relief granted by and the releases contained in this Order

18    (including, without limitation, Paragraphs 2(c), 3(e) and (7); and (b) the priority, validity,

19    enforceability or effectiveness of any lien, security interest or other benefit or claim authorized hereby

20    with respect to Cash Collateral used or Postpetition Debt incurred prior to the effective date of such

21    termination or subsequent order.  All such liens, security interests, claims and other benefits shall be

22    governed in all respects by the original provisions of this Order, and Postpetition Agent and

23    Postpetition Lenders shall be entitled to all the rights, remedies, privileges and benefits granted hereto,

24    including the liens and priorities granted herein, with respect to the Postpetition Debt.  Except as

25    otherwise explicitly set forth in this Order, no third party is intended to be, or shall be deemed to be, a

26    third party beneficiary of this Order.

27        25.    Survival.  The provisions of this Order, and any actions taken pursuant to or in

28    reliance upon the terms hereof, shall survive entry of, and govern in the event of any conflict with, any

17

Exhibit 1 - 33

order which may be entered in the Cases: (a) confirming any chapter 11 plan, (b) converting any of the Cases to a case under chapter 7 of the Code, (c) dismissing any of the Cases, (d) withdrawing of the reference of any Case from this Court, or (e) providing for abstention from handling or retaining of jurisdiction of the Cases in this Court. The terms and provisions of this Order, including, without limitation, the rights granted Postpetition Agent and Postpetition Lenders under Code §§ 364(c) and (d), shall continue in full force and effect until all of the Aggregate Debt is indefeasibly paid in full in cash and discharged.

26.    <u>Notice of Final Hearing.</u> The Final Hearing is scheduled for January ___, 2011, and may be continued from time to time without further notice other than that given in open court. The Debtors are directed to immediately serve a copy of this Order by first class mail, postage prepaid, on counsel for Agents, the Debtors' other secured creditors, the Debtors' twenty (20) largest unsecured creditors, and the United States Trustee, which service shall constitute adequate and proper notice of the Final Hearing. Any objection to the Order must be filed with the Court and received by counsel for each Debtor, the Agents, and the United States Trustee no later than seventy-two (72) hours prior to the commencement of the Final Hearing. Any timely and properly filed and served objection will be heard at the Final Hearing.

###

Exhibit 1 - 34

# EXHIBIT A

# DEFINED TERMS

1.    ***Agreement Among Lenders***.  That certain Agreement Among Lenders, dated as of October 15, 2010, by and among the Agents, the Prepetition Lenders and the Postpetition Lenders.

2.    ***Aggregate Collateral***.    Collectively, the Prepetition Collateral and the Postpetition Collateral.

3.    ***Aggregate Debt***.  Collectively, the Prepetition Debt and the Postpetition Debt.

4.    ***Allowable 506(b) Amounts***.  To the extent allowable under Code § 506(b), interest at the default rate of interest as set forth in Section 2.07 of the Prepetition Credit Agreement, all fees, costs, expenses, and other charges due or coming due under the Prepetition Documents or in connection with the Prepetition Debt (regardless of whether such fees, costs, interest and other charges are included in the Budget), and all costs and expenses at any time incurred by Prepetition Agent and Prepetition Lenders in connection with:  (a) the negotiation, preparation and submission of this Order and any other order or document related hereto, and (b) the representation of Prepetition Agents and Prepetition Lenders in the Cases, including in defending any Challenge.

5.    ***Blocked Account***.  Account No. 407-187-4 at Harris N.A.

6.    ***Budget***.  The budget attached to this Order as Exhibit B, as amended, modified or supplemented from time to time, as may be agreed to by Postpetition Agent and the Postpetition Lenders required under the Postpetition Credit Agreement.

7.    ***Carveout***.  Collectively, (a) all fees required to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a), and (b) with respect to each Carveout Professional, the allowed fees and disbursements as may be awarded to such Carveout Professional from time to time pursuant to Code § 330, in the aggregate amount set forth in Paragraph 6 of this Order.

8.    ***Carveout Professionals***.  CRG Partners, LLC, Imperial Capital, LLC, Peitzman, Weg & Kempinsky LLP, Crowe Horwath LLP, Kurtzman Carson Consultants and the United States Trustee.

9.    ***Cases***.  These jointly administered chapter 11 cases or any superseding chapter 7 cases of Debtors.

10.    ***Cash Collateral***.  All "cash collateral," as that term is defined in Code § 363(a), in which Agents (on behalf of Lenders) have an interest, all deposits subject to setoff rights in favor of Agents and Lenders, and all cash arising from the collection or other conversion to cash of the Aggregate Collateral, including from the sale of inventory and the collection of accounts receivable.

11.    ***Challenge***.  A claim or cause of action challenging the extent, validity, perfection, priority or enforceability of the Prepetition Debt, the Prepetition Liens or any other claims or causes of action against Prepetition Agent and Prepetition Lenders, which any Debtor, any Committee, or another party in interest may bring, in accordance with Paragraph 8 of this Order.

1

Exhibit 1 - 35

12. **Challenge Party**. Any Committee, any Trustee, or other party in interest with the requisite standing.

13. **Code**. The United States Bankruptcy Code (11 U.S.C. § 101 *et seq.*), as amended, and any successor statute. Unless otherwise indicated, all statutory section references in this Order are to the Code.

14. **Committee**. Any official creditors' committee appointed to represent unsecured creditors in any Case pursuant to Code § 1102, if any.

15. **DIP Commitment**. $5,000,000.00.

16. **Event of Default**. At Postpetition Agent's election, (a) the occurrence and continuance of any Event of Default first arising after the Filing Date under the Postpetition Credit Agreement; and (b) any Debtor's failure to comply with the covenants or perform any of its obligations in strict accordance with the terms of this Order.

17. **Filing Date**. December 21, 2010.

18. **Final Hearing**. The final hearing on the Motion conducted in accordance with Fed. R. Bankr. P. 4001.

19. **Final Order**. A final order authorizing the Operating Debtor to use Cash Collateral and the Debtors to incur Postpetition Debt entered at or in connection with the Final Hearing.

20. **Intercreditor Agreement**. That certain Intercreditor Agreement dated as of April 9, 2008, by and among Prepetition Agent, The Northwestern Mutual Life Insurance Company, the Operating Debtor and the Prepetition Guarantors, as amended, modified and supplemented from time to time.

21. **Interim DIP Amount**. $2,500,000.00.

22. **Investigation Period**. The period from the Filing Date until the date that is the earlier of (1) seventy-five (75) days after the Filing Date, (2) sixty (60) days after the date that any Committee is formed, and (3) the effective date of any chapter 11 plan confirmed in the Cases in accordance with the Plan Covenants.

23. **Minimum Cash Threshold**. $2,000,000.00; provided, however, that such amount shall be permanently reduced to $1,000,000.00 from and after the date that the Operating Debtor first incurs Postpetition Debt.

24. **Obligations.** The "Obligations", as that term is defined in the Postpetition Credit Agreement.

25. **Permitted Priority Liens**. Collectively, (a) the Carveout, and (b) liens in favor of third parties upon the Prepetition Collateral, which third-party liens, as of the Filing Date: (1) had priority under applicable law over the Prepetition Liens, (2) were not subordinated by agreement or applicable law, and (3) were non-avoidable, valid, properly perfected and enforceable as of the Filing

2

Exhibit 1 - 36

Date and (c) the Prepetition Liens which as of the Filing Date (1) were not subordinated by agreement or applicable law, and (2) were non-avoidable, valid, properly perfected and enforceable as of the Filing Date.

26.    ***Permitted Variance.***    With respect to each weekly line item in the Budget, an amount equal to 15% of the amount set forth in the Budget, tested on a rolling four-week basis; <u>provided, however</u>, that the aggregate, cumulative variance for all line items shall not exceed 10%.

27.    ***Plan Covenants.***    Those covenants set forth in Section 7.15 of the Postpetition Credit Agreement.

28.    ***Postpetition Charges***.    Interest at the applicable rate of interest under the Postpetition Credit Agreement and all fees, costs, and expenses provided for in the Postpetition Credit Agreement, including those incurred by Postpetition Agent and Postpetition Lenders in connection with the Postpetition Debt (regardless of whether any such fees, costs, interest and other charges are included in the Budget).

29.    ***Postpetition Collateral***.    All of the real and personal property of the Debtors of any description whatsoever, wherever located and whenever arising or acquired, including all cash, accounts, inventory, equipment, fixtures, chattel paper, general intangibles (including, upon entry of the Final Order, claims and proceeds under Code §§ 544, 547, 548, 549, 550 and 553), all leaseholds, all commercial torts, all other "Collateral" (as that term is defined in the Postpetition Credit Agreement), and all proceeds, rents, issues, profits and products, whether tangible or intangible, of any of the foregoing, including proceeds of insurance covering any of the foregoing.

30.    ***Postpetition Credit Agreement***.    That certain Debtor-in-Possession Credit Agreement dated as of December ___, 2010 by and between the Debtors, Postpetition Agent and Postpetition Lenders party thereto, as amended, modified, supplemented, replaced or refinanced from time to time.

31.    ***Postpetition Debt***.    All indebtedness or obligations of the Debtors to Postpetition Agent and Postpetition Lenders incurred on or after the Filing Date pursuant to this Order or otherwise, including all Obligations and any advances made by Postpetition Lenders to pay the Carveout.

32.    ***Postpetition Documents***.    The Postpetition Credit Agreement and the "Credit Documents" (as that term is defined in the Postpetition Credit Agreement).

33.    ***Postpetition Liens***.    Priority Liens in the Aggregate Collateral, subject only to Permitted Priority Liens.

34.    ***Prepetition Collateral***.    All of the "Collateral" (as that term is defined in the that certain Security Agreement dated as of April 9, 2008, by and among the Operating Debtor, the Prepetition Guarantors and Prepetition Agent (on behalf of the Prepetition Lenders)) existing as of the Filing Date, and all proceeds, rents, issues, profits and products thereof.

35.    ***Prepetition Credit Agreement***.    That certain Credit Agreement dated as of April 9, 2008, by and among the Operating Debtor, the Prepetition Guarantors, Prepetition Agent and Prepetition Lenders party thereto, as amended, modified and supplemented from time to time.

Exhibit 1 - 37

36.    ***Prepetition Debt***.  (a) All indebtedness or obligations under the Prepetition Documents as of the Filing Date, including all "Obligations" (as defined in the Prepetition Credit Agreement), and all fees, costs, interest, and expenses as and when due and payable pursuant to the Prepetition Documents, <u>plus</u> (b) all Allowable 506(b) Amounts.

37.    ***Prepetition Documents***.  The Prepetition Credit Agreement and the "Credit Documents" (as that term is defined in the Prepetition Credit Agreement).

38.    ***Prepetition Guarantors***.  Luxe Beauty Holdings Corporation and the Postpetition Guarantors.

39.    ***Prepetition Guaranty***.  The Guaranty set forth in Article IV of the Prepetition Credit Agreement.

40.    ***Prepetition Liens***.  Prepetition Agent's (on behalf of Prepetition Lenders) asserted security interests in the Prepetition Collateral under the Prepetition Documents, subject only to other Permitted Priority Liens.

41.    ***Prepetition Third Party Documents***.  Collectively, the Debtors' deposit account control agreements, leases, licenses, landlord agreements, warehouse agreements, bailment agreements, insurance policies, contracts or other similar agreements in which Prepetition Agent has an interest.

42.    ***Priority Liens***.  Liens which are first priority, properly perfected, valid and enforceable security interests, which are not subject to any claims, counterclaims, defenses, setoff, recoupment or deduction, and which are otherwise unavoidable and not subject to recharacterization or subordination pursuant to any provision of the Code, any agreement, or applicable nonbankruptcy law.

43.    ***Replacement Liens***.  Priority Liens in the Postpetition Collateral granted to Prepetition Agent (for the benefit of the Prepetition Lenders) pursuant to this Order, subject only to the Permitted Priority Liens and the Postpetition Liens.

44.    ***Termination Date***.  At Postpetition Agent's election, the earliest to occur of: (a) the date on which Postpetition Agent provides, via facsimile or overnight mail, written notice to counsel for the Debtors and counsel for any Committee of the occurrence and continuance of an Event of Default; (b) the date that is 21 days following the entry of this Order if the Final Order is not entered in form and substance satisfactory to Postpetition Agent by such date; (c) the date of the Final Hearing, if this Order is modified at the Final Hearing in a manner unacceptable to Agents and Lenders; (d) the effective date of any chapter 11 plan confirmed in the Cases; (e) the closing date of the sale of substantially all of the assets of the Operating Debtor; (f) the date on which the Aggregate Debt is indefeasibly paid in full in cash; and (g) June 15, 2011.

45.    ***Trustee***.  Any trustee appointed or elected in any Case.

Exhibit 1 - 38

# **EXHIBIT B**

## **BUDGET**

Exhibit 1 - 39

# DRAFT SUBJECT TO CHANGE

**Sexy Hair Concepts, LLC**
Projected DIP / Cash Collateral Budget
13 weeks 12/24 to 3/18/11

| Week Ending Date | 12/24/2010 | 12/31/2010 | 1/7/2011 | 1/14/2011 | 1/21/2011 | 1/28/2011 | 2/4/2011 | 2/11/2011 | 2/18/2011 | 2/25/2011 | 3/4/2011 | 3/11/2011 | 3/18/2011 | 13 Weeks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **SALES** | | | | | | | | | | | | | | |
| Net Sales | $ 872 | $ 872 | $ 1,058 | $ 1,058 | $ 1,058 | $ 1,635 | $ 1,186 | $ 1,186 | $ 1,186 | $ 1,833 | $ 945 | $ 945 | $ 1,389 | $ 15,222 |
| **OPERATING CASH ACTIVITY** | | | | | | | | | | | | | | |
| _Receipts_ | | | | | | | | | | | | | | |
| Trade Receipts | 1,581 | 756 | 475 | 1,038 | 710 | 945 | 567 | 677 | 1,200 | 1,425 | 1,616 | 1,495 | 1,395 | 13,881 |
| Asset Sales | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Receipts** | 1,581 | 756 | 475 | 1,038 | 710 | 945 | 567 | 677 | 1,200 | 1,425 | 1,616 | 1,495 | 1,395 | 13,881 |
| _Operating Disbursements_ | | | | | | | | | | | | | | - |
| Material Purchases / Disbursements | 598 | 525 | 375 | 337 | 203 | 341 | 157 | 157 | 157 | 157 | 345 | 345 | 345 | 4,041 |
| Freight | 25 | 25 | 35 | 35 | 35 | 35 | 39 | 39 | 39 | 39 | 32 | 32 | 32 | 444 |
| Selling Expense | 128 | 128 | 167 | 167 | 167 | 167 | 182 | 182 | 182 | 182 | 162 | 162 | 162 | 2,140 |
| Marketing Expenses | 68 | 68 | 211 | 211 | 211 | 211 | 122 | 122 | 122 | 122 | 106 | 106 | 106 | 1,787 |
| G&A Expense | 122 | 122 | 134 | 134 | 134 | 134 | 127 | 127 | 127 | 127 | 110 | 110 | 110 | 1,619 |
| Other | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Operating Disbursements** | 941 | 868 | 922 | 884 | 751 | 889 | 627 | 627 | 627 | 627 | 756 | 756 | 756 | 10,031 |
| **OPERATING CASH FLOW** | $ 641 | $ (112) | $ (448) | $ 154 | $ (40) | $ 56 | $ (60) | $ 50 | $ 573 | $ 798 | $ 861 | $ 739 | $ 639 | $ 3,851 |
| **Non-Operating Disbursements** | | | | | | | | | | | | | | |
| Secured Lender DIP Interest | - | - | - | - | - | - | - | 17 | - | - | - | 20 | - | 37 |
| Secured Lender Interest | - | - | - | 1,900 | - | - | - | 355 | - | - | - | 355 | - | 2,610 |
| Lender DIP Fee | 50 | - | - | 50 | - | - | - | - | - | - | - | - | - | 100 |
| 503(b)9 Payments | - | - | - | - | - | - | 1,800 | - | - | - | - | - | - | 1,800 |
| Total Professional Fees | - | 112 | 12 | 12 | 12 | 114 | 12 | 12 | 12 | 40 | 12 | 12 | 2,249 | 2,611 |
| US Trustee | - | - | - | - | - | - | - | - | - | - | - | - | 50 | 50 |
| **Total Non-Operating Disbursements** | 50 | 112 | 12 | 1,962 | 12 | 114 | 1,812 | 384 | 12 | 40 | 12 | 387 | 2,299 | 7,207 |
| **Total Disbursements** | 991 | 980 | 934 | 2,846 | 763 | 1,002 | 2,439 | 1,011 | 639 | 667 | 768 | 1,142 | 3,055 | 17,238 |
| **NET CASH FLOW** | $ 591 | $ (224) | $ (460) | $ (1,808) | $ (52) | $ (57) | $ (1,872) | $ (334) | $ 561 | $ 758 | $ 849 | $ 352 | $ (1,660) | $ (3,356) |
| **DIP Activity (enter both as positive numbers)** | | | | | | | | | | | | | | |
| Draws | - | - | - | 1,664 | 53 | 57 | 1,872 | 334 | - | - | - | - | 1,659 | 5,639 |
| Payments | - | - | - | - | - | - | - | - | 561 | 758 | 849 | 352 | - | 2,520 |
| **DIP Balance** | | | | | | | | | | | | | | |
| Beginning | - | - | - | - | 1,664 | 1,717 | 1,774 | 3,646 | 3,980 | 3,419 | 2,661 | 1,812 | 1,460 | |
| Additions | - | - | - | 1,664 | 53 | 57 | 1,872 | 334 | - | - | - | - | 1,659 | |
| Reductions | - | - | - | - | - | - | - | - | 561 | 758 | 849 | 352 | - | |
| Ending | - | - | - | 1,664 | 1,717 | 1,774 | 3,646 | 3,980 | 3,419 | 2,661 | 1,812 | 1,460 | 3,119 | |
| **DIP Availability (before ending cash)** | | | | | | | | | | | | | | |
| Beginning | 5,000 | 5,000 | 5,000 | 5,000 | 3,336 | 3,283 | 3,226 | 1,354 | 1,020 | 1,581 | 2,339 | 3,188 | 3,540 | |
| Changes | - | - | - | (1,664) | (53) | (57) | (1,872) | (334) | 561 | 758 | 849 | 352 | (1,659) | |
| Ending | 5,000 | 5,000 | 5,000 | 3,336 | 3,283 | 3,226 | 1,354 | 1,020 | 1,581 | 2,339 | 3,188 | 3,540 | 1,881 | |
| Commitment Fee | 0.48 | 0.48 | 0.48 | 0.48 | 0.32 | 0.32 | 0.31 | 0.13 | 0.10 | 0.15 | 0.22 | 0.31 | 0.34 | 4.12 |
| **BEGINNING CASH** | 337 | 928 | 703 | 244 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 337 |
| **ENDING CASH** | 928 | 703 | 244 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |

Exhibit 1 - 40

Exhibit 2

# DRAFT SUBJECT TO CHANGE

**Sexy Hair Concepts, LLC**
Projected DIP / Cash Collateral Budget
13 weeks 12/24 to 3/18/11

| Week Ending Date | 12/24/2010 | 12/31/2010 | 1/7/2011 | 1/14/2011 | 1/21/2011 | 1/28/2011 | 2/4/2011 | 2/11/2011 | 2/18/2011 | 2/25/2011 | 3/4/2011 | 3/11/2011 | 3/18/2011 | 13 Weeks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **SALES** | | | | | | | | | | | | | | |
| Net Sales | $ 872 | $ 872 | $ 1,058 | $ 1,058 | $ 1,058 | $ 1,635 | $ 1,186 | $ 1,186 | $ 1,186 | $ 1,833 | $ 945 | $ 945 | $ 1,389 | $ 15,222 |
| **OPERATING CASH ACTIVITY** | | | | | | | | | | | | | | |
| **Receipts** | | | | | | | | | | | | | | |
| Trade Receipts | 1,581 | 756 | 475 | 1,038 | 710 | 945 | 567 | 677 | 1,200 | 1,425 | 1,616 | 1,495 | 1,395 | 13,881 |
| Asset Sales | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Receipts** | 1,581 | 756 | 475 | 1,038 | 710 | 945 | 567 | 677 | 1,200 | 1,425 | 1,616 | 1,495 | 1,395 | 13,881 |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| Material Purchases / Disbursements | 598 | 525 | 375 | 337 | 203 | 341 | 157 | 157 | 157 | 157 | 345 | 345 | 345 | 4,041 |
| Freight | 25 | 25 | 35 | 35 | 35 | 35 | 39 | 39 | 39 | 39 | 32 | 32 | 32 | 444 |
| Selling Expense | 128 | 128 | 167 | 167 | 167 | 167 | 182 | 182 | 182 | 182 | 162 | 162 | 162 | 2,140 |
| Marketing Expenses | 68 | 68 | 211 | 211 | 211 | 211 | 122 | 122 | 122 | 122 | 106 | 106 | 106 | 1,787 |
| G&A Expense | 122 | 122 | 134 | 134 | 134 | 134 | 127 | 127 | 127 | 127 | 110 | 110 | 110 | 1,619 |
| Other | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Operating Disbursements** | 941 | 868 | 922 | 884 | 751 | 889 | 627 | 627 | 627 | 627 | 756 | 756 | 756 | 10,031 |
| **OPERATING CASH FLOW** | $ 641 | $ (112) | $ (448) | $ 154 | $ (40) | $ 56 | $ (60) | $ 50 | $ 573 | $ 798 | $ 861 | $ 739 | $ 639 | $ 3,851 |
| **Non-Operating Disbursements** | | | | | | | | | | | | | | |
| Secured Lender DIP Interest | - | - | - | - | - | - | - | 17 | - | - | - | 20 | - | 37 |
| Secured Lender Interest | - | - | - | 1,900 | - | - | - | 355 | - | - | - | 355 | - | 2,610 |
| Lender DIP Fee | 50 | - | - | 50 | - | - | - | - | - | - | - | - | - | 100 |
| 503(b)9 Payments | - | - | - | - | - | - | 1,800 | - | - | - | - | - | - | 1,800 |
| Total Professional Fees | - | 112 | 12 | 12 | 12 | 114 | 12 | 12 | 12 | 40 | 12 | 12 | 2,249 | 2,611 |
| US Trustee | - | - | - | - | - | - | - | - | - | - | - | - | 50 | 50 |
| **Total Non-Operating Disbursements** | 50 | 112 | 12 | 1,962 | 12 | 114 | 1,812 | 384 | 12 | 40 | 12 | 387 | 2,299 | 7,207 |
| **Total Disbursements** | 991 | 980 | 934 | 2,846 | 763 | 1,002 | 2,439 | 1,011 | 639 | 667 | 768 | 1,142 | 3,055 | 17,238 |
| **NET CASH FLOW** | $ 591 | $ (224) | $ (460) | $ (1,808) | $ (52) | $ (57) | $ (1,872) | $ (334) | $ 561 | $ 758 | $ 849 | $ 352 | $ (1,660) | $ (3,356) |
| **DIP Activity (enter both as positive numbers)** | | | | | | | | | | | | | | |
| Draws | - | - | - | 1,664 | 53 | 57 | 1,872 | 334 | - | - | - | - | 1,659 | 5,639 |
| Payments | - | - | - | - | - | - | - | - | 561 | 758 | 849 | 352 | - | 2,520 |
| **DIP Balance** | | | | | | | | | | | | | | |
| Beginning | - | - | - | - | 1,664 | 1,717 | 1,774 | 3,646 | 3,980 | 3,419 | 2,661 | 1,812 | 1,460 | |
| Additions | - | - | - | 1,664 | 53 | 57 | 1,872 | 334 | - | - | - | - | 1,659 | |
| Reductions | - | - | - | - | - | - | - | - | 561 | 758 | 849 | 352 | - | |
| Ending | - | - | - | 1,664 | 1,717 | 1,774 | 3,646 | 3,980 | 3,419 | 2,661 | 1,812 | 1,460 | 3,119 | |
| **DIP Availability (before ending cash)** | | | | | | | | | | | | | | |
| Beginning | 5,000 | 5,000 | 5,000 | 5,000 | 3,336 | 3,283 | 3,226 | 1,354 | 1,020 | 1,581 | 2,339 | 3,188 | 3,540 | |
| Changes | - | - | - | (1,664) | (53) | (57) | (1,872) | (334) | 561 | 758 | 849 | 352 | (1,659) | |
| Ending | 5,000 | 5,000 | 5,000 | 3,336 | 3,283 | 3,226 | 1,354 | 1,020 | 1,581 | 2,339 | 3,188 | 3,540 | 1,881 | |
| Commitment Fee | 0.48 | 0.48 | 0.48 | 0.48 | 0.32 | 0.32 | 0.31 | 0.13 | 0.10 | 0.15 | 0.22 | 0.31 | 0.34 | 4.12 |
| **BEGINNING CASH** | 337 | 928 | 703 | 244 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 337 |
| **ENDING CASH** | 928 | 703 | 244 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |

Exhibit 2 - 41

Exhibit 3

**DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

**dated as of _____, 2010**

**among**

**SEXY HAIR CONCEPTS, LLC, Chapter 11 Debtor-In-Possession,**
as Borrower,

**CERTAIN SUBSIDIARIES AND AFFILIATES OF THE BORROWER,**
as Guarantors,

**THE DIP LENDERS PARTY HERETO**

**and**

**BANK OF MONTREAL,**
**as DIP Agent and DIP Collateral Agent**

Exhibit 3 - 42

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS AND ACCOUNTING TERMS ................................................... 1
    Section 1.01    Defined Terms. ................................................................. 1
    Section 1.02    Interpretive Provisions. .................................................... 21
    Section 1.03    Accounting Terms and Provisions. ...................................... 22
    Section 1.04    Rounding. ...................................................................... 22
    Section 1.05    Times of Day. ................................................................. 22

ARTICLE II DIP LOAN COMMITMENTS AND BORROWINGS ................................... 22
    Section 2.01    DIP Loan Commitments. .................................................. 22
    Section 2.02    Borrowings. .................................................................... 23
    Section 2.03    [Reserved] ...................................................................... 24
    Section 2.04    Repayment of DIP Loans. ................................................. 24
    Section 2.05    Prepayments. .................................................................. 24
    Section 2.06    [Reserved] ...................................................................... 25
    Section 2.07    Interest. ......................................................................... 25
    Section 2.08    Fees. ............................................................................. 25
    Section 2.09    Computation of Interest and Fees. ...................................... 26
    Section 2.10    Payments Generally; DIP Agent's Clawback. ....................... 26
    Section 2.11    Sharing of Payments By DIP Lenders. ................................. 28
    Section 2.12    Evidence of Debt. ........................................................... 29

ARTICLE III TAXES, YIELD PROTECTION AND ILLEGALITY ................................. 29
    Section 3.01    Taxes. ........................................................................... 29
    Section 3.02    [Reserved]. .................................................................... 33
    Section 3.03    [Reserved]. .................................................................... 33
    Section 3.04    Increased Costs. .............................................................. 33
    Section 3.05    [Reserved]. .................................................................... 34
    Section 3.06    Mitigation Obligations: Replacement of DIP Lenders. ........... 34
    Section 3.07    Survival. ........................................................................ 35

ARTICLE IV GUARANTY ................................................................................. 35
    Section 4.01    The Guaranty. ................................................................. 35
    Section 4.02    Obligations Unconditional. ................................................ 35
    Section 4.03    Reinstatement. ................................................................ 37
    Section 4.04    Certain Waivers. ............................................................. 37
    Section 4.05    Remedies. ...................................................................... 37
    Section 4.06    Rights of Contribution. .................................................... 38
    Section 4.07    Guaranty of Payment; Continuing Guaranty. ....................... 38

ARTICLE V CONDITIONS PRECEDENT TO CREDIT EXTENSIONS ......................... 38
    Section 5.01    Conditions to Initial Borrowings. ....................................... 38

Exhibit 3 - 43

Section 5.02         Conditions to all Borrowings.................................................................. 40

ARTICLE VI REPRESENTATIONS AND WARRANTIES ............................................ 41
Section 6.01         Existence, Qualification and Power.......................................................... 42
Section 6.02         Authorization; No Contravention. ........................................................... 42
Section 6.03         Governmental Authorization; Other Consents. ....................................... 42
Section 6.04         Binding Effect.......................................................................................... 42
Section 6.05         Financial Statements................................................................................ 43
Section 6.06         No Material Adverse Effect...................................................................... 43
Section 6.07         Litigation.................................................................................................. 43
Section 6.08         No Default. ............................................................................................... 43
Section 6.09         Ownership of Property; Liens................................................................... 43
Section 6.10         Environmental Compliance...................................................................... 44
Section 6.11         Insurance................................................................................................... 44
Section 6.12         Taxes......................................................................................................... 44
Section 6.13         ERISA Compliance. ................................................................................. 44
Section 6.14         Subsidiaries.............................................................................................. 45
Section 6.15         Margin Regulations; Investment Company Act. ..................................... 45
Section 6.16         Disclosure. ............................................................................................... 45
Section 6.17         Taxpayer Identification Number; Other Identifying Information. .......... 46
Section 6.18         Compliance with Laws............................................................................. 46
Section 6.19         Intercreditor Agreement........................................................................... 46
Section 6.20         Intellectual Property; Licenses, Etc. ....................................................... 46
Section 6.21         Security Interest in Collateral. ................................................................. 46
Section 6.22         [Reserved]................................................................................................. 47
Section 6.23         [Reserved]................................................................................................. 47
Section 6.24         Real Property. ........................................................................................... 47

ARTICLE VII AFFIRMATIVE COVENANTS................................................................ 47
Section 7.01         Financial Statements................................................................................ 47
Section 7.02         Certificates; Other Information................................................................ 48
Section 7.03         Notification. ............................................................................................. 49
Section 7.04         Payment of Taxes. ................................................................................... 50
Section 7.05         Preservation of Existence, Etc. ............................................................... 50
Section 7.06         Maintenance of Properties....................................................................... 51
Section 7.07         Maintenance of Insurance........................................................................ 51
Section 7.08         Compliance with Laws............................................................................. 51
Section 7.09         Books and Records. ................................................................................. 51
Section 7.10         Inspection Rights. .................................................................................... 51
Section 7.11         Use of Proceeds........................................................................................ 52
Section 7.12         Joinder of Subsidiaries as Guarantors. ................................................... 52
Section 7.13         Financial Consultant. ............................................................................... 52
Section 7.14         Pledge of Collateral. ................................................................................ 53
Section 7.15         Sale Covenants......................................................................................... 53

Exhibit 3 - 44

ARTICLE VIII NEGATIVE COVENANTS ........................................................................ 54
    Section 8.01   Liens. .................................................................................................... 54
    Section 8.02   Investments. .......................................................................................... 56
    Section 8.03   Indebtedness. ......................................................................................... 56
    Section 8.04   Mergers and Dissolutions. .................................................................... 57
    Section 8.05   Dispositions. ......................................................................................... 57
    Section 8.06   Restricted Payments. ............................................................................ 58
    Section 8.07   Change in Nature of Business. .............................................................. 59
    Section 8.08   Change in Fiscal Year. .......................................................................... 59
    Section 8.09   Transactions with Affiliates. ................................................................ 59
    Section 8.10   Prepayment of Subordinated Debt. ...................................................... 59
    Section 8.11   No Further Negative Pledges. ............................................................... 60
    Section 8.12   Financial Covenants. ............................................................................ 60
    Section 8.13   Ownership of Subsidiaries; Limitations on Parent, Midco and
                        Ecoly. ................................................................................................... 61
    Section 8.14   No Adverse Actions. ............................................................................. 61

ARTICLE IX EVENTS OF DEFAULT AND REMEDIES ................................................. 61
    Section 9.01   Events of Default. .................................................................................. 61
    Section 9.02   Remedies Upon Event of Default. ........................................................ 63
    Section 9.03   Application of Funds. ........................................................................... 64

ARTICLE X DIP AGENT AND DIP COLLATERAL AGENT ......................................... 65
    Section 10.01  Appointment and Authorization of DIP Agent and DIP Collateral
                        Agent. ................................................................................................... 65
    Section 10.02  Rights as a DIP Lender. ........................................................................ 65
    Section 10.03  Exculpatory Provisions. ........................................................................ 66
    Section 10.04  Reliance by DIP Agent. ........................................................................ 67
    Section 10.05  Delegation of Duties. ............................................................................ 67
    Section 10.06  Resignation of the DIP Agent. ............................................................. 67
    Section 10.07  Non-Reliance on DIP Agent and Other DIP Lenders. ......................... 68
    Section 10.08  [Reserved]. ........................................................................................... 68
    Section 10.09  DIP Agent May File Proofs of Claim. .................................................. 68
    Section 10.10  Collateral and Guaranty Matters. ......................................................... 69

ARTICLE XI MISCELLANEOUS ..................................................................................... 70
    Section 11.01  Amendments, Etc. ................................................................................ 70
    Section 11.02  Notices; Effectiveness; Electronic Communication. ........................... 71
    Section 11.03  No Waiver; Cumulative Remedies; Enforcement. ............................... 73
    Section 11.04  Expenses; Indemnity; Damage Waiver. ............................................... 74
    Section 11.05  Payments Set Aside. ............................................................................. 76
    Section 11.06  Successors and Assigns. ....................................................................... 76
    Section 11.07  Treatment of Certain Information; Confidentiality. ............................. 80
    Section 11.08  Right of Setoff. ..................................................................................... 81
    Section 11.09  Interest Rate Limitation. ....................................................................... 81
    Section 11.10  Counterparts; Integration; Effectiveness. ............................................ 82

Exhibit 3 - 45

Section 11.11    Survival of Representations and Warranties...........................................82
Section 11.12    Severability.............................................................................................82
Section 11.13    Replacement of DIP Lenders..................................................................82
Section 11.14    Governing Law; Jurisdiction; Etc...........................................................83
Section 11.15    Waiver of Jury Trial................................................................................85
Section 11.16    No Advisory or Fiduciary Responsibility...............................................85
Section 11.17    Electronic Execution of Assignments and Certain Other
                 Documents..............................................................................................86
Section 11.18    Termination............................................................................................86
Section 11.19    USA PATRIOT Act................................................................................86

Exhibit 3 - 46

## SCHEDULES

| | |
|---|---|
| Schedule 2.01 | DIP Lenders and DIP Loan Commitments |
| Schedule 6.02(b) | Authorization; No Contravention |
| Schedule 6.14 | Subsidiaries |
| Schedule 6.17 | Taxpayer Identification Numbers |
| Schedule 6.20 | Claims with Respect to Intellectual Property |
| Schedule 6.24 | Real Property |
| Schedule 8.01 | Existing Liens |
| Schedule 8.02 | Existing Investments |
| Schedule 8.03 | Existing Indebtedness |
| Schedule 11.02 | Notice Addresses |

## EXHIBITS

| | |
|---|---|
| Exhibit 1.01 | Budget |
| Exhibit 2.02 | Form of DIP Loan Notice |
| Exhibit 2.12 | Form of DIP Loan Note |
| Exhibit 7.02(b) | Form of Compliance Certificate |
| Exhibit 11.06 | Form of Assignment and Assumption |

## DEBTOR-IN-POSSESSION CREDIT AGREEMENT

This DEBTOR-IN-POSSESSION CREDIT AGREEMENT (the "Credit Agreement") is entered into as of _____, 2010, by and among Sexy Hair Concepts, LLC, a California limited liability company (the "Borrower"), the Guarantors identified herein, the DIP Lenders party hereto, and BANK OF MONTREAL, as DIP Agent.

## WITNESSETH

**WHEREAS**, Borrower has requested that DIP Lenders extend a post-petition revolving credit facility to Borrower in the principal amount of up to Five Million Dollars ($5,000,000) (i) to fund general corporate purposes relating to post-petition operations, (ii) to pay fees and expenses that comprise part of the Obligations, including without limitation all professional fees and expenses (including legal, financial advisor, appraisal and valuation-related fees and expenses) incurred by DIP Agent and DIP Lenders, including those incurred in connection with the preparation, negotiation, documentation and court approval hereof (whether incurred before or after the date of the commencement of the Bankruptcy Case), (iii) to repay certain other prepetition claims as may be permitted by the Bankruptcy Court and (iv) to provide for ongoing debtor-in-possession working capital needs; and for these purposes, DIP Lenders are willing to make certain post-petition loans and other extensions of credit to Borrower of up to such amount upon the terms and conditions set forth herein; and

NOW, THEREFORE, in consideration of these premises and the mutual covenants and agreements contained herein, the receipt and sufficiency of which are hereby acknowledged, the parties hereto covenant and agree as follows:

## ARTICLE I
## DEFINITIONS AND ACCOUNTING TERMS

### Section 1.01    Defined Terms.

As used in this Credit Agreement, the following terms have the meanings provided below:

"Acquisition" means the purchase or acquisition by any Person of (a) more than 50% of the Capital Stock with ordinary voting power of another Person or (b) all or any substantial portion of the property (other than Capital Stock) of another Person, whether or not involving a merger or consolidation with such Person.

"Administrative Questionnaire" means an administrative questionnaire for the DIP Lenders in a form supplied by the DIP Agent.

"Affiliate" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

Exhibit 3 - 48

"Aggregate DIP Loan Commitments" means the DIP Loan Commitments of all the DIP Lenders.

"Aggregate DIP Loan Committed Amount" has the meaning provided in Section 2.01(a).

"Applicable Percentage" means 5.00% per annum.

"Approved Fund" means any Fund that is administered or managed by (a) a DIP Lender, (b) an Affiliate of a DIP Lender or (c) an entity or an Affiliate of an entity that administers or manages a DIP Lender.

"Assignee Group" means two (2) or more Eligible Assignees that are Affiliates of one another or two (2) or more Approved Funds managed by the same investment advisor.

"Assignment and Assumption" means an assignment and assumption entered into by a DIP Lender and an assignee (with the consent of any party whose consent is required by Section 11.06(b)) and accepted by the DIP Agent, in substantially the form of Exhibit 11.06 or any other form approved by the DIP Agent.

"Attributable Principal Amount" means (a) in respect of any Capital Lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP, (b) in respect of any Synthetic Lease, an amount determined by capitalization of the remaining lease payments thereunder as if it were a capital lease determined in accordance with GAAP and (c) in respect of any Sale and Leaseback Transaction, the present value (discounted in accordance with GAAP at the debt rate implied in the applicable lease) of the obligations of the lessee for rental payments during the term of such lease.

"Avoidance Action Recoveries" means any and all recoveries of cash, property or proceeds thereof in the Bankruptcy Case under any or all of Sections 544, 547, 548, 549, 550 and 553 of, and any other avoidance actions under, the Bankruptcy Code.

"Avoidance Actions" means any and all actions in the Bankruptcy Case under any or all of Sections 544, 547, 548, 549, 550 and 553 of, and any other avoidance actions under, the Bankruptcy Code.

"Bank of Montreal" means Bank of Montreal, together with its successors.

"Bankruptcy Case" means, collectively, the cases under Chapter 11 of the Bankruptcy Code in which each Credit Party, respectively, is the debtor and debtor-in-possession, pending before the Bankruptcy Court.

"Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

-2-

Exhibit 3 - 49

"Bankruptcy Court" means the United States Bankruptcy Court for the Central District of California having jurisdiction over the Bankruptcy Case.

"Base Rate" means for any day a fluctuating rate per annum equal to the higher of (i) the Federal Funds Rate plus 1/2 of 1% and (ii) the rate of interest in effect for such day as publicly announced from time to time by Bank of Montreal as its "prime rate". The "prime rate" is a rate set by Bank of Montreal based upon various factors including Bank of Montreal's costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such announced rate. Any change in the prime rate announced by Bank of Montreal shall take effect at the opening of business on the day specified in the public announcement of such change.

"Borrower" has the meaning provided in the recitals hereto, together with its successors and permitted assigns.

"Borrowing" means a borrowing consisting of simultaneous DIP Loans.

"Budget" means the budget prepared by Borrower and attached hereto as Exhibit 1.01 (as revised from time to time during the term of this Credit Agreement, subject in each instance to Required DIP Lenders' written consent (which consent Required DIP Lenders may or may not give in their sole and absolute discretion)).

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state where the DIP Agent's Office is located.

"Capital Stock" means (a) in the case of a corporation, capital stock, (b) in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of capital stock, (c) in the case of a partnership, partnership interests (whether general or limited), (d) in the case of a limited liability company, membership interests and (e) any other equity interest or equity participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person.

"Cash Equivalents" means (a) securities issued or directly and filly guaranteed or insured by the United States or any agency or instrumentality thereof (provided that the full faith and credit of the United States is pledged in support thereof) having maturities of not more than twelve months from the date of acquisition, (b) Dollar-denominated time deposits and certificates of deposit of (i) any DIP Lender, (ii) any domestic commercial bank of recognized standing having capital and surplus in excess of $500 million or (iii) any bank whose short-term commercial paper rating from S&P is at least A-I or the equivalent thereof or from Moody's is at least P-1 or the equivalent thereof (each an "Approved Bank"), in each case with maturities of not more than 270 days from the date of acquisition, (c) commercial paper and variable or fixed rate notes issued by any Approved Bank (or by the parent company thereof) or any variable rate notes issued by, or guaranteed by, any domestic

-3-

Exhibit 3 - 50

corporation rated A-I (or the equivalent thereof) or better by S&P or P-1 (or the equivalent thereof) or better by Moody's and maturing within six (6) months of the date of acquisition, (d) repurchase agreements entered into by any Person with a bank or trust company (including any of the DIP Lenders) or recognized securities dealer having capital and surplus in excess of $500 million for direct obligations issued by or fully guaranteed by the United States in which such Person shall have a perfected First Priority security interest (subject to no other Liens) and having, on the date of purchase thereof, a fair market value of at least 100% of the amount of the repurchase obligations and (e) Investments (classified in accordance with GAAP as current assets) in money market investment programs registered under the Investment Company Act of 1940 that are administered by reputable financial institutions having capital of at least $500 million and the portfolios of which are limited to Investments of the character described in the foregoing subclauses hereof.

"Cash Management Order" means the order entered in the Bankruptcy Case authorizing the maintenance of a cash management system, bank accounts, business forms and deviation from the deposit and investment guidelines set forth in U.S.C. § 345(b).

"Change in Law" means the occurrence, after the date of this Credit Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority.

"Change of Control" means, with respect to any Person, an event or series of events by which:

(a)     any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, but excluding any employee benefit plan of such person or its subsidiaries, and any person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan), other than the Permitted Holders, becomes the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Securities Exchange Act of 1934, except that a person or group shall be deemed to have "beneficial ownership" of all securities that such person or group has the right to acquire, whether such right is exercisable immediately or only after the passage of time (such right, an "option right")), directly or indirectly, of 25% or more of the equity securities of such Person entitled to vote for members of the board of directors or equivalent governing body of such Person on a fully diluted basis (and taking into account all such securities that such person or group has the right to acquire pursuant to any option right); or

(b)     during any period of twelve consecutive months, a majority of the members of the board of directors or other equivalent governing body of such Person cease to be composed of individuals (i) who were members of that board or equivalent governing body on the first day of such period, (ii) whose election or nomination to that board or equivalent governing body was approved by individuals referred to in clause (i) above constituting at the time of such election or nomination at least a majority of that board or

-4-

Exhibit 3 - 51

equivalent governing body or (iii) whose election or nomination to that board or other equivalent governing body was approved by individuals referred to in clauses (i) and (ii) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body (excluding, in the case of both clause (ii) and clause (iii), any individual whose initial nomination for, or assumption of office as, a member of that board or equivalent governing body occurs as a result of an actual or threatened solicitation of proxies or consents for the election or removal of one or more directors by any person or group other than a solicitation for the election of one or more directors by or on behalf of the board of directors); or

(c)     at any time, the Sponsor Group shall cease to (i) own and control legally and beneficially (free and clear of all Liens), either directly or indirectly, Capital Stock in the Parent representing more than (A) 30% of the combined voting power of all of the Capital Stock entitled to vote for members of the board of directors or equivalent governing body of the Parent (and taking into account all such securities that the Sponsor Group has the right to acquire pursuant to any option right and taking into account all voting agreements) and (B) 30% of the economic interest in the profits of the Parent or (ii) control (directly, by way of shareholder agreement or otherwise) a majority of the board of directors or other governing body of the Parent; or

(d)     at any time, the Parent shall own and control less than 100% of the Capital Stock of Midco, or Parent and Midco shall own and control less than 100% of the Capital Stock of Ecoly; or

(e)     at any time, Ecoly shall own less than 100% of the Capital Stock of Borrower; or

(f)     the occurrence of a "Fundamental Change" (as defined in the Parent Charter).

"Closing Date" means the date hereof.

"Code" means the Internal Revenue Code of 1986.

"Collateral" means the collateral identified in, and at any time covered by, the Collateral Documents or the Financing Orders, including all Avoidance Actions and Avoidance Action Recoveries to the extent provided by the Financing Orders.

"Collateral Documents" means the Financing Order, the Security Agreement, all intellectual property security agreements, if any, and all other documents, if any, executed and delivered in connection with the attachment and perfection of security interests granted to secure the Obligations.

"Commitment Period" means the period from and including the Closing Date to the DIP Loan Termination Date.

Exhibit 3 - 52

"Compliance Certificate" means a certificate substantially in the form of Exhibit 7.02(b).

"Consolidated Capital Expenditures" means, for any period for the Credit Parties, without duplication, all expenditures (whether paid in cash or other consideration) during such period that, in accordance with GAAP, are or should be included in additions to property, plant and equipment or similar items reflected in the consolidated statement of cash flows for such period; provided, that Consolidated Capital Expenditures shall not include, for purposes hereof, without duplication, (a) expenditures in connection with any Acquisition permitted hereunder, (b) expenditures of proceeds of insurance settlements, condemnation awards and other settlements in respect of lost, destroyed, damaged or condemned assets, equipment or other property to the extent such expenditures are made to replace or repair such lost, destroyed, damaged or condemned assets, equipment or property or (c) the purchase price of equipment that is purchased simultaneously with the trade-in of existing equipment to the extent that the gross amount of such purchase price is reduced by the credit granted by the seller of such equipment for the equipment being traded in at such time.

"Contractual Obligation" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto. Without limiting the generality of the foregoing, a Person shall be deemed to be Controlled by another Person if such other Person possesses, directly or indirectly, power to vote 20% or more of the securities having ordinary voting power for the election of directors, managing general partners or the equivalent.

"Credit Agreement" has the meaning provided in the recitals hereto, as the same may be amended and modified from time to time.

"Credit Documents" means this Credit Agreement, the DIP Loan Notes, the Collateral Documents, the Joinder Agreements, the Interim Financing Order, the Final Financing Order and any reaffirmation of the "Credit Documents" (as defined in the Prepetition Credit Agreement) executed in connection with the Prepetition Credit Agreement executed by the Credit Parties.

"Credit Parties" means, collectively, the Borrower and the Guarantors.

"Debt Transaction" means, with respect to any Credit Party, any sale, issuance, placement, assumption or guaranty of Funded Debt, whether or not evidenced by a promissory note or other written evidence of Indebtedness, except for Funded Debt permitted to be incurred pursuant to Section 8.03.

"Debtor Relief Laws" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium,

rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Default" means any event, act or condition that constitutes an Event of Default or that, with notice, the passage of time, or both, would constitute an Event of Default.

"Default Rate" means an interest rate equal to the Base Rate plus the Applicable Percentage plus 2% per annum.

"Defaulting DIP Lender" means any DIP Lender that (a) has failed to fund any portion of the DIP Loans required to be funded by it hereunder within one (1) Business Day of the date required to be funded by it hereunder and has not cured such failure prior to the date of determination, (b) has otherwise failed to pay over to the DIP Agent or any other DIP Lender any other amount required to be paid by it hereunder within one (1) Business Day of the date when due, unless the subject of a good faith dispute, and has not cured such failure prior to the date of determination, or (c) has been deemed insolvent or become the subject of a bankruptcy or insolvency proceeding.

"DIP Agent" means Bank of Montreal in its capacity as administrative agent and collateral agent for the DIP Lenders under any of the Credit Documents, or any successor DIP Agent.

"DIP Agent's Office" means the DIP Agent's address and, as appropriate, account as set forth on Schedule 11.02, or such other address or account as the DIP Agent may from time to time notify the Borrower and the DIP Lenders.

"DIP Collateral Agent" means Bank of Montreal in its capacity as collateral agent for the DIP Lenders under any of the Collateral Documents, or any successor DIP Collateral Agent.

"DIP Lender" means each of the Persons identified as a "DIP Lender" on the signature pages hereto and each Person who joins as a DIP Lender pursuant to the terms hereof, together with their respective successors and assigns.

"DIP Loan Commitment" means the commitment of each DIP Lender to make DIP Loans (and to share in DIP Loans) hereunder.

"DIP Loan" means the loans made by DIP Lenders to Borrower pursuant to Section 2.01(a).

"DIP Loan Commitment Percentage" means, for each DIP Lender, a fraction (expressed as a percentage carried to the ninth decimal place), the numerator of which is such DIP Lender's DIP Loan Committed Amount and the denominator of which is the Aggregate DIP Loan Committed Amount. The initial DIP Loan Commitment Percentages are set forth on Schedule 2.01.

Exhibit 3 - 54

"DIP Loan Committed Amount" means, for each DIP Lender, the amount of such DIP Lender's DIP Loan Commitment. The initial DIP Loan Committed Amounts are set out in Schedule 2.01.

"DIP Loan Notes" means the promissory notes, if any, given to evidence the DIP Loans, as amended, restated, modified, supplemented, extended, renewed or replaced. A form of DIP Loan Note is attached as Exhibit 2.12.

"DIP Loan Notice" means a notice of a Borrowing of DIP Loans.

"DIP Loan Termination Date" means, unless extended by Required DIP Lenders in writing, the earliest of (i) the closing date of the sale of all or substantially all of the assets of Borrower, (ii) twenty-one (21) days after the Filing Date if a Final Financing Order acceptable to DIP Agent (acting in its discretion unless instructed otherwise by Required DIP Lenders) is not entered into on or prior to such date, (iii) the acceleration of the DIP Loans and the termination of the DIP Loan Commitments pursuant to Section 9.02 hereof (to the extent the Event of Default or Events of Default giving rise to such acceleration are not waived in writing by DIP Agent (acting in its discretion unless instructed otherwise by Required DIP Lenders)), (iv) the effective date of confirmation of a plan in the Bankruptcy Case, and (v) June 15, 2011.

"Disposition" or "Dispose" means the sale, transfer, license, lease or other disposition (including any Sale and Leaseback Transaction) of any Property by any Credit Party, including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith, but excluding, for purposes hereof, (a) Dispositions of obsolete or worn out property, whether now owned or hereafter acquired, in the ordinary course of business; (b) Dispositions of inventory in the ordinary course of business; and (c) Dispositions of equipment or real property to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property or (ii) the proceeds of such Disposition are reasonably promptly applied to the purchase price of such replacement property.

"Dollar" or "$" means the lawful currency of the United States.

"Domestic Credit Party" means any Credit Party that is organized under the laws of any State of the United States or the District of Columbia.

"Domestic Subsidiary" means any Subsidiary that is organized under the laws of any State of the United States or the District of Columbia.

"Ecoly" means Ecoly International, Inc., a California corporation.

"Ecoly Acquisition Agreement" means that certain Securities Purchase Agreement, made and entered into as of March 18, 2008, by and among Ecoly and the shareholders of Ecoly listed on Schedule I to the Ecoly Acquisition Agreement, as sellers, the Parent and Midco, as buyers, and others parties identified therein.

-8-

Exhibit 3 - 55

"Eligible Assignee" means any Person that meets the requirements to be an assignee under Section 11.06(b)(iii), (v) and (vi) (subject to such consents, if any, as may be required under Section 11.06(b)(iii)).

"Environmental Laws" means any and all federal, state, local, and foreign statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses, agreements or governmental restrictions having the force and effect of law relating to pollution and the protection of the environment or the release of any materials into the environment, including those related to hazardous substances or wastes, air emissions and discharges to waste or public systems.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of the Borrower, any other Credit Party or any of their respective Subsidiaries directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equity Transaction" means, with respect to any Credit Party, any issuance or sale of shares of its Capital Stock, other than an issuance (a) to a Credit Party, (b) in connection with a conversion of debt securities to equity, or (c) in connection with the exercise by a present or former employee, officer or director under a stock incentive plan, stock option plan or other equity-based compensation plan or arrangement.

"ERISA" means the Employee Retirement Income Security Act of 1974.

"ERISA Affiliate" means any trade or business (whether or not incorporated) under common control with the Borrower within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code).

"ERISA Event" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by the Borrower or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by the Borrower or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization; (d) the filing of a notice of intent to terminate, the treatment of a Plan amendment as a termination under Section 4041 or 4041 A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (e) an event or condition that would reasonably be expected to constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; or (f) the imposition of

-9-

Exhibit 3 - 56

any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Borrower or any ERISA Affiliate.

"Excluded Taxes" means, with respect to the DIP Agent, any DIP Lender or any other recipient of any payment to be made by or on account of any obligation of the Borrower hereunder, (a) taxes imposed on or measured by its overall net income (however denominated), and franchise taxes imposed on it (in lieu of net income taxes), by the jurisdiction (or any political subdivision thereof) under the Laws of which such recipient is organized or incorporated or in which its principal office is located or, in the case of any DIP Lender, in which its applicable Lending Office is located, (b) any branch profits taxes imposed by the United States or any similar tax imposed by any other jurisdiction in which the Borrower is located, (c) any backup withholding tax that is required by the Code to be withheld from amounts payable to a DIP Lender that has failed to comply with clause (A) of Section 3.01(e)(ii), (d) in the case of a Foreign DIP Lender, any United States withholding tax that (i) is required to be imposed on amounts payable to such Foreign DIP Lender (other than an assignee pursuant to a request by the Borrower under Section 11.13) pursuant to the Laws in force at the time such Foreign DIP Lender becomes a party hereto (or designates a new Lending Office), except to the extent that such Foreign DIP Lender (or its assignor, if any) was entitled, at the time of designation of a new Lending Office (or assignment), to receive additional amounts from the Borrower with respect to such withholding tax pursuant to Section 3.01(a)(ii), or (ii) is attributable to such Foreign DIP Lender's failure or inability (other than as a result of a Change in Law) to comply with clause (B) of Section 3.01(e) and (e) interest, additions to tax, and penalties applicable to taxes described in clauses (a) through (d) of this definition.

"Event of Default" has the meaning provided in Section 9.01.

"Federal Funds Rate" means, for any day, the rate per annum equal to the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day immediately succeeding such day; provided that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate (rounded upward, if necessary, to the multiple of 1/100" of 1%) charged to Bank of Montreal on such day on such transactions as determined by the DIP Agent.

"Filing Date" has the meaning assigned to that term in the Interim Financing Order.

"Final Financing Order" means a Financing Order entered in the Bankruptcy Case subsequent to the satisfaction of the fourteen (14) day notice period contained in Rule 4001(c) of the Federal Rules of Bankruptcy Procedure.

-10-

Exhibit 3 - 57

"Financing Order" means an order, including the Interim Financing Order and the Final Financing Order, entered in the Bankruptcy Case authorizing Borrower to obtain the financing contemplated by and described in this Credit Agreement, including all amendments and modifications of such orders, in each case, in form and substance satisfactory to DIP Agent and, as applicable, DIP Lenders or Required DIP Lenders.

"First Priority" means (i) with respect to any Lien purported to be created in any Collateral pursuant to the Bankruptcy Case against any Credit Party, that (a) pursuant to Section 364(c)(1) of the Bankruptcy Code, such Lien is entitled to superpriority administrative expense status in the Bankruptcy Case, (b) pursuant to Section 364(c)(2) of the Bankruptcy Code, such Lien is secured by a first priority perfected security interest in all of such Credit Party's and each other obligor's and guarantor's assets, including all real and personal property, whether now owned or hereafter acquired, and the proceeds of any avoidance actions of such Credit Party under Sections 544, 545, 547 through 551 and 553 of the Bankruptcy Code, (c) pursuant to Section 364(c)(3) of the Bankruptcy Code, such Lien is a perfected junior lien on all property of such Credit Party and each other obligor and guarantor that is subject to valid, perfected and non-avoidable Liens; and (d) pursuant to Section 364(d), such Lien is a senior Lien with priority over all Liens in or against such Credit Party's assets, subject only to the "Carveout" (as defined in the then applicable Financing Order), amounts required to be paid by such Credit Party to the United States Trustee during the term of the then applicable Financing Order and Prior Permitted Liens, and (ii) with respect to any Lien purported to be created in any Collateral pursuant to any Collateral Documents against any other Credit Party, that (a) such Lien is perfected and has priority over any other Lien on such Collateral, whether due to the filing or control provisions of the UCC or otherwise, and (b) such Lien is the only Lien (other than Permitted Liens) to which such Collateral is subject.

"Foreign DIP Lender" means any DIP Lender that is organized under the Laws of a jurisdiction other than that in which the Borrower is resident for tax purposes. For purposes of this definition, the United States, each state thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"Foreign Subsidiary" means any Subsidiary that is not a Domestic Subsidiary.

"FRB" means the Board of Governors of the Federal Reserve System of the United States.

"Fund" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities.

"Funded Debt" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

Exhibit 3 - 58

(a)    all obligations for borrowed money, whether current or long-term (including the Obligations hereunder), and all obligations evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)    all purchase money indebtedness (including indebtedness and obligations in respect of conditional sales and title retention arrangements, except for customary conditional sales and title retention arrangements with suppliers that are entered into in the ordinary course of business) and all indebtedness and obligations in respect of the deferred purchase price of property or services (other than (x) trade accounts payable incurred in the ordinary course of business and payable on customary trade terms and (y) any purchase price adjustments or earn-out obligations in respect of Acquisitions or Investments permitted pursuant to Section 8.02);

(c)    all direct obligations under letters of credit (including standby and commercial), bankers' acceptances and similar instruments (including bank guaranties, surety bonds, comfort letters, keep-well agreements and capital maintenance agreements);

(d)    the Attributable Principal Amount of capital leases and Synthetic Leases;

(e)    all preferred stock and comparable equity interests providing for mandatory redemption, sinking fund or other like payments;

(f)    Support Obligations in respect of Funded Debt of another Person;

(g)    Funded Debt of any partnership or joint venture or other similar entity in which such Person is a general partner or joint venturer, and, as such, has personal liability for such obligations, but only to the extent there is recourse to such Person for payment thereof; and

For purposes hereof, the amount of Funded Debt shall be determined (i) based on the outstanding principal amount in the case of borrowed money indebtedness under clause (a) and purchase money indebtedness and the deferred purchase obligations under clause (b), (ii) based on the maximum amount available to be drawn in the case of letter of credit obligations and the other obligations under clause (c) , and (iii) based on the amount of Funded Debt that is the subject of the Support Obligations in the case of Support Obligations under clause (f).

"GAAP" means generally accepted accounting principles in effect in the United States as set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board from time to time applied on a consistent basis, subject to the provisions of Section 1.03.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising

Exhibit 3 - 59

executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supranational bodies such as the European Union or the European Central Bank).

"Guaranteed Obligations" has the meaning provided in Section 4.01(a).

"Guarantors" means Ecoly and Midco, in each case together with their successors and permitted assigns.

"Guaranty" means the guaranty provided under Article IV.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"Indebtedness" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)     all Funded Debt;

(b)     all contingent obligations under letters of credit (including standby and commercial), bankers' acceptances and similar instruments (including bank guaranties, surety bonds, comfort letters, keep-well agreements and capital maintenance agreements);

(c)     net obligations under any Swap Contract;

(d)     Support Obligations in respect of Indebtedness of another Person; and

(e)     Indebtedness of any partnership or joint venture or other similar entity in which such Person is a general partner or joint venturer, and, as such, has personal liability for such obligations, but only to the extent there is recourse to such Person for payment thereof.

For purposes hereof, the amount of Indebtedness shall be determined (i) based on Swap Termination Value in the case of net obligations under Swap Contracts under clause (c) and (ii) based on the outstanding principal amount of the Indebtedness that is the subject of the Support Obligations in the case of Support Obligations under clause (d).

"Indemnified Taxes" means, with respect to the DIP Agent, any DIP Lender or any other recipient of any payment to be made by or on account of any obligation of the Borrower hereunder, Taxes other than Excluded Taxes and Other Taxes.

"Indemnitees" has the meaning provided in Section 11.04(b).

"Information" has the meaning specified in Section 11.07.

Exhibit 3 - 60

"Initial Closing Date" means April 9, 2008.

"Intercreditor Agreement" means that certain Intercreditor Agreement, dated as of the Initial Closing Date, by and among the Junior Lenders named therein, the Prepetition Agent and the Borrower.

"Interest Payment Date" means the last Business Day of each calendar month and the DIP Loan Termination Date.

"Interim DIP Amount" has the meaning assigned to that term in Section 2.01(a).

"Interim Financing Order" means a Financing Order entered in the Bankruptcy Case prior to the satisfaction of the fourteen (14) day notice period contained in Rule 4001(c) of the Federal Rules of Bankruptcy Procedure.

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Capital Stock of another Person, (b) a loan, advance or capital contribution to, guaranty or assumption of debt of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person and any arrangement pursuant to which the investor undertakes any Support Obligation with respect to Indebtedness of such other Person, or (c) the purchase or other acquisition (in one transaction or a series of transactions) of assets of another Person that constitute a business unit. For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment.

"Involuntary Disposition" means the receipt by any Credit Party of any cash insurance proceeds or condemnation awards payable by reason of theft, loss, physical destruction or damage, taking or similar event with respect to any of its Property.

"IP Rights" has the meaning provided in Section 6.20.

"IRS" means the United States Internal Revenue Service.

"Joinder Agreement" means a joinder agreement in form and substance reasonably acceptable to DIP Agent.

"Laws" means, collectively, all international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, licenses, authorizations and permits of, and agreements with, any Governmental Authority.

Exhibit 3 - 61

"Lending Office" means, as to any DIP Lender, the office or offices of such DIP Lender set forth in such DIP Lender's Administrative Questionnaire or such other office or offices as a DIP Lender may from time to time notify the Borrower and the DIP Agent.

"Lien" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or otherwise), charge, or preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property and any financing lease having substantially the same economic effect as any of the foregoing).

"Material Adverse Effect" means (a) a material adverse effect upon, the business, assets, liabilities (actual or contingent) or financial condition of the Credit Parties taken as a whole; (b) a material adverse effect on the ability of any Credit Party to perform its material obligations under any Credit Document to which it is a party; or (c) a material adverse effect upon the legality, validity, binding effect or the enforceability against any Credit Party of any material provision of any Credit Document to which it is a party.

"Midco" means Luxe Beauty Midco Corporation, a Delaware corporation.

"Moody's" means Moody's Investors Service, Inc. and any successor thereto.

"Multiemployer Plan" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which the Borrower or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"Net Cash Proceeds" means the aggregate proceeds paid in cash or Cash Equivalents received by any Credit Party in connection with any Disposition, Debt Transaction or Equity Transaction, net of (a) direct costs incurred in connection therewith (including, without limitation, legal, accounting and investment banking fees and expenses, sales commissions and underwriting discounts), (b) estimated taxes paid or payable (including, without limitation, sale, use or other transactional taxes and any net marginal increase in income taxes) as a result thereof, (c) the amount necessary to retire any Indebtedness secured by a Permitted Lien on the related property and (d) amounts which are required to be placed in escrow unless and until such amounts are released to such Credit Party. For purposes hereof, "Net Cash Proceeds" includes any cash or Cash Equivalents received upon the disposition of any non-cash consideration received by any Credit Party in any Disposition, Debt Transaction or Equity Transaction.

"Obligations" means, without duplication, (a) all advances to, and debts, liabilities, obligations, covenants and duties of, any Credit Party arising under any Credit Document or otherwise with respect to any DIP Loan, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Credit Party of any proceeding under any Debtor Relief Laws naming such

-15-

Exhibit 3 - 62

Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding and (b) all obligations under any Swap Contract between any Credit Party and any DIP Lender or Affiliate of a DIP Lender to the extent permitted hereunder and (c) all obligations under any Treasury Management Agreement between any Credit Party and any DIP Lender or Affiliate of a DIP Lender; provided, further, that claims for reimbursement of professional fees and expenses owing to Prepetition Agent under the Prepetition Credit Agreement and outstanding as of the Closing Date shall be deemed to constitute "Obligations" incurred under this Credit Agreement.

"Organization Documents" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"Other Taxes" means all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or under any other Credit Document or from the execution, delivery or enforcement of, or otherwise with respect to, this Credit Agreement or any other Credit Document.

"Outstanding Amount" means, with respect to DIP Loans on any date, the aggregate outstanding principal amount thereof after giving effect to any Borrowings and prepayments or repayments of DIP Loans occurring on such date.

"Parent" means Luxe Beauty Holdings Corporation, a Delaware corporation.

"Parent Charter" means the Amended and Restated Certificate of Incorporation of the Parent as in effect on the Closing Date.

"Participant" has the meaning specified in Section 11.06(d).

"PBGC" means the Pension Benefit Guaranty Corporation.

"Pension Plan" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by the Borrower or any ERISA Affiliate or to which the Borrower or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the immediately preceding five plan years.

Exhibit 3 - 63

"Permitted Holders" means, collectively, (i) the Sponsor Group, (ii) the Rollover Sellers, as defined in the Ecoly Acquisition Agreement, and (iii) in respect of each of the Rollover Sellers, (a) his spouse, (b) his descendants and any member of his immediate family, including in each case stepchildren and family members by adoption, (c) his heirs at law and his estate and the beneficiaries thereof, (d) any charitable foundation created by any Rollover Seller, and (e) any trust, corporation, limited liability company, partnership or other entity, the beneficiaries, stockholders, members, general partners, owners or beneficially owning a majority of the interests of which consist of, as applicable, and/or one or more of the Persons referred to in the immediately preceding clauses (a) through (d).

"Permitted Liens" means Liens permitted pursuant to Section 8.01.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Plan" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) established by the Borrower or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, any ERISA Affiliate.

"Platform" has the meaning specified in Section 7.02.

"Prepetition Agent" means Bank of Montreal, as administrative agent, under the Prepetition Credit Agreement, together with its successors and assigns in such capacity.

"Prepetition Credit Agreement" means that certain Credit Agreement dated as of the Initial Closing Date by, between and among Borrower, Midco, the other "Guarantors" party thereto, the Prepetition Agent and the Prepetition Lenders.

"Prepetition Debt" means the "Obligations" under (and as defined in) the Prepetition Credit Agreement, including interests, fees, costs and other charges accruing from and after the Filing Date.

"Prepetition Lenders" means the lenders from time to time party to the Prepetition Credit Agreement.

"Prior Permitted Liens" means perfected, non-avoidable Liens with priority over the Liens granted pursuant to the Prepetition Credit Agreement as of the Filing Date and permitted under the Prepetition Credit Agreement.

"Property" means an interest of any kind in any property or asset, whether real, personal or mixed, and whether tangible or intangible.

"Register" has the meaning provided in Section 11.06(c).

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents and advisors of such Person and of such Person's Affiliates.

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the thirty (30) days' notice period has been waived.

"Required DIP Lenders" means, as of any date of determination, DIP Lenders having more than 50% of the Aggregate DIP Loan Commitments or, if the DIP Loan Commitments shall have expired or been terminated, DIP Lenders holding in the aggregate more than 50% of the DIP Loans; provided that the commitments of, and the portion of the DIP Loans held or deemed held by, any Defaulting DIP Lender shall be excluded for purposes of making a determination of Required DIP Lenders.

"Responsible Officer" means, for purposes of certifying or confirming matters relating to the Organizational Documents, incumbency and like matters, the secretary or an assistant secretary, and for all other purposes, the chief executive officer, president, chief financial officer, vice president of finance, treasurer or assistant treasurer of a Credit Party. Any document delivered hereunder that is signed by a Responsible Officer of a Credit Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Credit Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Credit Party.

"Restricted Payment" means (a) any dividend or other distribution (whether in cash, securities or other property) with respect to any Capital Stock of any Credit Party, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Capital Stock or of any option, warrant or other right to acquire any such Capital Stock and (b) payment of any management fees.

"S&P" means Standard & Poor's Ratings Services, a d vision of The McGraw-Hill Companies, Inc. and any successor thereto.

"Sale and Leaseback Transaction" means, with respect to any Credit Party, any arrangement, directly or indirectly, with any Person (other than a Credit Party) whereby such Credit Party shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property being sold or transferred.

"SEC' means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"Security Agreement" means the security agreement, if any, dated on or after the Closing Date, given by the Credit Parties, as grantors, to the DIP Collateral Agent to secure the Obligations, and any other security agreements that may be given by any Person

-18-

Exhibit 3 - 65

pursuant to the terms hereof, in each case as the same may be amended and modified from time to time.

"Sponsor" means Thoma Cressey Bravo, Inc.

"Sponsor Group" means the Sponsor and its Subsidiaries and Affiliates.

"Subordinated Debt" means the Securities Purchase and Guaranty Agreement, dated as of the Initial Closing Date, in respect of the 14% Senior Subordinated Notes due April 9, 2015, in an initial aggregate principal amount of $19 million on the Initial Closing Date, pursuant to the terms of the documentation executed on the Initial Closing Date with respect to the Subordinated Debt, as the same may be amended, supplemented or otherwise modified from time to time in accordance with the terms hereof.

"Subordinated Debt Documents" means the Securities Purchase and Guaranty Agreement referred to in the definition of Subordinated Debt and all documents executed and delivered in connection therewith in compliance with the Intercreditor Agreement.

"Subsidiary" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which more than 50% of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise provided, "Subsidiary" shall refer to a Subsidiary of the Borrower.

"Support Obligations" means, as to any Person, any (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation payable or performable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other obligation of the payment or performance of such Indebtedness or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness or other obligation of any other Person, whether or not such Indebtedness or other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien). The amount of any Support Obligations shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Support

Exhibit 3 - 66

Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith.

"Swap Contract" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, that are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"Swap Termination Value" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination values determined in accordance therewith, such termination values, and (b) for any date prior to the date referenced in clause (a), the amounts determined as the mark-to-market values for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a DIP Lender or any Affiliate of a DIP Lender).

"Synthetic Lease" means any synthetic lease, tax retention operating lease, off-balance sheet loan or similar off-balance sheet financing arrangement that is considered borrowed money indebtedness for tax purposes but is classified as an operating lease under GAAP.

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Treasury Management Agreement" means any agreement governing the provision of treasury or cash management services, including deposit accounts, funds transfer, automated clearinghouse, zero balance accounts, returned check concentration, controlled disbursement, lockbox, account reconciliation and reporting and trade finance services.

Exhibit 3 - 67

"UCC" means the Uniform Commercial Code in effect in any applicable jurisdiction from time to time.

"Unfunded Pension Liability" means the excess of a Pension Plan's benefit liabilities under Section 4001(a)(16) of ERISA, over the current value of that Pension Plan's assets, determined in accordance with the assumptions used for funding the Pension Plan pursuant to Section 412 of the Code for the applicable plan year.

"United States" or "U.S." means the United States of America.

"Wholly Owned Subsidiary" means, with respect to any direct or indirect Subsidiary of any Person, that 100% of the Capital Stock with ordinary voting power issued by such Subsidiary (other than directors' qualifying shares and investments by foreign nationals mandated by applicable Law) is beneficially owned, directly or indirectly, by such Person.

**Section 1.02**      **Interpretive Provisions.**

With reference to this Credit Agreement and each other Credit Document, unless otherwise specified herein or in such other Credit Document:

(a)      The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any Organization Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Credit Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein," "hereof" and "hereunder," and words of similar import when used in any Credit Document, shall be construed to refer to such Credit Document in its entirety and not to any particular provision thereof, (iv) all references in a Credit Document to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, the Credit Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

Exhibit 3 - 68

(b)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including".

(c)    Section headings herein and in the other Credit Documents are included for convenience of reference only and shall not affect the interpretation of this Credit Agreement or any other Credit Document.

### Section 1.03    Accounting Terms and Provisions.

All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Credit Agreement shall be prepared in conformity with, GAAP applied on a consistent basis, as in effect from time to time.

### Section 1.04    Rounding.

Any financial ratios required to be maintained by the Borrower pursuant to this Credit Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

### Section 1.05    Times of Day.

Unless otherwise provided, all references herein to times of day shall be references to Pacific time (daylight or standard, as applicable).

### ARTICLE II
### DIP LOAN COMMITMENTS AND BORROWINGS

### Section 2.01    DIP Loan Commitments.

Subject to the terms and conditions set forth herein:

(a)    DIP Loans.    Subject to the terms and conditions of this Credit Agreement and in reliance upon the representations and warranties of Borrower herein set forth, each DIP Lender hereby severally agrees, subject to the limitations set forth below with respect to the maximum amount of DIP Loans permitted to be outstanding from time to time hereunder and with respect to the Budget, to lend to Borrower from time to time during the Commitment Period, DIP Loans in an aggregate amount outstanding at any time not exceeding the lesser of the amount of its DIP Loan Commitment and its Pro Rata Share of the aggregate amount of the DIP Loan Commitments to be used for the purposes identified in Section 7.11.    The aggregate principal amount of DIP Loans outstanding at any time hereunder, (1) during the term of the Interim Financing Order, shall not exceed during any week, the lesser of Two Million Five Hundred Thousand Dollars ($2,500,000) and the

-22-

Exhibit 3 - 69

principal amount of the DIP Loans projected to be outstanding during such week as set forth in the Budget for such week and in the Interim Financing Order (such lesser principal amount during the term of the Interim Financing Order, the "Interim DIP Amount") (subject to any permitted variance thereunder) and (2) after the entry of the Final Financing Order, shall not exceed during any week, the principal amount of the DIP Loans projected to be outstanding during such week as set forth in the Budget for such week (subject to any permitted variance thereunder). Borrower shall only request that DIP Lenders make DIP Loans in the event, and to the extent, that Borrower does not have sufficient cash collateral available for use by Borrower in accordance with the Bankruptcy Case and the then applicable Financing Order.

The original amount of each DIP Lender's DIP Loan Commitment is set forth opposite its name on Schedule 2.01 annexed hereto and the aggregate original amount of the DIP Loan Commitments is Five Million Dollars ($5,000,000) (the "Aggregate DIP Loan Committed Amount"); provided that the DIP Loan Commitments of DIP Lenders shall be adjusted to give effect to any assignments of the DIP Loan Commitments pursuant to Section 11.06(b). Each DIP Lender's DIP Loan Commitment shall expire on the DIP Loan Termination Date and all DIP Loans and all other amounts owed hereunder with respect to the DIP Loans and the DIP Loan Commitments shall be paid in full no later than such date. Subject to reduction of the DIP Loan Commitments pursuant to Section 2.05, amounts borrowed under this Section 2.01(a) may be repaid and reborrowed to but excluding the DIP Loan Termination Date.

(b)     Anything contained in this Credit Agreement to the contrary notwithstanding, the DIP Loans and the DIP Loan Commitments shall be subject to the limitation that at no time shall the sum of the Outstanding Amount of DIP Loans and the applicable amount of the "Carveout" (as defined in the then applicable Financing Order) at such time exceed the DIP Loan Commitments then in effect (or during the term of the Interim Financing Order, Two Million Five Hundred Thousand Dollars ($2,500,000). In furtherance of the foregoing, it is agreed and understood that DIP Agent shall from time to time establish reserves and revise such reserves in its reasonable credit judgment, reducing dollar-for-dollar the amount of DIP Loans which would otherwise be available to Borrower hereunder, in an amount equal to the unfunded portion of the "Carveout" (as defined in the then applicable Financing Order).

## Section 2.02      Borrowings.

(a)     Each Borrowing shall be made upon the Borrower's irrevocable notice to the DIP Agent, which may be given by telephone. Each such notice must be received by the DIP Agent not later than 11:00 a.m. on the requested date of any Borrowing. Each telephonic notice by the Borrower pursuant to this Section 2.02(a) must be confirmed promptly by delivery to the DIP Agent of a written DIP Loan Notice, appropriately completed and signed by a Responsible Officer of the Borrower. Each Borrowing shall be in a principal amount of $250,000 or a whole multiple of $100,000 in excess thereof (or, if less, the entire unfunded amount of the DIP Loan Committed Amount). Each DIP Loan Notice

(whether telephonic or written) shall specify (i) the requested date of such Borrowing (which shall be a Business Day) and (ii) the principal amount of DIP Loans to be borrowed.

(b)     Following receipt of a DIP Loan Notice, the DIP Agent shall promptly notify each DIP Lender of the amount of its pro rata share of the applicable DIP Loans. Each DIP Lender shall make the amount of its DIP Loan available to the DIP Agent in immediately available funds at the DIP Agent's Office not later than 1:00 p.m. on the Business Day specified in the applicable DIP Loan Notice. Upon satisfaction of the applicable conditions set forth in <u>Section 5.02</u> (and, if such Borrowing is the initial Borrowing, <u>Section 5.01</u>), the DIP Agent shall make all funds so received available to the Borrower in like funds as received by the DIP Agent either by (i) crediting the account of the Borrower on the books of Bank of Montreal with the amount of such funds or (ii) wire transfer of such funds, in each case in accordance with instructions provided to (and reasonably acceptable to) the DIP Agent by the Borrower.

**Section 2.03      [Reserved]**

**Section 2.04      Repayment of DIP Loans.**

The Borrower shall repay to the DIP Lenders the Outstanding Amount of DIP Loans on the DIP Loan Termination Date.

**Section 2.05      Prepayments.**

(a)     <u>Voluntary Prepayments.</u>  Borrower may, at any time and from time to time, repay any portion of the outstanding principal balance of the DIP Loans on any Business Day in whole or in part.

(b)     <u>Mandatory Prepayments.</u>

(i)     <u>DIP Loan Commitments.</u>  If at any time the Outstanding Amount of DIP Loans shall exceed the Aggregate DIP Loan Committed Amount, less any reserves established pursuant to <u>Section 2.01(b)</u> with respect to the "Carveout" (as defined in the then applicable Financing Order), immediate prepayment will be made on or in respect of the DIP Loans in an amount equal to such excess.

(ii)     <u>Dispositions and Involuntary Dispositions.</u>  Prepayment will be made on the DIP Loans on the Business Day following receipt of Net Cash Proceeds as hereafter provided in an amount equal to 100% of the Net Cash Proceeds received from any Disposition (other than clauses (a) through (f) of <u>Section 8.05</u>) or any Involuntary Disposition by any Credit Party.

(iii)     <u>Debt Transactions.</u>  Prepayment will be made on the DIP Loans in an amount equal to 100% of the Net Cash Proceeds from any Debt Transactions on the Business Day following receipt thereof.

(c)     <u>Application.</u>

(i)    <u>Voluntary Prepayments.</u>    Voluntary prepayments shall be applied to the outstanding principal balance of the DIP Loans. Voluntary prepayments on the DIP Loans will be paid by the DIP Agent to the DIP Lenders ratably in accordance with their respective interests therein.

(ii)    <u>Mandatory Prepayments.</u>    Mandatory prepayments on the DIP Loans will be paid by the DIP Agent to the DIP Lenders ratably in accordance with their respective interests therein.

**Section 2.06**    **[Reserved].**

**Section 2.07**    **Interest.**

(a)    Subject to the provisions of subsection (b) below, each DIP Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate <u>plus</u> the Applicable Percentage.

(b)    (i)    If any amount of principal of any DIP Loan is not paid when due (without regard to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, such amount shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Law.

(ii)    If any amount (other than principal of any DIP Loan) payable by the Borrower under any Credit Document is not paid when due (without regard to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, then such amount shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Law.

(iii)    During the continuance of an Event of Default, the Borrower shall, at the request of the Required DIP Lenders, pay interest on the principal amount of all outstanding Obligations hereunder at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Law.

(iv)    Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

(c)    Interest on each DIP Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein. Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

**Section 2.08**    **Fees.**

(a)    <u>Commitment Fee.</u>    The Borrower shall pay to the DIP Agent for the account of each DIP Lender in accordance with its DIP Loan Commitment Percentage, a

commitment fee equal to 0.50% per annum of the actual daily amount by which the Aggregate DIP Loan Committed Amount exceeds the Outstanding Amount of DIP Loans. The commitment fee shall accrue at all times during the Commitment Period, including at any time during which one or more of the conditions in <u>Article V</u> is not met, and shall be due and payable monthly in arrears on the last Business Day of each calendar month, commencing with the first such date to occur after the Closing Date, and on the DIP Loan Termination Date.

(b)    <u>Closing Fee</u>.  The Borrower shall pay to the DIP Agent, for the account of each DIP Lender in accordance with its DIP Loan Commitment Percentage, a fee in an aggregate amount equal to $100,000, which fee shall be fully-earned, non-refundable and due and payable in two installments of $50,000 each (1) on the Closing Date and (2) upon the entry of the Final Financing Order.

### Section 2.09    <u>Computation of Interest and Fees</u>.

All computations of interest when the Base Rate is determined by Bank of Montreal's prime rate shall be made on the basis of a year of 365 or 366 days, as the case may be, and actual days elapsed. All other computations of fees and interest shall be made on the basis of a three hundred sixty (360)-day year and actual days elapsed (which results in more fees or interest, as applicable, being paid than if computed on the basis of a three hundred sixty-five (365)-day year). Interest shall accrue on each DIP Loan for the day on which the DIP Loan is made, and shall not accrue on a DIP Loan, or any portion thereof, for the day on which the DIP Loan or such portion is paid, <u>provided</u> that any DIP Loan that is repaid on the same day on which it is made shall, subject to <u>Section 2.10(a)</u>, bear interest for one day. Each determination by the DIP Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

### Section 2.10    <u>Payments Generally; DIP Agent's Clawback</u>.

(a)    <u>General.</u>  All payments to be made by the Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff. Except as otherwise expressly provided herein, all payments by the Borrower hereunder shall be made to the DIP Agent, for the account of the DIP Lenders to which such payment is owed, at the DIP Agent's Office in Dollars and in immediately available funds not later than 12:00 noon on the date specified herein. The DIP Agent will promptly distribute to each DIP Lender its pro rata share of such payment in like funds as received by wire transfer to such DIP Lender's Lending Office. All payments received by the DIP Agent after 12:00 noon shall be deemed received on the immediately succeeding Business Day and any applicable interest or fee shall continue to accrue.  If any payment to be made by the Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(b)    (i) <u>Funding by DIP Lenders; Presumption by DIP Agent.</u> Unless the DIP Agent shall have received notice from a DIP Lender prior to 12:00 noon on the date of

-26-

Exhibit 3 - 73

such Borrowing that such DIP Lender will not make available to the DIP Agent such DIP Lender's share of such Borrowing, the DIP Agent may assume that such DIP Lender has made such share available in accordance with and at the time required by Section 2.02 and may, in reliance upon such assumption, make available to the Borrower a corresponding amount. In such event, if a DIP Lender has not in fact made its share of the applicable Borrowing available to the DIP Agent, then the applicable DIP Lender and the Borrower severally agree to pay to the DIP Agent forthwith on demand such corresponding amount in immediately available funds with interest thereon, for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to the DIP Agent, at (A) in the case of a payment to be made by such DIP Lender, the greater of the Federal Funds Rate and a rate determined by the DIP Agent in accordance with banking industry rules on interbank compensation, plus any administrative, processing or similar fees customarily charged by the DIP Agent in connection with the foregoing, and (B) in the case of a payment to be made by the Borrower, the interest rate applicable to DIP Loans. If the Borrower and such DIP Lender shall pay such interest to the DIP Agent for the same or an overlapping period, the DIP Agent shall promptly remit to the Borrower the amount of such interest paid by the Borrower for such period. If such DIP Lender pays its share of the applicable Borrowing to the DIP Agent, then the amount so paid shall constitute such DIP Lender's DIP Loan included in such Borrowing. Any payment by the Borrower shall be without prejudice to any claim the Borrower may have against a DIP Lender that shall have failed to make such payment to the DIP Agent.

(ii)     Payments by Borrower: Presumptions by DIP Agent. Unless the DIP Agent shall have received notice from the Borrower prior to the date on which any payment is due to the DIP Agent for the account of the DIP Lenders hereunder that the Borrower will not make such payment, the DIP Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the DIP Lenders the amount due. In such event, if the Borrower has not in fact made such payment, then each of the DIP Lenders severally agree to repay to the DIP Agent forthwith on demand the amount so distributed to such DIP Lender, in immediately available funds with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the DIP Agent, at the greater of the Federal Funds Rate and a rate determined by the DIP Agent in accordance with banking industry rules on interbank compensation.

A notice of the DIP Agent to any DIP Lender or the Borrower with respect to any amount owing under this subsection (b) shall be conclusive, absent manifest error.

(c)     Failure to Satisfy Conditions Precedent.  If any DIP Lender makes available to the DIP Agent funds for any DIP Loan to be made by such DIP Lender as provided in the foregoing provisions of this Article II, and such funds are not made available to the Borrower by the DIP Agent because the conditions to the applicable Borrowing set forth in Article V are not satisfied or waived in accordance with the terms hereof, the DIP Agent shall return such funds (in like funds as received from such DIP Lender) to such DIP Lender, without interest.

-27-

Exhibit 3 - 74

(d)     <u>Obligation of the DIP Lenders Several.</u>   The obligations of the DIP Lenders hereunder to make DIP Loans and to make payments pursuant to <u>Section 11.04(c)</u> are several and not joint. The failure of any DIP Lender to make any DIP Loan, to fund any such participation or to make any payment under <u>Section 11.04(c)</u> on any date required hereunder shall not relieve any other DIP Lender of its corresponding obligation to do so on such date, and no DIP Lender shall be responsible for the failure of any other DIP Lender to so make its DIP Loan, to purchase its participation or to make its payment under <u>Section 11.04(c)</u>.

(e)     <u>Funding Source.</u>   Nothing herein shall be deemed to obligate any DIP Lender to obtain the funds for any DIP Loan in any particular place or manner or to constitute a representation by any DIP Lender that it has obtained or will obtain the funds for any DIP Loan in any particular place or manner.

(f)     <u>Allocation of Funds.</u> If at any time insufficient funds are received by or are available to the DIP Agent to pay fully all amounts of principal, interest and fees then due hereunder, such funds shall be applied (i) <u>first</u>, toward costs and expenses (including all reasonable fees, expenses and disbursements of any law firm or other counsel and amounts payable under <u>Article III</u>) incurred by the DIP Agent and each DIP Lender, (ii) <u>second</u>, toward repayment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties and (iii) <u>third</u>, toward repayment of principal, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties.

### Section 2.11     <u>Sharing of Payments By DIP Lenders.</u>

If any DIP Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of the DIP Loans made by it, resulting in such DIP Lender's receiving payment of a proportion of the aggregate amount of such DIP Loans and accrued interest thereon greater than its pro rata share thereof as provided herein, then the DIP Lender receiving such greater proportion shall (a) notify the DIP Agent of such fact, and (b) purchase (for cash at face value) participations in the DIP Loans of the other DIP Lenders, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the DIP Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective DIP Loans and other amounts owing them, <u>provided</u> that:

(i)     if any such participations or subparticipations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations or subparticipations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

(ii)     the provisions of this Section shall not be construed to apply to (x) any payment made by the Borrower pursuant to and in accordance with the express terms of this Credit Agreement or (y) any payment obtained by a DIP Lender as consideration for the assignment of or sale of a participation in any of its DIP

-28-

Exhibit 3 - 75

Loans to any assignee or participant, other than to any Credit Party (as to which the provisions of this Section shall apply).

Each Credit Party consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any DIP Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Credit Party rights of setoff and counterclaim with respect to such participation as fully as if such DIP Lender were a direct creditor of such Credit Party in the amount of such participation.

### Section 2.12    Evidence of Debt.

(a)    The Borrowings made by each DIP Lender shall be evidenced by one or more accounts or records maintained by such DIP Lender and by the DIP Agent in the ordinary course of business. The accounts or records maintained by the DIP Agent and each DIP Lender shall be conclusive absent manifest error of the amount of the Borrowings made by the DIP Lenders to the Borrower and the interest and payments thereon. Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations. In the event of any conflict between the accounts and records maintained by any DIP Lender and the accounts and records of the DIP Agent in respect of such matters, the accounts and records of the DIP Agent shall control in the absence of manifest error.  Upon request by a DIP Lender, Borrower shall execute and deliver to the DIP Agent a DIP Loan Note for such DIP Lender, which shall evidence such DIP Lender's DIP Loans in addition to such accounts or records. Each DIP Lender may attach schedules to its Note and endorse thereon the date, amount and maturity of its DIP Loans and payments with respect thereto.

(b)    In addition to the accounts and records referred to in subsection (a), each DIP Lender and the DIP Agent shall maintain in accordance with its usual practice accounts or records evidencing the purchases and sales by such DIP Lender. In the event of any conflict between the accounts and records maintained by the DIP Agent and the accounts and records of any DIP Lender in respect of such matters, the accounts and records of the DIP Agent shall control in the absence of manifest error.

### ARTICLE III
### TAXES, YIELD PROTECTION AND ILLEGALITY

### Section 3.01    Taxes.

(a)    Payments Free of Taxes; Obligation to Withhold; Payments on Account of Taxes.

(i)    Any and all payments by or on account of any obligation of the Borrower hereunder or under any other Credit Document shall to the extent permitted by applicable Laws be made free and clear of and without reduction or withholding for any Taxes. If, however, applicable Laws require the Borrower or the DIP Agent to withhold or deduct any Tax from any such payment, such Tax shall be withheld or deducted in accordance with such Laws as determined by the Borrower or the DIP

-29-

Exhibit 3 - 76

Agent, as the case may be, upon the basis of the information and documentation to be delivered pursuant to subsection (e) below.

(ii)    If the Borrower or the DIP Agent shall be required by the applicable Law to withhold or deduct any Taxes, including both United States Federal backup withholding and withholding taxes, from any such payment, then (A) the DIP Agent shall withhold or make such deductions as are determined by the DIP Agent to be required based upon the information and documentation it has received pursuant to subsection (e) below, (B) the DIP Agent shall timely pay the full amount withheld or deducted to the relevant Governmental Authority in accordance with the applicable Law, and (C) to the extent that the withholding or deduction is made on account of Indemnified Taxes or Other Taxes, the sum payable by the Borrower shall be increased as necessary so that after any required withholding or the making of all required deductions (including deductions applicable to additional sums payable under this Section) the DIP Agent or DIP Lender, as the case may be, receives an amount equal to the sum it would have received had no such withholding or deduction been made.

(b)    <u>Payment of Other Taxes by the Borrower.</u>    Without limiting the provisions of subsection (a) above, the Borrower shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable Laws.

(c)    <u>Tax Indemnifications.</u>

(i)    Without limiting the provisions of subsection (a) or (b) above, the Borrower shall, and does hereby, indemnify the DIP Agent and each DIP Lender, and shall make payment in respect thereof within 10 days after demand therefor, for the full amount of any Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) withheld or deducted by the Borrower or the DIP Agent or paid by the DIP Agent or such DIP Lender, as the case may be, and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. The Borrower shall also, and does hereby, indemnify the DIP Agent, and shall make payment in respect thereof within 10 days after demand therefor, for any amount which a DIP Lender for any reason fails to pay to the DIP Agent as required by clause (ii) of this subsection. A certificate as to the amount of any such payment or liability delivered to the Borrower by a DIP Lender (with a copy to the DIP Agent), or by the DIP Agent on its own behalf or on behalf of a DIP Lender, shall be conclusive absent manifest error.

(ii)    Without limiting the provisions of subsection (a) or (b) above, each DIP Lender shall, and does hereby, indemnify the Borrower and the DIP Agent, and shall make payment in respect thereof within 10 days after demand therefor, against any and all Taxes and any and all related losses, claims, liabilities, penalties, interest and expenses (including the fees, charges and disbursements of any counsel

for the Borrower or the DIP Agent) incurred by or asserted against the Borrower or the DIP Agent by any Governmental Authority as a result of the failure by such DIP Lender to deliver, or as a result of the inaccuracy, inadequacy or deficiency of, any documentation required to be delivered by such DIP Lender to the Borrower or the DIP Agent pursuant to subsection (e). Each DIP Lender hereby authorizes the DIP Agent to set off and apply any and all amounts at any time owing to such DIP Lender under this Credit Agreement or any other Credit Document against any amount due to the DIP Agent under this clause (ii). The agreements in this clause (ii) shall survive the resignation and/or replacement of the DIP Agent, any assignment of rights by, or the replacement of, a DIP Lender, the termination of the Aggregate DIP Loan Commitments and the repayment, satisfaction or discharge of all other Obligations.

(d)    Evidence of Payments.   Upon request by the Borrower or the DIP Agent, as the case may be, after any payment of Taxes by the Borrower or the DIP Agent to a Governmental Authority as provided in this Section 3.01, the Borrower shall deliver to the DIP Agent or the DIP Agent shall deliver to the Borrower, as the case may be, the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of any return required by Law to report such payment or other evidence of such payment reasonably satisfactory to the Borrower or the DIP Agent, as the case may be.

(e)    Status of DIP Lenders; Tax Documentation.

(i)    Each DIP Lender shall deliver to the Borrower and to the DIP Agent, at the time or times prescribed by applicable Laws or when reasonably requested by the Borrower or the DIP Agent, such properly completed and executed documentation prescribed by applicable Laws or by the taxing authorities of any jurisdiction and such other reasonably requested information as will permit the Borrower or the DIP Agent, as the case may be, to determine (A) whether or not payments made hereunder or under any other Credit Document are subject to Taxes, (B) if applicable, the required rate of withholding or deduction, and (C) such DIP Lender's entitlement to any available exemption from, or reduction of, applicable Taxes in respect of all payments to be made to such DIP Lender by the Borrower pursuant to this Credit Agreement or otherwise to establish such DIP Lender's status for withholding tax purposes in the applicable jurisdiction.

(ii)    Without limiting the generality of the foregoing, if the Borrower is resident for tax purposes in the United States,

(A)    any DIP Lender that is a "United States person" within the meaning of Section 7701(a)(30) of the Code shall deliver to the Borrower and the DIP Agent properly completed and duly executed originals of Internal Revenue Service Form W-9 or such other documentation or information prescribed by applicable Laws or reasonably requested by the Borrower or the DIP Agent as will enable the Borrower or the DIP Agent, as the case may be, to determine whether or not such DIP Lender is subject to backup withholding or information reporting requirements; and

-31-

Exhibit 3 - 78

(B)      each Foreign DIP Lender that is entitled under the Code or any applicable treaty to an exemption from or reduction of withholding tax with respect to payments hereunder or under any other Credit Document shall deliver to the Borrower and the DIP Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign DIP Lender becomes a DIP Lender under this Credit Agreement (and from time to time thereafter upon the obsolescence or invalidity of such forms or otherwise upon the request of the Borrower or the DIP Agent, but only if such Foreign DIP Lender is legally entitled to do so), whichever of the following is applicable:

(I)      properly completed and duly executed originals of Internal Revenue Service Form W-8BEN claiming eligibility for benefits of an income tax treaty to which the United States is a party,

(II)      properly completed and duly executed originals of Internal Revenue Service Form W-8ECI,

(III)      properly completed and duly executed originals of Internal Revenue Service Form W-8IMY and all required supporting documentation,

(IV)      in the case of a Foreign DIP Lender claiming the benefits of the exemption for portfolio interest under section 881(c) of the Code, (x) a certificate to the effect that such Foreign DIP Lender is not (A) a "bank" within the meaning of section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of the Borrower within the meaning of section 881(c)(3)(B) of the Code, or (C) a "controlled foreign corporation" described in section 881(c)(3)(C) of the Code and (y) executed originals of Internal Revenue Service Form W-8BEN, or

(V)      properly completed and duly executed originals of any other form. prescribed by applicable Laws as a basis for claiming exemption from or a reduction in United States Federal withholding tax together with such supplementary documentation as may be prescribed by applicable Laws to permit the Borrower or the DIP Agent to determine the withholding or deduction required to be made.

(iii)      Each DIP Lender shall promptly (A) notify the Borrower and the DIP Agent of any change in circumstances which would modify or render invalid any claimed exemption or reduction, and (B) take such steps as shall not be materially disadvantageous to it, in the reasonable judgment of such DIP Lender, and as may be reasonably necessary (including the re-designation of its Lending Office) to avoid any requirement of applicable Laws of any jurisdiction that the Borrower or the DIP Agent make any withholding or deduction for Taxes from amounts payable to such DIP Lender.

Exhibit 3 - 79

(f)    <u>Treatment of Certain Refunds.</u>  Unless required by applicable Laws, at no time shall the DIP Agent have any obligation to file for or otherwise pursue on behalf of a DIP Lender, or have any obligation to pay to any DIP Lender, any refund of Taxes withheld or deducted from funds paid for the account of such DIP Lender. If the DIP Agent or any DIP Lender determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes or Other Taxes as to which it has been indemnified by the Borrower or with respect to which the Borrower has paid additional amounts pursuant to this Section, it shall pay to the Borrower an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under this Section with respect to the Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses incurred by the DIP Agent or such DIP Lender, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), <u>provided</u> that the Borrower, upon the request of the DIP Agent or such DIP Lender, agrees to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the DIP Agent or such DIP Lender in the event the DIP Agent or such DIP Lender is required to repay such refund to such Governmental Authority. This subsection shall not be construed to require the DIP Agent or any DIP Lender to make available its tax returns (or any other information relating to its taxes that it deems confidential) to the Borrower or any other Person.

**Section 3.02**    **[Reserved].**

**Section 3.03**    **[Reserved].**

**Section 3.04**    <u>Increased Costs</u>.

(a)    <u>Increased Costs Generally.</u>  If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any DIP Lender; or

(ii)    subject any DIP Lender to any tax of any kind whatsoever with respect to this Credit Agreement or change the basis of taxation of payments to such DIP Lender in respect thereof (except for Indemnified Taxes or Other Taxes covered by <u>Section 3.01</u> and the imposition of, or any change in the rate of, any Excluded Tax payable by such DIP Lender);

and the result of any of the foregoing shall be to reduce the amount of any sum received or receivable by such DIP Lender (whether of principal, interest or any other amount) then, upon request of such DIP Lender, the Borrower will pay to such DIP Lender such additional amount or amounts as will compensate such DIP Lender for such additional costs incurred or reduction suffered.

(b)    <u>Capital Requirements.</u>  If any DIP Lender reasonably determines that any Change in Law affecting such DIP Lender or any Lending Office of such DIP Lender or such DIP Lender's holding company, if any, regarding capital requirements has or would

-33-

Exhibit 3 - 80

have the effect of reducing the rate of return on such DIP Lender's capital or on the capital of such DIP Lender's holding company, if any, as a consequence of this Credit Agreement, the DIP Loan Commitment of such DIP Lender or the DIP Loans made by such DIP Lender to a level below that which such DIP Lender or such DIP Lender's holding company could have achieved but for such Change in Law (taking into consideration such DIP Lender's policies and the policies of such DIP Lender's with respect to capital adequacy), then from time to time the Borrower will pay to such DIP Lender such additional amount or amounts as will compensate such DIP Lender or such DIP Lender's holding company for any such reduction suffered.

(c)    <u>Certificates for Reimbursement.</u>  A certificate of a DIP Lender setting forth the amount or amounts necessary to compensate such DIP Lender or its holding company, as the case may be, as specified in subsection (a) or (b) of this Section and delivered to the Borrower shall be conclusive absent manifest error. The Borrower shall pay such DIP Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

(d)    <u>Delay in Requests.</u>  Failure or delay on the part of any DIP Lender to demand compensation pursuant to the foregoing provisions of this Section shall not constitute a waiver of such DIP Lender's right to demand such compensation, <u>provided</u> that the Borrower shall not be required to compensate a DIP Lender pursuant to the foregoing provisions of this Section for any increased costs incurred or reductions suffered more than six months prior to the date that such DIP Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such DIP Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the six-month period referred to above shall be extended to include the period of retroactive effect thereof).

**Section 3.05    [Reserved].**

**Section 3.06    Mitigation Obligations: Replacement of DIP Lenders.**

(a)    <u>Designation of a Different Lending Office.</u>  If any DIP Lender requests compensation under <u>Section 3.04</u>, or the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to <u>Section 3.01</u>, then such DIP Lender shall, as applicable, use reasonable efforts to designate a different Lending Office for funding or booking its DIP Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the reasonably judgment of such DIP Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to <u>Section 3.01</u> or <u>3.04</u>, as the case may be, in the future, and (ii) would not subject such DIP Lender to any material unreimbursed cost or expense and would not otherwise be materially disadvantageous to such DIP Lender. The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any DIP Lender in connection with any such designation or assignment.

Exhibit 3 - 81

(b)    <u>Replacement of DIP Lenders.</u>    If any DIP Lender requests compensation under <u>Section 3.04</u>, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to <u>Section 3.01</u>, the Borrower may replace such DIP Lender in accordance with <u>Section 11.13</u>.

### Section 3.07    <u>Survival.</u>

All of the Borrower's obligations under this Article III shall survive termination of the Aggregate DIP Loan Commitments, repayment of all other Obligations hereunder and resignation of the DIP Agent.

## ARTICLE IV
## GUARANTY

### Section 4.01    <u>The Guaranty</u>.

(a)    Each of the Guarantors hereby jointly and severally guarantees to the DIP Agent and each of the holders of the Obligations, as hereinafter provided, as primary obligor and not as surety, the prompt payment of the Obligations (the "<u>Guaranteed Obligations</u>") in full when due (whether at stated maturity, as a mandatory prepayment, by acceleration, as a mandatory cash collateralization or otherwise) strictly in accordance with the terms hereof. The Guarantors hereby further agree that if any of the Guaranteed Obligations are not paid in full when due (whether at stated maturity, as a mandatory prepayment, by acceleration, as a mandatory cash collateralization or otherwise), the Guarantors will, jointly and severally, promptly pay the same, without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Guaranteed Obligations, the same will be promptly paid in full when due (whether at extended maturity, as a mandatory prepayment, by acceleration, as a mandatory cash collateralization or otherwise) in accordance with the terms of such extension or renewal.

(b)    Notwithstanding any provision to the contrary contained herein, in any other of the Credit Documents or other documents relating to the Obligations, the obligations of each Guarantor under this Credit Agreement and the other Credit Documents shall be limited to an aggregate amount equal to the largest amount that would not render such obligations subject to avoidance under the Debtor Relief Laws or any comparable provisions of any applicable state law.

### Section 4.02    <u>Obligations Unconditional</u>.

The obligations of the Guarantors under <u>Section 4.01</u> are joint and several, absolute and unconditional, irrespective of the value, genuineness, validity, regularity or enforceability of any of the Credit Documents or other documents relating to the Obligations, or any substitution, compromise, release, impairment or exchange of any other guarantee of or security for any of the Guaranteed Obligations, and, to the fullest extent permitted by applicable Law, irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor, it being the intent

Exhibit 3 - 82

of this Section 4.02 that the obligations of the Guarantors hereunder shall be absolute and unconditional under any and all circumstances. Each Guarantor agrees that such Guarantor shall have no right of subrogation, indemnity, reimbursement or contribution against the Borrower or any other Guarantor for amounts paid under this Article IV until such time as the Obligations have been irrevocably paid in full and the commitments relating thereto have expired or been terminated. Without limiting the generality of the foregoing, it is agreed that, to the fullest extent permitted by law, the occurrence of any one or more of the following shall not alter or impair the liability of any Guarantor hereunder, which shall remain absolute and unconditional as described above:

(a)    at any time or from time to time, without notice to any Guarantor, the time for any performance of or compliance with any of the Guaranteed Obligations shall be extended, or such performance or compliance shall be waived;

(b)    any of the acts mentioned in any of the provisions of any of the Credit Documents, or other documents relating to the Guaranteed Obligations or any other agreement or instrument referred to therein shall be done or omitted;

(c)    the maturity of any of the Guaranteed Obligations shall be accelerated, or any of the Obligations shall be modified, supplemented or amended in any respect, or any right under any of the Credit Documents or other documents relating to the Guaranteed Obligations, or any other agreement or instrument referred to therein shall be waived or any other guarantee of any of the Guaranteed Obligations or any security therefor shall be released, impaired or exchanged in whole or in part or otherwise dealt with;

(d)    any Lien granted to, or in favor of, the DIP Agent or any of the holders of the Guaranteed Obligations as security for any of the Guaranteed Obligations shall fail to attach or be perfected; or

(e)    any of the Guaranteed Obligations shall be determined to be void or voidable (including, without limitation, for the benefit of any creditor of any Guarantor) or shall be subordinated to the claims of any Person (including, without limitation, any creditor of any Guarantor).

With respect to its obligations hereunder, each Guarantor hereby expressly waives diligence, presentment, demand of payment, protest notice of acceptance of the guaranty given hereby and of extensions of credit that may constitute obligations guaranteed hereby, notices of amendments, waivers and supplements to the Credit Documents and other documents relating to the Guaranteed Obligations, or the compromise, release or exchange of collateral or security, and all notices whatsoever, and any requirement that the DIP Agent or any holder of the Guaranteed Obligations exhaust any right, power or remedy or proceed against any Person under any of the Credit Documents or any other documents relating to the Guaranteed Obligations or any other agreement or instrument referred to therein, or against any other Person under any other guarantee of, or security for, any of the Obligations.

Exhibit 3 - 83

### Section 4.03 <u>Reinstatement</u>.

Neither the Guarantors' obligations hereunder nor any remedy for the enforcement thereof shall be impaired, modified, changed or released in any manner whatsoever by an impairment, modification, change, release or limitation of the liability of the Borrower, by reason of the Borrower's bankruptcy or insolvency or by reason of the invalidity or unenforceability of all or any portion of the Guaranteed Obligations. The obligations of the Guarantors under this <u>Article IV</u> shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of any Person in respect of the Guaranteed Obligations is rescinded or must be otherwise restored by any holder of any of the Obligations, whether as a result of any proceedings pursuant to any Debtor Relief Law or otherwise, and each Guarantor agrees that it will indemnify the DIP Agent and each holder of Guaranteed Obligations on demand for all reasonable out-of-pocket costs and expenses (including all reasonable fees, expenses and disbursements of any law firm or other outside counsel) incurred by the DIP Agent or such holder of Guaranteed Obligations in connection with such rescission or restoration, including any such costs and expenses incurred in defending against any claim alleging that such payment constituted a preference, fraudulent transfer or similar payment under any Debtor Relief Law.

### Section 4.04 <u>Certain Waivers</u>.

Each Guarantor acknowledges and agrees that (a) the guaranty given hereby may be enforced without the necessity of resorting to or otherwise exhausting remedies in respect of any other security or collateral interests, and without the necessity at any time of having to take recourse against the Borrower hereunder or against any collateral securing the Guaranteed Obligations or otherwise, (b) it will not assert any right to require the action first be taken against the Borrower or any other Person (including any co-guarantor) or pursuit of any other remedy or enforcement any other right and (c) nothing contained herein shall prevent or limit action being taken against the Borrower hereunder, under the other Credit Documents or the other documents and agreements relating to the Guaranteed Obligations or from foreclosing on any security or collateral interests relating hereto or thereto, or from exercising any other rights or remedies available in respect thereof, if neither the Borrower nor the Guarantors shall timely perform their obligations, and the exercise of any such rights and completion of any such foreclosure proceedings shall not constitute a discharge of the Guarantors' obligations hereunder unless as a result thereof, the Guaranteed Obligations shall have been paid in full and the commitments relating thereto shall have expired or been terminated, it being the purpose and intent that the Guarantors' obligations hereunder be absolute, irrevocable, independent and unconditional under all circumstances.

### Section 4.05 <u>Remedies</u>.

The Guarantors agree that, to the fullest extent permitted by law, as between the Guarantors, on the one hand, and the DIP Agent and the holders of the Guaranteed Obligations, on the other hand, the Guaranteed Obligations may be declared to be forthwith due and payable as provided in <u>Section 9.02</u> (and shall be deemed to have become automatically due and payable in the circumstances provided in <u>Section 9.02)</u> for purposes of

Exhibit 3 - 84

<u>Section 4.01</u>, notwithstanding any stay, injunction or other prohibition preventing such declaration (or preventing the Guaranteed Obligations from becoming automatically due and payable) as against any other Person and that, in the event of such declaration (or the Guaranteed Obligations being deemed to have become automatically due and payable), the Guaranteed Obligations (whether or not due and payable by any other Person) shall forthwith become due and payable by the Guarantors for purposes of <u>Section 4.01.</u> The Guarantors acknowledge and agree that the Guaranteed Obligations are secured in accordance with the terms of the Collateral Documents and that the holders of the Guaranteed Obligations may exercise their remedies thereunder in accordance with the terms thereof.

**Section 4.06      <u>Rights of Contribution</u>.**

The Guarantors hereby agree as among themselves that, in connection with payments made hereunder, each Guarantor shall have a right of contribution from each other Guarantor in accordance with applicable Law. Such contribution rights shall be subordinate and subject in right of payment to the Guaranteed Obligations until such time as the Guaranteed Obligations have been irrevocably paid in full and the commitments relating thereto shall have expired or been terminated, and none of the Guarantors shall exercise any such contribution rights until the Guaranteed Obligations have been irrevocably paid in full and the commitments relating thereto shall have expired or been terminated.

**Section 4.07      <u>Guaranty of Payment; Continuing Guaranty</u>.**

The guarantee in this <u>Article IV</u> is a guaranty of payment and not of collection, and is a continuing guarantee, and shall apply to all Guaranteed Obligations whenever arising.

**ARTICLE V
CONDITIONS PRECEDENT TO CREDIT EXTENSIONS**

**Section 5.01      <u>Conditions to Initial Borrowings</u>.**

The obligation of each DIP Lender to make its initial Borrowing hereunder is subject to satisfaction of the following conditions precedent:

(a)      <u>Executed Credit Documents.</u>  The DIP Agent's receipt of counterparts of this Credit Agreement, the DIP Loan Notes and the Collateral Documents, in each case, dated as of the Closing Date, duly executed by a Responsible Officer of each Credit Party party thereto and by each DIP Lender party thereto.

(b)      <u>Organization Documents, Etc.</u>  The DIP Agent's receipt of a duly executed certificate of a Responsible Officer of each Credit Party, in form and substance reasonably satisfactory to the DIP Agent and the DIP Lenders, attaching each of the following documents and certifying that each is true, correct and complete and in full force and effect as of the Closing Date:

Exhibit 3 - 85

(i) <u>Charter Documents.</u>  Copies of its articles or certificate of organization or formation, certified to be true, correct and complete as of a recent date by the appropriate Governmental Authority of the jurisdiction of its organization or formation;

(ii) <u>Bylaws.</u>  Copies of its bylaws, operating agreement or partnership agreement;

(iii) <u>Resolutions.</u>  Copies of its resolutions (a) approving and adopting the Credit Documents to which it is party, the transactions contemplated therein, and authorizing the execution and delivery thereof, (b) approving and adopting the Investment Agreement, the transactions contemplated therein, and authorizing the execution and delivery thereof, and (c) unconditionally authorizing the consummation of a plan under chapter 11 of the Bankruptcy Code in accordance with <u>Section 7.15</u>;

(iv) <u>Incumbency.</u>  Incumbency certificates identifying the Responsible Officers of such Credit Party that are authorized to execute Credit Documents and to act on such Credit Party's behalf in connection with the Credit Documents; and

(v) <u>Good Standing Certificates.</u>  Certificates of good standing or the equivalent from its jurisdiction of organization or formation, in each case certified as of a recent date by the appropriate Governmental Authority.

(c) <u>Financial Statements.</u>  On or before the Closing Date, DIP Agent shall have received such information regarding the financial condition of the Credit Parties as DIP Agent shall have reasonably requested.

(d) <u>Security Interests in Collateral</u>.  DIP Lenders shall have received evidence satisfactory to them that Borrower and the Guarantors shall have taken or caused to be taken all such actions, executed and delivered or caused to be executed and delivered all such agreements, documents and instruments, and made or caused to be made all such filings and recordings that may be necessary or, in the opinion of DIP Collateral Agent, desirable in order to create in favor of DIP Collateral Agent, for the benefit of DIP Lenders, a valid and (upon such filing and recording) perfected First Priority security interest in the Collateral.

(e) <u>Evidence of Insurance.</u>  The DIP Collateral Agent's receipt of copies of insurance certificates or policies with respect to all insurance required to be maintained pursuant to the Credit Documents identifying the DIP Collateral Agent as sole loss payee, with respect to casualty insurance, and as additional insured, with respect to liability insurance.

(f) <u>Fees and Expenses.</u>  All fees and reasonable out-of-pocket expenses (including, unless waived by the DIP Agent, all reasonable fees, expenses and disbursements of any law firm or other outside counsel) required to be paid on or before the Closing Date shall have been paid.

Exhibit 3 - 86

(g)  Budget.  Borrower shall have delivered a thirteen-week Budget and availability forecast for Borrower to DIP Agent, each in form and substance satisfactory to DIP Agent and Required DIP Lenders.

(h)  Employment of Senior Management.  Borrower shall have employed senior management acceptable to DIP Agent on terms and conditions acceptable to DIP Agent.

(i)  Bankruptcy Case.

(i)  The Bankruptcy Court shall have found that the DIP Loans contemplated by this Credit Agreement are made by DIP Lenders in "good faith" within the meaning of Section 364(e) of the Bankruptcy Code.

(ii)  Not later than three (3) Business Days following the Filing Date, the Interim Financing Order shall have been entered, containing terms and conditions satisfactory to DIP Agent and DIP Lenders in their sole discretion, including without limitation, provisions to the effect that (i) upon the occurrence of an Event of Default, (A) DIP Lenders shall be permitted to cease immediately making DIP Loans, and (B) Credit Parties shall be prohibited from using cash collateral in which DIP Lenders have an interest without DIP Agent's prior written consent, (ii) all of DIP Agent's and DIP Lenders' claims for payment with respect to the Obligations shall have superpriority status pursuant to Section 364(c)(1) of the Bankruptcy Code, subject to the "Carveout" (as defined in the then applicable Financing Order) and that no costs or expenses of administration shall be imposed against DIP Agent, DIP Lenders or the Collateral pursuant to Section 506(c) of the Bankruptcy Code or otherwise, (iii) each Credit Party shall be authorized to incur the Obligations pursuant to the terms of this Credit Agreement and the other Credit Documents and (iv) the terms and provisions of such Interim Financing Order shall be specifically binding on any subsequently appointed Chapter 11 or Chapter 7 trustee.

(iii)  All other "first day" orders entered on or about the time of the Bankruptcy Case shall be reasonably satisfactory in form and substance to DIP Agent.

Without limiting the generality of the provisions of Section 10.04, for purposes of determining compliance with the conditions specified in this Section 5.01, each DIP Lender that has signed this Credit Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a DIP Lender unless the DIP Agent shall have received notice from such DIP Lender prior to the proposed Closing Date specifying its objection thereto.

## Section 5.02   Conditions to all Borrowings.

The obligation of each DIP Lender to honor any DIP Loan Notice is subject to the following conditions precedent:

-40-

Exhibit 3 - 87

(a)    The representations and warranties contained in <u>Article VI</u> or any other Credit Document shall be true and correct in all material respects on and as of the date of such Borrowing, except:

(i)    to the extent that such representations and warranties specifically relate to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date;

(ii)    that for purposes of this <u>Section 5.02</u>, the representations and warranties contained in subsections (a) and (b) of <u>Section 6.05</u> shall be deemed to refer to the most recent annual audited or company-prepared monthly unaudited financial statements furnished pursuant to subsections (a) and (b) of <u>Section 7.01</u>.

(b)    No Default or Event of Default shall exist, or would result from such proposed Borrowing or from the application of the proceeds thereof.

(c)    The DIP Agent shall have received a DIP Loan Notice in accordance with the requirements hereof.

(d)    With respect to any DIP Loan requested on or after the date that is twenty-one (21) days following the entry of the Interim Financing Order, the Final Financing Order shall have been entered and shall contain terms and conditions satisfactory to DIP Agent and DIP Lenders in their sole discretion, including without limitation, provisions to the effect that (i) upon the occurrence of an Event of Default, (A) DIP Lenders shall be permitted to cease immediately making DIP Loans, and (B) Credit Parties shall be prohibited from using cash collateral in which DIP Lenders have an interest without DIP Agent's prior written consent, (ii) all of DIP Agent's and DIP Lenders' claims for payment with respect to the Obligations shall have superpriority status pursuant to Section 364(c)(1) of the Bankruptcy Code (subject to the "Carveout" (as defined in the then applicable Financing Order)) and that no costs or expenses of administration shall be imposed against DIP Agent, DIP Lenders or the Collateral pursuant to Section 506(c) of the Bankruptcy Code or otherwise, (iii) each Credit Party shall be authorized to incur the Obligations pursuant to the terms of this Credit Agreement and the other Credit Documents, and (iv) the terms and provisions of the Final Financing Order shall be specifically binding on any subsequently appointed Chapter 11 or Chapter 7 trustee.

Each DIP Loan Notice submitted by the Borrower shall be deemed to be a representation and warranty by the Borrower that the conditions specified in <u>Sections 5.02(a)</u> and <u>(b)</u> have been satisfied on and as of the date of the applicable Borrowing.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES

The Credit Parties represent and warrant to the DIP Agent and the DIP Lenders that:

Exhibit 3 - 88

**Section 6.01    Existence, Qualification and Power.**

Each Credit Party (a) is duly organized or formed, validly existing and in good standing under the Laws of the jurisdiction of its incorporation or formation, (b) has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (i) execute, deliver and perform its obligations under the Credit Documents to which it is a party and (ii) except to the extent it would not reasonably be expected to have a Material Adverse Effect, own or lease its assets and carry on its business and (c) except to the extent it would not reasonably be expected to have a Material Adverse Effect, is duly qualified and is licensed and in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license.

**Section 6.02    Authorization; No Contravention.**

(a)    The execution, delivery and performance by each Credit Party of each Credit Document to which it is party have been duly authorized by all necessary corporate or other organizational action by such Credit Party.

(b)    Except as set forth on Schedule 6.02(b), the execution, delivery and performance by each Credit Party of each Credit Document to which is a party do not (i) contravene the terms of such Credit Party's Organizational Documents (ii) conflict with or result in any material breach or contravention of, or the creation of any Lien (other than Permitted Liens) under, (A) any material Contractual Obligation to which such Credit Party is party or (B) any material order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Credit Party or its Property is subject; or (iii) violate any Law in any material respect.

**Section 6.03    Governmental Authorization; Other Consents.**

No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Credit Party of this Credit Agreement or any other Credit Document (other than (a) as have already been obtained and are in full force and effect and (b) filings and other actions to perfect security interests granted pursuant to the Credit Documents).

**Section 6.04    Binding Effect.**

This Credit Agreement and each other Credit Document has been duly executed and delivered by each Credit Party that is party thereto. This Credit Agreement and the other Credit Documents constitute legal, valid and binding obligations of such Credit Party, enforceable against such Credit Party in accordance with its terms, subject to and limited by the effect of any applicable bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other similar laws of general application affecting the rights and remedies of creditors and to general principals of equity (including, without limitation, concepts of materiality, reasonableness, good faith, fair dealing and unconscionability),

Exhibit 3 - 89

regardless of whether considered in a proceeding in equity or law.  The then applicable Final Financing Order is in full force and effect.

### Section 6.05 Financial Statements.

Borrower has heretofore delivered to DIP Agent, at DIP Agent's request, the financial information described in subsection 5.01(c).  All such financial information of the Credit Parties, and, to the knowledge of Borrower and any other Credit Parties with respect to any other Person, were prepared in conformity with GAAP (where applicable) and fairly present, in all material respects, the financial position (on a consolidated and, where applicable, on a consolidating basis) of the entities described in such financial information as at the respective dates thereof.

### Section 6.06 No Material Adverse Effect.

Since December 31, 2009, there has been no event or circumstance, either individually or in the aggregate, that has had or would reasonably be expected to have a Material Adverse Effect.

### Section 6.07 Litigation.

There are no actions, suits, investigations, criminal prosecutions, civil investigative demands, imposition of criminal or civil fines or penalties, proceedings, claims or disputes pending or, to the knowledge of the Borrower, overtly threatened in writing or contemplated, at law, in equity, in arbitration or before any Governmental Authority, by or against any Credit Party or against any of their properties or revenues that (a) purport to pertain to this Credit Agreement or any other Credit Document, or any of the transactions contemplated hereby, or (b) either individually or in the aggregate, if determined adversely, would reasonably be expected to have a Material Adverse Effect.

### Section 6.08 No Default.

No Credit Party is in default under or with respect to any Contractual Obligation that would, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, other than any default in existence under the Subordinated Debt Documents.  No Default or Event of Default has occurred and is continuing or would result from the consummation of the transactions contemplated by this Credit Agreement or any other Credit Document.

### Section 6.09 Ownership of Property; Liens.

Each Credit Party has good record and marketable title in fee simple to, or valid leasehold interests in, all real property used in the ordinary conduct of its business, except for such defects in title as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. The property of the Credit Parties is subject to no Liens, other than Permitted Liens.

### Section 6.10    **Environmental Compliance.**

To the Borrower's knowledge, there are no Environmental Laws or claims alleging potential liability or responsibility for violation of any Environmental Law which, individually or in the aggregate, have had or would reasonably be expected to have a Material Adverse Effect.

### Section 6.11    **Insurance.**

The properties of the Credit Parties are insured with financially sound and reputable insurance companies not Affiliates of the Credit Parties, in such amounts, with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the applicable Credit Party operates.

### Section 6.12    **Taxes.**

Each Credit Party has filed all federal and other material tax returns and reports required to be filed, and have paid or caused to be paid all federal and other material taxes, assessments, fees and other governmental charges levied or imposed upon them or their properties, income or assets otherwise due and payable, except those that are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves have been provided in accordance with GAAP. There is no proposed tax assessment against any Credit Party that would, if made, have a Material Adverse Effect.

### Section 6.13    **ERISA Compliance.**

(a)    Each Plan is in compliance in all material respects with the applicable provisions of ERISA, the Code and other federal or state Laws. Each Plan that is intended to qualify under Section 401(a) of the Code has received a favorable determination letter from the IRS or an application for such a letter is currently pending before the IRS with respect thereto and, to the knowledge of the Borrower, nothing has occurred that would be expected to prevent, or cause the loss of, such qualification. The Borrower and each ERISA Affiliate have made all required contributions to each Plan subject to Section 412 of the Code, and no application for a funding waiver or an extension of any amortization period pursuant to Section 412 of the Code has been made with respect to any Plan.

(b)    There are no pending or, to the knowledge of the Borrower, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that would reasonably be expected to have a Material Adverse Effect. There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan that has resulted or would reasonably be expected to result in a Material Adverse Effect.

(c)    (i) No ERISA Event has occurred or would reasonably be expected to occur; (ii) no Pension Plan has any Unfunded Pension Liability; (iii) neither the Borrower nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability under Title IV of ERISA with respect to any Pension Plan (other than premiums due and not delinquent

-44-

Exhibit 3 - 91

under Section 4007 of ERISA); (iv) neither the Borrower nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and no event has occurred that, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Section 4201 or 4243 of ERISA with respect to a Multiemployer Plan; and (v) neither the Borrower nor any ERISA Affiliate has engaged in a transaction that would reasonably be expected to be subject to Section 4069 or 4212(c) of ERISA.

### Section 6.14    Subsidiaries.

As of the Closing Date, set forth on Schedule 6.14, with respect to each Credit Party, is the jurisdiction of organization, classes of Capital Stock (including options, warrants, rights of subscription, conversion, exchangeability and other similar rights), and ownership and ownership percentages of each Subsidiary of such Credit Party. The outstanding Capital Stock has been validly issued, is owned free of Liens, and with respect to any outstanding shares of Capital Stock of a corporation, such shares have been validly issued and are fully paid and non-assessable. As of the Closing Date, the outstanding shares of Capital Stock are not subject to any buy-sell, voting trust or other shareholder agreement except as identified on Schedule 6.14. As of the Closing Date; the Credit Parties have no Subsidiaries other than those specifically disclosed on Schedule 6.14.

### Section 6.15    Margin Regulations; Investment Company Act.

(a)    The Credit Parties are not engaged and will not engage, principally or as one of their important activities, in the business of purchasing or carrying "margin stock" (within the meaning of Regulation U issued by the FRB), or extending credit for the purpose of purchasing or carrying margin stock.

(b)    None of the Credit Parties, any Person Controlling a Credit Party, or any Subsidiary of a Credit Party is or is required to be registered as an "investment company" under the Investment Company Act of 1940.

### Section 6.16    Disclosure.

No report, financial statement, certificate or other information furnished in writing by any Credit Party to the DIP Agent or any DIP Lender in connection with the transactions contemplated hereby and the negotiation of this Credit Agreement or delivered hereunder or under any other Credit Document (in each case, as modified or supplemented by other information so furnished), taken as a whole, contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided that, with respect to projected financial information, the Borrower represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time (it being understood that no assurance has been made or will be given that any projections will be achieved).

Exhibit 3 - 92

**Section 6.17      Taxpayer Identification Number; Other Identifying Information.**

The true and correct U.S. taxpayer identification number of the Borrower and each Guarantor is set forth on Schedule 6.17.

**Section 6.18      Compliance with Laws.**

Each Credit Party is in compliance in all material respects with the requirements of all Laws and all orders, writs, injunctions, settlements or other agreements with any Governmental Authority and decrees applicable to it or to its properties, except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted or (b) the failure to comply therewith, either individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

**Section 6.19      Intercreditor Agreement.**

The execution, delivery and performance of this Agreement do not violate or otherwise conflict with the Intercreditor Agreement and all Obligations shall constitute "Senior Debt" under the Intercreditor Agreement

**Section 6.20      Intellectual Property; Licenses, Etc.**

Each Credit Party owns, or possesses the right to use, all of the trademarks, service marks, trade names, copyrights, patents, patent rights, franchises, licenses and other intellectual property rights (collectively, "IP Rights") that are reasonably necessary for the operation of their respective businesses, without conflict with the rights of any other Person, except where a failure to have such ownership or right of use would not reasonably be expected to have a Material Adverse Effect. Except as set forth on Schedule 6.20, on the Closing Date, to the knowledge of the Credit Parties, no claim has been asserted in writing and is pending by any Person challenging the use of any IP Rights or the validity or effectiveness of any IP Rights.

**Section 6.21      Security Interest in Collateral.**

The execution and delivery of the Collateral Documents, if any, by Credit Parties, together with (i) the actions taken on or prior to the date hereof pursuant to subsections 5.01(d) and 7.14, (ii) the orders by the Bankruptcy Court under the Bankruptcy Case, and (iii) the delivery to DIP Collateral Agent of any Collateral not delivered to DIP Collateral Agent at the time of execution and delivery of the applicable Collateral Document (all of which Collateral has been so delivered) are effective to create in favor of DIP Collateral Agent for the benefit of DIP Lenders, as security for the respective Secured Obligations (as defined in the applicable Collateral Document in respect of any Collateral), a valid First Priority Lien on all of the Collateral, and all filings and other actions necessary or desirable to perfect and maintain the perfection and First Priority status of such Liens have been duly made or taken and remain in full force and effect, other than the periodic filing of

Exhibit 3 - 93

UCC continuation statements in respect of UCC financing statements filed by or on behalf of DIP Collateral Agent.

**Section 6.22**   **[Reserved]**.

**Section 6.23**   **[Reserved]**.

**Section 6.24**   **Real Property**.

Set forth on <u>Schedule 6.24</u>, as of the Closing Date, with respect to each Credit Party, is a true, correct and complete list of (a) all real property (including street address) owned by such Person and (b) all real property (including street address) leased by such Person.

## ARTICLE VII
## AFFIRMATIVE COVENANTS

Until the DIP Loans shall have been paid in full or otherwise satisfied, and the DIP Loan Commitments hereunder shall have expired or been terminated, the Credit Parties will, and will cause each of their Subsidiaries to:

**Section 7.01**   **Financial Statements**.

Deliver to the DIP Agent and DIP Lenders, in form and detail reasonably satisfactory to the DIP Agent and the Required DIP Lenders:

(a)      as soon as available, but in any event not later than the earlier of (i) the date such deliveries are required by the SEC and (ii) one hundred twenty (120) days after the end of each fiscal year of Borrower, consolidated balance sheets of Borrower as at the end of such fiscal year (beginning with the fiscal year ending December 31, 2010), and the related consolidated statements of income or operations, changes in shareholders' equity, and cash flows for such fiscal year, setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail and prepared in accordance with GAAP, such consolidated statements to be audited and accompanied by (i) a report and opinion of an independent certified public accountant of nationally recognized standing, which report and opinion shall not be subject to any "going concern" or like qualification or exception or any qualification or exception as to the scope of such audit, and such statements to be certified by the chief executive officer, chief financial officer, treasurer or controller of Borrower to the effect that such statements are fairly stated in all material respects when considered in relation to the consolidated financial statements of the Borrower and its Subsidiaries; and

(b)      as soon as available, but in any event not later than (i) the date such deliveries are required by the SEC and (ii) thirty (30) days after the end of each fiscal month of each fiscal year of Borrower (beginning with the fiscal month ending December 31, 2010), consolidated balance sheets of Borrower as at the end of such fiscal month, and the related consolidated statements of income or operations for such fiscal month and for the portion of the Borrower's fiscal year then ended, and the related consolidated statements of changes in

shareholders' equity, and cash flows for the portion of the Borrower's fiscal year then ended, in each case setting forth in each case in comparative form, as applicable, the figures for the corresponding fiscal month of the previous fiscal year and the corresponding portion of the previous fiscal year, all in reasonable detail and certified by the chief executive officer, chief financial officer, treasurer or controller of Borrower as fairly presenting in all material respects the financial condition, results of operations, shareholders' equity and cash flows of the Borrower and its Subsidiaries in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes; and

(c)    commencing with the Filing Date, each week, a one week rollforward of each of the Budget and availability forecast for Borrower (subject to approval by DIP Agent), setting forth in each case in comparative form the corresponding figures for the previous Budget and a reconciliation of Borrower's actual performance, collections, revenues and disbursements to the Budget.

## Section 7.02    Certificates; Other Information.

Deliver to the DIP Agent and the DIP Lenders, in form and detail reasonably satisfactory to the DIP Agent and the Required DIP Lenders:

(a)    concurrently with the delivery of the financial statements referred to in Sections 7.01(a) and (b), (beginning with the fiscal month ending December 31, 2010), a duly completed Compliance Certificate signed by the chief executive officer, chief financial officer, treasurer or controller of the Borrower (i) stating that such financial statements are fairly stated in all material respects and (ii) certifying that no Default or Event of Default exists as of the date thereof (or the nature and extent thereof and proposed actions with respect thereto);

(b)    promptly after any request by the DIP Agent or any DIP Lender, copies of any final management letters submitted to the board of directors (or the audit committee of the board of directors) of the Borrower by independent accountants in connection with the accounts or books of any Credit Party, or any audit of any of them;

(c)    promptly after the same are available, copies of each annual report, proxy or financial statement or other report or communication sent to the stockholders of the Borrower, and copies of all annual, regular, periodic and special reports and registration statements that the Borrower may file or be required to file with the SEC under Section 13 or 15(d) of the Securities Exchange Act of 1934, and not otherwise required to be delivered to the DIP Agent pursuant hereto;

(d)    promptly after the furnishing thereof, copies of any statement or report furnished to any holder of debt securities with an aggregate principal amount in excess of $1 million of any Credit Party pursuant to the terms of any indenture, loan or credit or similar agreement and not otherwise required to be furnished to the DIP Lenders pursuant to Section 7.01 or any other clause of this Section 7.02;

(e)       promptly, and in any event within ten (10) Business Days after receipt thereof by any Credit Party, copies of each notice or other correspondence received from the SEC (or comparable agency in any applicable non-U.S. jurisdiction) concerning any investigation or possible investigation or other inquiry by such agency regarding financial or other operational results of any Credit Party; and

(f)       promptly, such additional information regarding the business, financial or corporate affairs of any Credit Party, or compliance with the terms of the Credit Documents, as the DIP Agent or any DIP Lender may from time to time reasonably request.

Documents required to be delivered pursuant to Section 7.01(a) or Section 7.02(c) (to the extent any such documents are included in materials otherwise filed with the SEC) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Borrower posts such documents, or provides a link thereto on the Borrower's website on the internet at the website address listed on Schedule 11.02; (ii) on which such documents are posted on the Borrower's behalf on an internet or intranet website, if any, to which each DIP Lender and the DIP Agent have access (whether a commercial, third-party website or whether sponsored by the DIP Agent) or (iii) the Borrower shall provide the DIP Agent and the DIP Lenders, by electronic mail electronic versions (i.e. soft copies) of such documents; provided that the Borrower shall notify (which may be by facsimile or electronic mail), in the case of clause (i) or clause (iii) above, the DIP Agent and each DIP Lender of the posting of any such documents. Notwithstanding anything contained herein, in every instance the Borrower shall be required to provide paper copies of the Compliance Certificates required by Section 7.02(a) to the DIP Agent. Except for such Compliance Certificates, the DIP Agent shall have no obligation to request the delivery or to maintain copies of the documents referred to above, and in any event shall have no responsibility to monitor compliance by the Borrower with any such request for delivery, and each DIP Lender shall be solely responsible for requesting delivery to it or maintaining its copies of such documents.

The Credit Parties hereby acknowledge that the DIP Agent will make available to the Lenders materials and/or information provided by or on behalf of the Credit Parties hereunder by posting such materials and/or information on IntraLinks or another similar electronic system (the "Platform").

## Section 7.03       Notification.

Promptly after knowledge thereof shall have come to the attention of any Responsible Officer of a Credit Party notify the DIP Agent of:

(a)       the occurrence of any Default or Event of Default;

(b)       any matter that has resulted or would reasonably be expected to result in a Material Adverse Effect, including (i) breach or non-performance of, or any default under, a Contractual Obligation of any Credit Party; or (ii) any dispute, litigation, investigation, proceeding or suspension between any Credit Party and any Governmental

Authority, which, in each case, has resulted or would reasonably be expected to result in a Material Adverse Effect;

(c)     the occurrence of any ERISA Event;

(d)     any material change in accounting policies or financial reporting practices by any Credit Party; and

(e)     any litigation, investigation or proceeding affecting any Credit Party in which the amount involved or relief sought would reasonably be expected to have a Material Adverse Effect.

Each notice pursuant to this Section (other than <u>Section 7.03(e)</u>) shall be accompanied by a statement of a Responsible Officer of the Borrower setting forth details of the occurrence referred to therein and stating what action the Borrower has taken and proposes to take with respect thereto. Each notice pursuant to <u>Section 7.03(a)</u> shall describe with particularity any and all provisions of this Credit Agreement and any other Credit Document that have been breached.

## Section 7.04     <u>Payment of Taxes</u>.

Subject to binding orders issued by the Bankruptcy Court in the Bankruptcy Case, pay and discharge as the same shall become due and payable, all its material tax liabilities, assessments and governmental charges or levies upon it or its properties or assets, unless the same are being contested in good faith by appropriate proceedings diligently conducted and adequate reserves in accordance with GAAP are being maintained by the Credit Parties.

## Section 7.05     <u>Preservation of Existence, Etc</u>.

(a)     Preserve, renew and maintain in full force and effect its legal existence and good standing under the Laws of the jurisdiction of its organization (except in connection with a transaction permitted by <u>Section 8.04</u> or <u>8.05</u>);

(b)     take all commercially reasonable action to maintain all rights, privileges, permits, licenses and franchises necessary or desirable in the normal conduct of its business, except to the extent that failure to do so would not reasonably be expected to have a Material Adverse Effect; and

(c)     preserve or renew all of its registered patents, trademarks, trade names and service marks, the non-preservation of which would not reasonably be expected to have a Material Adverse Effect.

Exhibit 3 - 97

**Section 7.06**      **Maintenance of Properties.**

(a)      Maintain, preserve and protect all of its material Property and equipment necessary in the operation of its business in good working order and condition, ordinary wear and tear excepted;

(b)      make all necessary repairs thereto and renewals and replacements thereof, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect; and

(c)      use the standard of care typical in the industry in the operation and maintenance of its facilities.

**Section 7.07**      **Maintenance of Insurance.**

Maintain in full force and effect with financially sound and reputable insurance companies that are not Affiliates of the Borrower, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts as are customarily carried under similar circumstances by such other Persons and identifying the DIP Collateral Agent as sole loss payee, with respect to casualty insurance, and as additional insured, with respect to liability insurance and providing for not less than thirty (30) days' prior notice to the DIP Collateral Agent of the termination, lapse or cancellation of any such insurance.

**Section 7.08**      **Compliance with Laws.**

Comply in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its business or property, except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted; or (b) the failure to comply therewith would not reasonably be expected to have a Material Adverse Effect.

**Section 7.09**      **Books and Records.**

Maintain (a) proper books of record and account, in which true and correct entries in conformity with GAAP shall be made of all financial transactions and matters involving the assets and business of the Credit Parties and (b) such books of record and account in material conformity with all applicable requirements of any Governmental Authority having regulatory jurisdiction over the Credit Parties.

**Section 7.10**      **Inspection Rights.**

Permit representatives and independent contractors of the DIP Agent and each DIP Lender to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs,

Exhibit 3 - 98

finances and accounts with its directors, officers, and independent public accountants, at such reasonable times during normal business hours and as often as may be reasonably desired, upon at least five (5) Business Days' advance notice to the Borrower; provided, however, that when an Event of Default exists the DIP Agent or any DIP Lender (or any of their respective representatives or independent contractors) may do any of the foregoing at the expense of the Borrower as often as reasonably necessary at any time during normal business hours and without advance notice.

### Section 7.11     Use of Proceeds.

Use the proceeds of the Borrowings (a) in accordance with the terms of the Interim Financing Order, the Final Financing Order and the Budget, and in accordance with the terms described herein, (b) to fund general corporate purposes relating to post-petition operations, (c) to pay (i) all fees due to DIP Agent and/or DIP Lenders as provided hereunder, (ii) all fees and expenses due to Prepetition Agent as provided under the Prepetition Credit Agreement and (iii) all professional fees and expenses (including legal, financial advisor, appraisal and valuation-related fees and expenses) incurred by DIP Agent and DIP Lenders as provided hereunder, including those incurred in connection with the preparation, negotiation, documentation and court approval hereof (whether incurred before or after the date of the commencement of the Bankruptcy Case), (d) to repay certain other prepetition claims as may be permitted by the Bankruptcy Court pursuant to "first day" orders, if any, satisfactory to DIP Agent and (e) to provide for ongoing debtor-in-possession working capital needs; provided, however, that the payment of a "Termination Fee" (as defined in the Investment Agreement) shall not be a permitted use of proceeds without the prior written consent of DIP Agent.

### Section 7.12     Joinder of Subsidiaries as Guarantors.

Promptly notify the DIP Agent of the formation, acquisition (or other receipt of interests) of any Subsidiary of any Credit Party, which notice shall include information as to the jurisdiction of organization, the number and class of Capital Stock outstanding and ownership thereof (including options, warrants, rights of conversion or purchase relating thereto); and with respect to any such Subsidiary that is a Domestic Subsidiary, within thirty (30) days of the formation, acquisition or other receipt of interests thereof, cause the joinder of such Subsidiary as a Guarantor pursuant to a Joinder Agreement (or such other documentation in form and substance reasonably acceptable to the DIP Agent) accompanied by Organization Documents and favorable opinions of counsel to such Credit Party, in form and substance reasonably satisfactory to the DIP Agent.

### Section 7.13     Financial Consultant.

Borrower shall promptly pay on demand all of the costs, fees and expenses incurred by DIP Agent in connection with any financial consultant engaged by DIP Agent. Each Credit Party shall cause its officers and employees to cooperate fully with any such financial consultant in connection with its review of the financial and operational condition

-52-

Exhibit 3 - 99

of Credit Parties and will make senior management available to such financial consultant for discussions relating to such review.

## Section 7.14      Pledge of Collateral.

Promptly notify the DIP Agent of the formation, acquisition (or other receipt of interests) of any Subsidiary of any Credit Party, which notice shall include information as to the jurisdiction of organization, the number and class of Capital Stock outstanding and ownership thereof (including options, warrants, rights of conversion or purchase relating thereto); and with respect to any such Subsidiary that is a Domestic Subsidiary, within thirty (30) days of the formation, acquisition or other receipt of interests thereof, cause such Domestic Subsidiary to take all such further actions and execute all such further documents and instruments (including actions, documents and instruments comparable to those described in subsection 5.01(d)) as may be necessary or, in the opinion of DIP Agent, desirable to create in favor of DIP Collateral Agent, for the benefit of DIP Lenders, a valid and perfected First Priority Lien on all of the assets of such Domestic Subsidiary described in the applicable forms of Collateral Documents.

## Section 7.15  Plan Covenants.

Borrower shall:

(i)      Disclosure Statement and Voting Procedures Motion.  File, within one day of the Filing Date, the Disclosure Statement and Voting Procedures Motion (as defined in the Investment Agreement), which Disclosure Statement and Voting Procedures Motion shall be in form and substance satisfactory to DIP Agent and Required DIP Lenders.

(ii)      Assumption Order.  Obtain, on or before the 25th day after the Filing Date, one or more Bankruptcy Court orders assuming the Investment Agreement and approving the Termination Fee (as defined in the Investment Agreement) (the "Assumption Order"), which Assumption Order shall be in form and substance satisfactory to DIP Agent and Required DIP Lenders.

(iii)      Disclosure Statement Approval Order.  Obtain, on or before the 38th day after the date the Disclosure Statement (as defined in the Investment Agreement) is filed with the Bankruptcy Court, one or more Bankruptcy Court orders approving the Disclosure Statement (the "Disclosure Statement Approval Order"), which Disclosure Statement Approval Order shall be in form and substance satisfactory to DIP Agent and Required DIP Lenders.

(iv)      Confirmation Order.  Obtain, on or before the 38th day after the entry of the Disclosure Statement Approval Order, one or more Bankruptcy Court orders approving the transactions (the "Confirmation Order") contemplated by the proposed Investment Agreement with Sexy Hair, Inc., a Delaware corporation, as prospective investor (the "Investment Agreement"), which Investment Agreement and

-53-

Exhibit 3 - 100

Confirmation Order shall be in form and substance satisfactory to DIP Agent and Required DIP Lenders.

# ARTICLE VIII
# NEGATIVE COVENANTS

Until the DIP Loans shall have been paid in full or otherwise satisfied, and the DIP Loan Commitments hereunder shall have expired or been terminated, the Credit Parties will not, and will not permit any of their Subsidiaries to:

### Section 8.01      Liens.

Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, other than the following:

(a)       Liens pursuant to any Credit Document securing the DIP Loans;

(b)       Liens in favor of a DIP Lender or any of its Affiliates pursuant to a Treasury Management Agreement permitted hereunder, but only to the extent that (i) the obligations under such Treasury Management Agreement are permitted under Section 8.03, (ii) such Liens are on the same collateral that secures the DIP Loans and (iii) the obligations under such Treasury Management Agreement and the DIP Loans share *pari passu* (subject to Section 9.03) in the collateral that is subject to such Liens;

(c)       Liens existing on the date hereof and listed on Schedule 8.01;

(d)       Liens for taxes, assessments or governmental charges not yet due or that are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

(e)       statutory Liens of landlords and carriers', warehousemen's, mechanics', materialmen's, repairmen's, suppliers' or other like Liens arising in the ordinary course of business that are not overdue for a period of more than sixty (60) days or that are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person;

(f)       pledges or deposits in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation, other than any Lien imposed by ERISA;

(g)       deposits to secure the performance of bids, trade contracts and leases (other than Indebtedness), workers' compensation, unemployment insurance, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

Exhibit 3 - 101

(h)    easements, rights-of-way, restrictions and other similar encumbrances affecting real property that, in the aggregate, are not substantial in amount, and that do not in any case materially detract from the value of the property subject thereto or materially interfere with the ordinary conduct of the business of the applicable Person;

(i)    Liens securing judgments for the payment of money (on appeal or other surety bonds relating to such judgments) not constituting an Event of Default under Section 9.01(e);

(j)    Liens securing, or in respect of, obligations under capital leases or Synthetic Leases and purchase money obligations for fixed or capital assets; provided that (i) such Liens do not at any time encumber any property other than the property financed by such Indebtedness and (ii) the Indebtedness secured thereby does not exceed the cost of the property being acquired on the date of acquisition;

(k)    licenses, sublicenses, leases or subleases granted to others not interfering in any material respect with the business of the Credit Parties;

(l)    any interest of title of a lessor under, and Liens arising from UCC financing statements (or equivalent filings, registrations or agreements in foreign jurisdictions) relating to, leases permitted by this Credit Agreement;

(m)    normal and customary rights of setoff upon deposits of cash in favor of banks or other depository institutions;

(n)    Liens of a collection bank arising under Section 4-210 of the Uniform Commercial Code on items in the course of collection;

(o)    Liens arising out of any conditional sale, title retention, consignment or other similar arrangements for the sale of goods entered into by a Credit Party in the ordinary course of business to the extent such Liens do not attach to any assets other than the goods subject to such arrangements and the proceeds thereof;

(p)    Liens (i) incurred in the ordinary course of business in connection with the purchase or shipping of goods or assets, which liens or in the favor of the seller or shipper of such goods or assets and only attach to such goods or assets (or the proceeds thereof), and (ii) in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(q)    Liens (i) (x) on advances of cash and Cash Equivalents in favor of the seller of any property to be acquired in an investment or acquisition permitted pursuant to Section 8.02 to be applied against the purchase price for such investment or acquisition and (y) consisting of an agreement to dispose of any property in an asset sale or disposition permitted under Section 8.05, and (ii) consisting of earnest money deposits of cash and Cash Equivalents made by a Credit Party in connection with any letter of intent or purchase agreement in connection with any investment or acquisition permitted pursuant to Section 8.02;

-55-

Exhibit 3 - 102

(r)    the "Carveout" (as defined in the then applicable Financing Order); and

(s)    Liens granted pursuant to the Prepetition Credit Agreement prior to the Closing Date.

**Section 8.02    <u>Investments</u>.**

Make or permit to exist any Investments, except:

(a)    cash and Cash Equivalents;

(b)    Investments (including intercompany Investments) existing on the date hereof and listed on <u>Schedule 8.02</u> and any extensions or renewals thereof;

(c)    to the extent not prohibited by applicable Law, advances to officers, directors and employees of Credit Parties in an aggregate amount not to exceed $250,000 at any time outstanding, for travel, entertainment, relocation and analogous ordinary business purposes;

(d)    Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss;

(e)    Support Obligations permitted by <u>Section 8.03</u>;

(f)    advances of payroll payments in the ordinary course of business;

(g)    Investments in the form of a cash deposit or prepayment of expenses to vendors, suppliers and trade creditors so long as such deposits are made and such expenses are incurred in the ordinary course of business;

(h)    deposits of cash with banks or other depository institutions in the ordinary course of business and deposits required by government agencies or utilities;

(i)    Credit Parties may receive and hold promissory notes and other non-cash consideration received in connection with any disposition permitted by <u>Section 8.05</u>; and

(j)    the making of Consolidated Capital Expenditures to the extent set forth in, and in accordance with, the Budget.

**Section 8.03    <u>Indebtedness</u>.**

Create, incur, assume or suffer to exist any Indebtedness, except:

(a)    Indebtedness under the Credit Documents;

-56-

Exhibit 3 - 103

(b)    Indebtedness outstanding on the date hereof and listed on Schedule 8.03;

(c)    Support Obligations by the Credit Parties in respect of Indebtedness otherwise permitted hereunder;

(d)    the Subordinated Debt, plus any amount added to the original principal amount thereof as a result of the capitalization of interest;

(e)    Indebtedness in respect of netting services, temporary overdraft protections and similar arrangements in each case in connection with cash management services in the ordinary course of business;

(f)    Indebtedness in respect of surety bonds, performance bonds, appeal bonds, completion guarantees and other similar obligations incurred in the ordinary course of business of the Credit Parties;

(g)    Indebtedness representing deferred compensation to officers, directors, employees of the Credit Parties;

(h)    endorsement of items for deposit or collection received in the ordinary course of business; and

(i)    the Prepetition Debt.

**Section 8.04    Mergers and Dissolutions.**

Merge, dissolve, liquidate, consolidate with or into another Person.

**Section 8.05    Dispositions.**

Make any Disposition or enter into any agreement to make any Disposition to or in favor of any Person, except:

(a)    Dispositions of property, machinery and equipment no longer used or useful in the conduct of business of the Credit Parties that are Disposed of in the ordinary course of business;

(b)    Dispositions of notes or accounts receivable in connection with the collection or compromise thereof;

(c)    licenses, sublicenses, leases or subleases granted to others not interfering in any material respect with the business of the Credit Parties;

(d)    the sale or disposition of Cash Equivalents for fair market value;

(e)    Dispositions of Investments permitted by Section 8.02(a), but only in full compliance with the Cash Management Order and then applicable Financing Order;

Exhibit 3 - 104

(f)    any Credit Party may sell or dispose of shares of Capital Stock of any of its Subsidiaries in order to qualify members of the governing body of such Subsidiary if required by applicable law;

(g)    Credit Parties may dispose of any asset subject to any settlement of or payment in respect of any property or casualty insurance claim or any condemnation proceeding;

(h)    Credit Parties may dispose of Investments in joint ventures, to the extent required by, or made pursuant to buy/sell arrangements between the joint venture parties in, joint venture agreements and similar binding arrangements entered into in the ordinary course of business; and

(i)    other Dispositions by the Credit Parties, provided that (i) at the time of such Disposition, no Event of Default shall exist or would result from such Disposition, (ii) the aggregate book value of all property Disposed of in reliance on this clause (j) in any fiscal year shall not exceed $50,000 and (iii) such Disposition shall be for fair market value.

### Section 8.06    Restricted Payments.

Declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, except that,

(a)    Subsidiaries of the Borrower may pay dividends and make distributions in respect of their Capital Stock;

(b)    each Credit Party may declare and make dividend payments or other distributions payable solely in the common stock or other common equity interests of such Person; and

(c)    each Credit Party may purchase, redeem or otherwise acquire shares of its Capital Stock or warrants or options to acquire any such shares with the proceeds received from the substantially concurrent issue of new shares of Capital Stock.

In addition to the restrictions contained in the foregoing paragraph, without prior approval of the Bankruptcy Court and the prior written consent of DIP Agent, Credit Parties shall not make any payment of any proceeds constituting part of the Collateral or other cash (including, without limitation, proceeds of DIP Loans) to the "Investor" (as defined in the Investment Agreement) on account of the "Termination Fee" (as defined in the Investment Agreement) or to any unsecured creditor of any Credit Party on account of claims arising prior to the commencement of the Bankruptcy Case (including without limitation payments in respect of reclamation claims of unpaid suppliers of goods delivered to Borrower prior to the commencement of the Bankruptcy Case (regardless of whether such claims have been granted administrative expense priority status pursuant to Section 546(c) of the Bankruptcy Code)), but excluding any payments of Indebtedness to the extent set forth in the Budget and any payments necessary to cure defaults under any executory contracts or

-58-

Exhibit 3 - 105

unexpired leases assumed by any Credit Party with the approval of the Bankruptcy Court and otherwise pursuant to the Budget.

Section 8.07     **Change in Nature of Business.**

Engage in any material line of business substantially different from those lines of business conducted by the Credit Parties on the date hereof or any business substantially related or incidental thereto.

Section 8.08     **Change in Fiscal Year.**

Change its fiscal year without the prior written consent of the Required DIP Lenders.

Section 8.09     **Transactions with Affiliates.**

Enter into any transaction of any kind with any Affiliate of the Borrower, whether or not in the ordinary course of business, other than on fair and reasonable terms substantially as favorable to such Credit Party as would be obtainable by such Credit Party at the time in a comparable arm's length transaction with a Person other than an Affiliate; provided that the foregoing restriction shall not apply to (i) transactions expressly permitted hereunder; (ii) compensation and reimbursement of expenses of officers and directors entered into in the ordinary course of business; (iii) reasonable and customary fees paid to members of the board of directors (or similar governing body) of the Credit Parties; (iv) customary indemnities and reimbursements paid to directors of the Credit Parties and indemnities made in favor of employees and officers of the Credit Parties in the ordinary course of business; (v) the entering into and the making of payments by any Credit Party under any employment agreements, severance agreements, employee benefit plans, stock option plans, indemnification provisions and other similar compensatory arrangements with officers, employees and directors of the Credit Parties in the ordinary course of business; and (vi) any contribution to the capital of Midco or any issuance of Capital Stock in respect thereof.

Section 8.10     **Prepayment of Subordinated Debt.**

(a)     Amend or modify, or permit or acquiesce to the amendment or modification (including waivers) of, the Subordinated Debt, including any Subordinated Debt Document, except to the extent permitted by the terms of the Intercreditor Agreement.

(b)     Make any payment, prepayment, redemption, defeasance or acquisition for value of (including by way of depositing money or securities with the trustee with respect thereto before due for the purpose of paying when due), or refund, refinance or exchange of, the Subordinated Debt.

Exhibit 3 - 106

## Section 8.11      No Further Negative Pledges.

Enter into any Contractual Obligation (other than this Credit Agreement and the other Credit Documents) that limits the ability (i) of any Subsidiary of a Credit Party to make Restricted Payments to the Borrower or any Guarantor or to otherwise transfer property to the Borrower or any Guarantor; provided, however, that this clause (i) shall not prohibit (a) any limitations set forth in the Organization Documents to the extent required by Law, (b) any limitations set forth in any joint venture arrangements or similar arrangements to the extent permitted to be entered into as expressly provided or required by this Credit Agreement, (c) any limitations on the disposition of assets subject to Permitted Liens and (d) customary restrictions and conditions contained in any agreement relating to the Disposition of any property or assets permitted under Section 8.05 pending the consummation of such Disposition, (ii) of any Domestic Subsidiary that is a Wholly-Owned Subsidiary to guarantee the Indebtedness of the Borrower or (iii) of any Credit Party to create, incur, assume or suffer to exist Liens on property of such Person; provided, however, that this clause (iii) shall not prohibit (a) any negative pledge incurred or provided in favor of any holder of Indebtedness permitted under Section 8.03(b) solely to the extent any such negative pledge relates to the property financed by or the subject of such Indebtedness, (b) any Permitted Lien or any document or instrument governing any Permitted Lien; provided that any such restriction contained therein relates only to the asset or assets subject to such Permitted Lien, (c) customary restrictions and conditions contained in any agreement relating to the Disposition of any property or assets permitted under Section 8.05 pending the consummation of such Disposition, and (d) customary provisions restricting assignments, subletting or other transfers contained in leases, licenses, joint venture agreements and similar agreements entered into in the ordinary course of business.

## Section 8.12      Financial Covenants.

(a)      For any calendar week for the period beginning on the Filing Date and ending on the last day of such week (calculated on a cumulative basis for the first three weeks and thereafter on a four-week rolling basis) (i) permit aggregate total receipts to be less than 85% of the aggregate amount projected to be received in the Budget for such period, (ii) permit, for any line item set forth in the Budget under the heading "Operating Disbursements", aggregate operating  disbursements for such line item to be greater than 115% of the aggregate amount projected to be disbursed in the Budget for such line item for such period or (iii) permit aggregate net cash flow to be less than 90% (or 110% in the case of a negative amount) of the aggregate amount projected to be generated in the Budget for such period..

(b)      Credit Parties shall not, during the term of this Credit Agreement, for any four-week calendar period occurring after the Filing Date, incur aggregate professional fees for professionals engaged by Credit Parties greater than the aggregate amount for such professional fees set forth in the Budget for such period.

Exhibit 3 - 107

**Section 8.13**      **Ownership of Subsidiaries; Limitations on Parent, Midco and Ecoly.**

Notwithstanding any other provisions of this Credit Agreement to the contrary:

(a)      Form or acquire any Subsidiary after the Closing Date.

(b)      Permit the Parent, Midco or Ecoly to (i) hold any assets other than Capital Stock of the Borrower or any Guarantor, solely to the extent held on the Closing Date, (ii) have any liabilities other than (A) the liabilities under the Credit Documents; (B) Tax liabilities; (C) corporate, administrative and operating expenses in the ordinary course of business and (D) liabilities under any of the Subordinated Debt Documents, or (iii) engage in any business other than (A) owning the Capital Stock of the Borrower or any Guarantor and activities incidental or related thereto, (B) acting as a Guarantor under this Credit Agreement, and pledging its assets to the DIP Collateral Agent, for the benefit of the DIP Lenders, pursuant to the Collateral Documents to which it is a party and (C) any activities expressly permitted under Article VIII.

**Section 8.14**      **No Adverse Actions.**

Recharacterize or use any portion of (i) the proceeds of the DIP Loans or the Collateral, (ii) the "Carveout" (as defined in the then applicable Financing Order) or (iii) cash collateral in which DIP Lenders have an interest, in any manner adverse to DIP Agent, DIP Lenders, Prepetition Agent or Prepetition Lenders, including to commence or prosecute any action or objection with respect to the claims or the Liens of DIP Agent, DIP Lenders, Prepetition Agent or Prepetition Lenders. Not more than $25,000 of the proceeds of the DIP Loans or the Collateral may be used by an official committee of unsecured creditors to investigate the extent, validity, characterization and priority of the claims and Liens under the Prepetition Credit Agreement.

**ARTICLE IX**
**EVENTS OF DEFAULT AND REMEDIES**

**Section 9.01**      **Events of Default.**

Any of the following shall constitute an Event of Default:

(a)      _Non-Payment._ The Borrower or any other Credit Party fails to pay (i) when and as required to be paid herein, any amount of principal of any DIP Loan, or (ii) within three (3) Business Days after the same becomes due, any interest on any DIP Loan, or any fee due hereunder, or (iii) within five (5) Business Days after the same becomes due, any other amount payable hereunder or under any other Credit Document; or

(b)      _Specific Covenants._ The Borrower or any other Credit Party fails to perform or observe any term, covenant or agreement contained in any of Section 7.01, 7.02(b), 7.03(a), (b) or (e), 7.05(a), 7.10, 7.11 or 7.15 or Article VIII; or

Exhibit 3 - 108

(c)    Other Defaults. The Borrower or any other Credit Party fails to perform or observe any other covenant or agreement (not specified in subsection (a) or (b) above) contained in any Credit Document on its part to be performed or observed and such failure continues for ten (10) days; or

(d)    Representations and Warranties.    My representation, warranty or certification made or deemed made by the Borrower or any other Credit Party herein, in any other Credit Document, or in any document delivered in connection herewith or therewith shall be false or misleading in any material respect when made or deemed made when made or deemed made; or

(e)    Judgments.  There is entered against any Credit Party one or more final judgments or orders for the payment of money in an aggregate amount (as to all such judgments or orders) exceeding $250,000 (to the extent not covered by independent third-party insurance as to which the insurer does not dispute coverage or an indemnity), and (A) enforcement proceedings are commenced by any creditor upon such judgment or order, or (B) there is a period of fifteen (15) consecutive days during which a stay of enforcement of such judgment, by reason of a pending appeal or otherwise, is not in effect; or

(f)    ERISA. (i) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan that has resulted or would reasonably be expected to result in liability of a Credit Party under Title IV of ERISA to the Pension Plan, Multiemployer Plan or the PBGC in an aggregate amount in excess of $250,000, or (ii) a Credit Party or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount in excess of $250,000; or

(g)    Invalidity of Credit Documents. Any Credit Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or satisfaction in full of all the DIP Loans, ceases to be in full force and effect; or any Credit Party or any other Person contests in any manner the validity or enforceability of any Credit Document; or any Credit Party denies that it has any or further liability or obligation under any Credit Document, or purports to revoke, terminate or rescind any Credit Document; or

(h)    Change of Control. There occurs any Change of Control; or

(i)    Employment of Senior Management.  Borrower shall fail to employ (and continue to employ) senior management acceptable to DIP Agent, and on terms and conditions acceptable to DIP Agent.

(j)    Bankruptcy Case.  (i) Any Credit Party makes a payment on any prepetition Indebtedness except as otherwise authorized by the "first day" orders consented to by DIP Agent or in accordance with the terms hereof; (ii) any Credit Party uses or seeks the use of "Cash Collateral" (as defined in the then applicable Financing Order) in a manner inconsistent with the terms of such Financing Order without DIP Agent's prior written

-62-

Exhibit 3 - 109

consent; (iii) any Credit Party incurs or seeks to incur, in a manner inconsistent with the then applicable Financing Order, Indebtedness that is secured by a Lien with priority equal to or superior to the Postpetition Liens (as defined in such Financing Order) or the Liens of Prepetition Agent, on behalf of Prepetition Lenders, or which is given superpriority administrative expense status under Bankruptcy Code Section 364(c); (iv) notice is given of a Bankruptcy Code Section 363 sale of all or part of the Postpetition Collateral (as defined in the then applicable Financing Order) unless consented to in writing by DIP Agent (in its discretion unless instructed otherwise by Required DIP Lenders); (v) any other party is granted relief from the automatic stay to permit enforcement of rights by such party with respect to any assets of any Credit Party or any other property in any Credit Party's possession; (vi) a plan under chapter 11 of the Bankruptcy Code is filed without the consent of DIP Agent and Prepetition Agent that does not provide for payment in full in cash on the effective date of such plan of all of the Obligations and the Prepetition Debt and the cash collateralization of any contingent Obligations and any contingent Prepetition Debt; (vii) the failure of the Bankruptcy Court to enter the Interim Financing Order or the Final Financing Order at the times and in the form required hereunder; (viii) the then applicable Financing Order or any other order of the Bankruptcy Court affecting this Credit Agreement is stayed, reversed, revoked or modified in any respect without the written consent of DIP Agent (or without the written consent of Required DIP Lenders or DIP Lenders to the extent such consents are required hereunder); (ix) any party objects to the extent, validity or priority of the Obligations; (x) any Credit Party's failure to comply with any provisions of the Interim Financing Order or the Final Financing Order; (xi) the Bankruptcy Case is converted to a case under chapter 7 of the Bankruptcy Code; (xii) a trustee is appointed or elected in the Bankruptcy Case, or an examiner with the power to operate any Credit Party's business is appointed in the Bankruptcy Case; (xiii) any Credit Party's exclusivity regarding proposing, or soliciting a proposal for, a plan of reorganization under the Bankruptcy Case shall terminate or is shortened at any time during the term of this Credit Agreement; (xiv) any party objects to or otherwise seeks to challenge the extent, validity or priority of the Obligations or the Prepetition Debt or the Liens under this Agreement or the Prepetition Credit Agreement or to otherwise subordinate or re-characterize the Obligations, the Prepetition Debt or such Liens; (xv) the occurrence of a "Termination Date" (as defined in the Investment Agreement) or (xvi) the holders of the Capital Stock of any Credit Party (or other authorized Person(s)) shall authorize the liquidation of Borrower's business pursuant to one or more Section 363 sales or otherwise, other than as consented to by DIP Agent (in its discretion unless instructed otherwise by Required DIP Lenders).

## Section 9.02     Remedies Upon Event of Default.

If any Event of Default occurs and is continuing, the DIP Agent shall, at the request of, or may, with the consent of, the Required DIP Lenders, take any or all of the following actions:

(a)     declare the commitments of the DIP Lenders to make DIP Loans to be terminated, whereupon such commitments and obligation shall be terminated;

Exhibit 3 - 110

(b)    declare the unpaid principal amount of all outstanding DIP Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Credit Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower; and

(c)    exercise on behalf of itself and the DIP Lenders all rights and remedies available to it and the DIP Lenders under the Credit Documents, the Financing Orders or applicable Law.

### Section 9.03    <u>Application of Funds</u>.

After the exercise of remedies provided for in <u>Section 9.02</u> (or after the DIP Loans have automatically become immediately due and payable), any amounts received on account of the Obligations shall be applied by the DIP Agent in the following order:

<u>First</u>, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (other than principal and interest but including all reasonable fees, expenses and disbursements of any law firm or other counsel and amounts payable under <u>Article III</u>) payable to the DIP Agent and the DIP Collateral Agent, in each case in its capacity as such;

<u>Second</u>, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to the DIP Lenders (including all reasonable fees, expenses and disbursements of any law firm or other counsel and amounts payable under <u>Article III</u>), ratably among the DIP Lenders in proportion to the respective amounts described in this clause <u>Second</u>, payable to them;

<u>Third</u>, to payment of that portion of the Obligations constituting accrued and unpaid interest on the DIP Loans and other Obligations (other than Obligations described in clause <u>Fourth</u> below), ratably among the DIP Lenders in proportion to the respective amounts described in this clause <u>Third</u> payable to them;

<u>Fourth</u>, to (a) payment of that portion of the Obligations constituting unpaid principal of the DIP Loans and (b) payments of amounts due under any Treasury Management Agreement between any Credit Party and any DIP Lender, or any Affiliate of a DIP Lender, ratably among such parties in proportion to the respective amounts described in this clause <u>Fourth</u> payable to them; and

<u>Last</u>, the balance, if any, after all of the Obligations have been paid in full, to the Borrower or as otherwise required by Law.

Exhibit 3 - 111

## ARTICLE X
## DIP AGENT AND DIP COLLATERAL AGENT

**Section 10.01**     **Appointment and Authorization of DIP Agent and DIP Collateral Agent.**

(a)     Each of the DIP Lenders hereby irrevocably appoints Bank of Montreal to act on its behalf as the DIP Agent hereunder and under the other Credit Documents and authorizes the DIP Agent to take such actions on its behalf and to exercise such powers as are delegated to the DIP Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. The provisions of this Article are solely for the benefit of the DIP Agent, the DIP Lenders, and neither the Borrower nor any other Credit Party shall have rights as a third party beneficiary of any of such provisions.

(b)     Each of the DIP Lenders hereby irrevocably appoints, designates and authorizes the DIP Collateral Agent to take such action on its behalf under the provisions of this Credit Agreement and each Collateral Document and to exercise such powers and perform such duties as are expressly delegated to it by the terms of this Credit Agreement or any Collateral Document, together with such powers as are reasonably incidental thereto. Notwithstanding any provision to the contrary contained elsewhere herein or in any Collateral Document, the DIP Collateral Agent shall not have any duties or responsibilities, except those expressly set forth herein or therein, nor shall the DIP Collateral Agent have or be deemed to have any fiduciary relationship with any DIP Lender or participant, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Credit Agreement or any Collateral Document or otherwise exist against the DIP Collateral Agent. Without limiting the generality of the foregoing sentence, the use of the term "agent" herein and in the Collateral Documents with reference to the DIP Collateral Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Law. Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties. The DIP Collateral Agent shall act on behalf of the DIP Lenders with respect to any Collateral and the Collateral Documents, and the DIP Collateral Agent shall have all of the benefits and immunities (i) provided to the DIP Agent under the Credit Documents with respect to any acts taken or omissions suffered by the DIP Collateral Agent in connection with any Collateral or the Collateral Documents as fully as if the term "DIP Agent" as used in such Credit Documents included the DIP Collateral Agent with respect to such acts or omissions, and (ii) as additionally provided herein or in the Collateral Documents with respect to the DIP Collateral Agent.

**Section 10.02**     **Rights as a DIP Lender.**

The Person serving as the DIP Agent hereunder shall have the same rights and powers in its capacity as a DIP Lender as any other DIP Lender and may exercise the same as though it were not the DIP Agent and the term "DIP Lender" or "DIP Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the DIP Agent hereunder in its individual capacity. Such Person and its

Exhibit 3 - 112

Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with any Credit Party or Affiliate thereof as if such Person were not the DIP Agent hereunder and without any duty to account therefor to the DIP Lenders.

## Section 10.03    Exculpatory Provisions.

The DIP Agent shall not have any duties or obligations except those expressly set forth herein and in the other Credit Documents. Without limiting the generality of the foregoing, the DIP Agent:

(a)    shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(b)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Credit Documents that the DIP Agent is required to exercise as directed in writing by the Required DIP Lenders (or such other number or percentage of the DIP Lenders as shall be expressly provided for herein or in the other Credit Documents), provided that the DIP Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the DIP Agent to liability or that is contrary to any Credit Document or applicable law; and

(c)    shall not, except as expressly set forth herein and in the other Credit Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as the DIP Agent or any of its Affiliates in any capacity.

The DIP Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required DIP Lenders (or such other number or percentage of the DIP Lenders as shall be necessary, or as the DIP Agent shall believe in good faith shall be necessary, under the circumstances as provided in Sections 11.01 and 9.02) or (ii) in the absence of its own gross negligence or willful misconduct. The DIP Agent shall be deemed not to have knowledge of any Default unless and until notice describing such Default is given to the DIP Agent by the Borrower or a DIP Lender.

The DIP Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Credit Agreement or any other Credit Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Credit Agreement, any other Credit Document or any other agreement, instrument or document or (v) the satisfaction of any condition set forth in Article V or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the DIP Agent.

Exhibit 3 - 113

### Section 10.04    Reliance by DIP Agent.

The DIP Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The DIP Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a DIP Loan, that by its terms must be fulfilled to the satisfaction of a DIP Lender, the DIP Agent may presume that such condition is satisfactory to such DIP Lender unless the DIP Agent shall have received notice to the contrary from such DIP Lender prior to the making of such DIP Loan. In determining compliance with any condition hereunder to the making of a DIP Loan that by its terms must be fulfilled to the satisfaction of a DIP Lender, the DIP Agent may presume that such condition is satisfactory to such DIP Lender unless the DIP Agent shall have received notice to the contrary from such DIP Lender prior to the making of such DIP Loan. The DIP Agent may consult with legal counsel, independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

### Section 10.05    Delegation of Duties.

The DIP Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Credit Document by or through any one or more sub-agents appointed by the DIP Agent. The DIP Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the DIP Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as DIP Agent.

### Section 10.06    Resignation of the DIP Agent.

The DIP Agent may at any time, on not less than 20 days' advance notice to the DIP Lenders and the Borrower, resign. Upon receipt of any such notice of resignation, the Required DIP Lenders shall have the right, in consultation with the Borrower, to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States. If no such successor shall have been so appointed by the Required DIP Lenders and shall have accepted such appointment within 20 days after the retiring DIP Agent gives notice of its resignation, then the retiring DIP Agent may on behalf of the DIP Lenders, appoint a successor DIP Agent meeting the qualifications set forth above; provided that if the DIP Agent shall notify the Borrower and the DIP Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (1) the retiring DIP Agent shall be discharged from its duties and obligations hereunder and under the other Credit

-67-

Exhibit 3 - 114

Documents (except that in the case of any collateral security held by the DIP Agent on behalf of the DIP Lenders under any of the Credit Documents, the retiring DIP Agent shall continue to hold such collateral security until such time as a successor DIP Agent is appointed) and (2) all payments, communications and determinations provided to be made by, to or through the DIP Agent shall instead be made by or to each DIP Lender directly, until such time as the Required DIP Lenders appoint a successor DIP Agent as provided for above in this Section. Upon the acceptance of a successor's appointment as DIP Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) DIP Agent, and the retiring DIP Agent shall be discharged from all of its duties and obligations hereunder or under the other Credit Documents (if not already discharged therefrom as provided above in this Section). The fees payable by the Borrower to a successor DIP Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the retiring DIP Agent's resignation hereunder and under the other Credit Documents, the provisions of this Article and Section 11.04 shall continue in effect for the benefit of such retiring DIP Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring DIP Agent was acting as DIP Agent.

Any resignation by Bank of Montreal as DIP Agent pursuant to this Section shall also constitute its resignation as DIP Collateral Agent. Upon the acceptance of a successor's appointment as DIP Agent hereunder, (a) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring DIP Collateral Agent and (b) the retiring DIP Collateral Agent shall be discharged from all of their respective duties and obligations hereunder or under the other Credit Documents.

### Section 10.07    Non-Reliance on DIP Agent and Other DIP Lenders.

Each DIP Lender acknowledges that it has, independently and without reliance upon the DIP Agent or any other DIP Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Credit Agreement. Each DIP Lender also acknowledges that it will, independently and without reliance upon the DIP Agent or any other DIP Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Credit Agreement, any other Credit Document or any related agreement or any document furnished hereunder or thereunder.

### Section 10.08    [Reserved].

### Section 10.09    DIP Agent May File Proofs of Claim.

In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Credit Party, the DIP Agent (irrespective of whether the principal of any DIP Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the DIP Agent shall have made any

Exhibit 3 - 115

demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the DIP Loans and all other Obligations (other than obligations under Treasury Management Agreements to which the DIP Agent is not a party) that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the DIP Lenders and the DIP Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the DIP Lenders, the L)C Issuer and the DIP Agent and their respective agents and counsel and all other amounts due the DIP Lenders and the DIP Agent under Sections 2.09 and 11.04 allowed in such judicial proceeding; and

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same; and

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each DIP Lender to make such payments to the DIP Agent and, in the event that the DIP Agent shall consent to the making of such payments directly to the DIP Lenders, to pay to the DIP Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the DIP Agent and its agents and counsel, and any other amounts due the DIP Agent under Sections 2.09 and 11.04.

Nothing contained herein shall be deemed to authorize the DIP Agent to authorize or consent to or accept or adopt on behalf of any DIP Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any DIP Lender or to authorize the DIP Agent to vote in respect of the claim of any DIP Lender in any such proceeding.

### Section 10.10    Collateral and Guaranty Matters.

The DIP Lenders irrevocably authorize each of the DIP Agent and the DIP Collateral Agent, at its option and in its discretion:

(a)    to release any Lien on any property granted to or held by the DIP Collateral Agent under any Credit Document (i) upon termination of the Aggregate DIP Loan Commitments and payment in full of all Obligations (other than contingent obligations), (ii) that is sold or to be sold as part of or in connection with any sale permitted hereunder or under any other Credit Document, or (iii) subject to Section 11.01, if approved, authorized or ratified in writing by the Required DIP Lenders;

(b)    to subordinate any Lien on any property granted to or held by the DIP Collateral Agent under any Credit Document to the holder of any Lien on such property that is permitted by Section 8.01(j); and

(c)     to release any Guarantor from its obligations under the Guaranty provided hereunder if such Person ceases to be a Subsidiary of a Credit Party as a result of a transaction permitted hereunder.

Upon request by the DIP Agent or the DIP Collateral Agent at any time, the Required DIP Lenders will confirm in writing the authority of the DIP Collateral Agent to release or subordinate its interest in particular property and of the DIP Agent to release any Guarantor from its obligations hereunder pursuant to this <u>Section 10.10.</u>

## ARTICLE XI
## MISCELLANEOUS

### Section 11.01     <u>Amendments, Etc</u>.

No amendment or waiver of any provision of this Credit Agreement or any other Credit Document, and no consent to any departure by the Borrower or any other Credit Party therefrom, shall be effective unless in writing signed by the Required DIP Lenders (or by the DIP Agent on behalf of the Required DIP Lenders upon receipt of a consent and direction letter to do so by the applicable DIP Lenders) and the Borrower or the applicable Credit Party, as the case may be, and acknowledged by the DIP Agent, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; <u>provided</u>, however, that:

(a)     unless also consented to in writing by each DIP Lender directly affected thereby, no such amendment, waiver or consent shall:

(i)     increase the DIP Loan Commitment of any DIP Lender (or reinstate any DIP Loan Commitment terminated pursuant to <u>Section 9.02)</u>, it being understood that the amendment or waiver of any condition precedent set forth in <u>Section 5.02</u> or of an Event of Default or a mandatory reduction or a mandatory prepayment in DIP Loan Commitments shall not be considered an increase in DIP Loan Commitments,

(ii)     waive non-payment or postpone any date fixed by this Credit Agreement or any other Credit Document for any payment of principal, interest, fees or other amounts due to any DIP Lender hereunder or under any other Credit Document, it being understood that the provisions of this clause shall not apply to mandatory prepayments (other than any mandatory prepayment of DIP Loans under <u>Section 2.05(b)(i)</u> or the manner of application thereof to the DIP Loans under <u>Section 2.05(c)</u>),

(iii)     reduce the principal of, or the rate of interest specified herein on, any DIP Loan, or any fees or other amounts payable hereunder or under any other Credit Document; <u>provided</u>, however, that only the consent of the Required DIP Lenders shall be necessary to amend the definition of "Default Rate" or to waive any obligation of the Borrower to pay interest at the Default Rate,

Exhibit 3 - 117

(iv)  change <u>Section 2.11</u> or <u>Section 9.03</u> in a manner that would alter the pro rata sharing of payments with respect to (A) the making of advances, (B) the manner of application of payments or prepayments of principal, interest, or fees or (C) the manner of reduction of commitments and committed amounts,

(v)  change any provision of this <u>Section 11.01(a)</u> or the definition of "Required DIP Lenders,"

(vi)  release all or substantially all of the Collateral (other than as provided herein or as appropriate in connection with transactions permitted hereunder), or

(vii)  release all or substantially all of the value of the Guaranty without the written consent of each DIP Lender, except to the extent that the release of any Guarantor is permitted hereunder (in which case such release may be made by the DIP Agent acting alone).

(b)  unless also consented to in writing by the DIP Agent, no such amendment, waiver or consent shall affect the rights or duties of the DIP Agent under this Credit Agreement or any other Credit Document; and

(c)  unless also consented to in writing by the DIP Collateral Agent, no such amendment, waiver or consent shall affect the rights or duties of the DIP Collateral Agent under this Credit Agreement or any other Credit Document;

<u>provided</u> however, that notwithstanding anything to the contrary contained herein, (i) no Defaulting DIP Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder, except that the DIP Loan Commitment of such DIP Lender may not be increased or extended without the consent of such DIP Lender, (ii) each DIP Lender is entitled to vote as such DIP Lender sees fit on any bankruptcy or insolvency reorganization plan that affects the DIP Loans, (iii) each DIP Lender acknowledged that the provisions of Section 1126(c) of the Bankruptcy Code supersedes the unanimous consent provisions set forth herein, and (iv) the Required DIP Lenders may consent to allow a Credit Party to use cash collateral in the context of a bankruptcy or insolvency proceeding.

## Section 11.02    Notices; Effectiveness; Electronic Communication.

(a)  <u>Notices Generally.</u> Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in subsection (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

Exhibit 3 - 118

(i)      if to the Borrower or the DIP Agent, to the address, telecopier number, electronic mail address or telephone number specified for such Person on Schedule 11.02; and

(ii)      if to any other DIP Lender, to the address, telecopier number, electronic mail address or telephone number specified in its Administrative Questionnaire.

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next business day for the recipient). Notices and other communications delivered through electronic communications to the extent provided in subsection (b) below, shall be effective as provided in such subsection (b).

(b)      Electronic Communications.  Notices and other communications to the DIP Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the DIP Agent, provided that the foregoing shall not apply to notices to any DIP Lender pursuant to Article II if such DIP Lender has notified the DIP Agent that it is incapable of receiving notices under such Article by electronic communication. The DIP Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, provided that approval of such procedures may be limited to particular notices or communications.

Unless the DIP Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(c)      THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE." THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION

Exhibit 3 - 119

WITH THE BORROWER MATERIALS OR THE PLATFORM. In no event shall the DIP Agent or any of its Related Parties (collectively, the "Agent Parties") have any liability to any Credit Party, any DIP Lender or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of any Credit Party's or the DIP Agent's transmission of Borrower Materials through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final judgment to have resulted from the gross negligence, bad faith or willful misconduct of such Agent Party; provided, however, that in no event shall any Agent Party have any liability to any Credit Party, any DIP Lender or any other Person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages).

(d)     Change of Address. Etc.  Each of the Borrower and the DIP Agent may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the other parties hereto. Each other DIP Lender may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the Borrower and the DIP Agent. In addition, each DIP Lender agrees to notify the DIP Agent from time to time to ensure that the DIP Agent has on record (i) an effective address, contact name, telephone number, telecopier number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such DIP Lender.

(e)     Reliance by DIP Agent and DIP Lenders.  The DIP Agent and the DIP Lenders shall be entitled to rely and act upon any notices (including telephonic DIP Loan Notices) reasonably believed to have been given by or on behalf of the Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof. The Borrower shall indemnify the DIP Agent, each DIP Lender and the Related Parties of each of them from all reasonable losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice reasonably believed to have been given by or on behalf of the Borrower. All telephonic notices to and other telephonic communications with the DIP Agent may be recorded by the DIP Agent, and each of the parties hereto hereby consents to such recording.

**Section 11.03    No Waiver; Cumulative Remedies; Enforcement.**

No failure by any DIP Lender or the DIP Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

Notwithstanding anything to the contrary contained herein or in any other Credit Document, the authority to enforce rights and remedies hereunder and under the other

-73-

Exhibit 3 - 120

Credit Documents against the Credit Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the DIP Agent for the benefit of all the DIP Lenders; provided, however, that the foregoing shall not prohibit (a) the DIP Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as DIP Agent) hereunder and under the other Credit Documents, (b) any DIP Lender from exercising setoff rights in accordance with Section 11.08 (subject to the terms of Section 2.12), or (c) any DIP Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Credit Party under any Debtor Relief Law; and provided, further, that if at any time there is no Person acting as DIP Agent hereunder and under the other Credit Documents, then (i) the Required DIP Lenders shall have the rights otherwise ascribed to the DIP Agent and (ii) in addition to the matters set forth in clauses (b), (c) and (d) of the preceding proviso and subject to Section 2.12, any DIP Lender may, with the consent of the Required DIP Lenders, enforce any rights and remedies available to it and as authorized by the Required DIP Lenders.

### Section 11.04    Expenses; Indemnity; Damage Waiver.

(a)    Costs and Expenses. The Borrower shall pay (i) all reasonable out-of-pocket expenses incurred by the DIP Agent and its Affiliates (including the reasonable fees, charges and disbursements of outside counsel for the DIP Agent), in connection with the syndication of the credit facilities provided for herein, (ii) all reasonable out-of-pocket expenses incurred by the DIP Agent (including the fees, charges and disbursements of any outside counsel for the DIP Agent), including amounts in connection with the preparation, negotiation, execution, delivery and administration of this Credit Agreement and the other Credit Documents or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (iii) all reasonable costs and expense, including reasonable attorneys' fees and fees, costs and expenses of accounts, advisors and consultants, incurred by DIP Agent and its counsel relating to efforts to evaluate or assess any Credit Party, its business or financial condition, (iv) all amounts of any kind paid by DIP Agent and/or the Prepetition Agent to any deposit banks of Credit Parties after the Filing Date and (v) all reasonable out-of-pocket expenses incurred by the DIP Agent (including the fees, charges and disbursements of any outside counsel for the DIP Agent), in connection with the enforcement or protection of its rights (A) in connection with this Credit Agreement and the other Credit Documents, including its rights under this Section, (B) in connection with the consummation of the transactions contemplated by Section 7.15 and the related financing therefor, or (E) in connection with the DIP Loans made hereunder, including all such out-of-pocket expenses incurred during the Bankruptcy Case and any workout, restructuring or negotiations in respect of such DIP Loans.

(b)    Indemnification by the Borrower. The Borrower shall indemnify the DIP Agent (and any sub-agent thereof), each DIP Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses (including the reasonable fees, charges and disbursements of counsel for the

Exhibit 3 - 121

Indemnitees), incurred by any Indemnitee or asserted against any Indemnitee by any third party or by the Borrower or any other Credit Party arising out of, in connection with, or as a result of (i) the execution or delivery of this Credit Agreement, any other Credit Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, or, in the case of the DIP Agent (and any sub-agent thereof) and its Related Parties only, the administration of this Credit Agreement and the other Credit Documents, (ii) any DIP Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by any Credit Party, or any Environmental Liability related in any way to any Credit Party, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Borrower or any other Credit Party, and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final judgment to have resulted from (x) the bad faith, gross negligence or willful misconduct of such Indemnitee (or its Affiliates, officers, directors or employees) or (y) a material breach of contract of such Indemnitee's or its. Affiliates', officers' or employees' obligations hereunder or under any other Credit Document, if the Borrower or such other Credit Party has obtained a final judgment in its favor on such claim as determined by a court of competent jurisdiction; provided, further that amounts payable under this Section 11.04 shall be without duplication of amounts paid under Section 3.01 and shall exclude Excluded Taxes; and provided further still that for any individual claim (or series of related claims), neither the Borrower nor any other Credit Party shall be required to reimburse the legal fees and expenses of more than one outside counsel (in addition to any reasonably necessary special counsel and up to one local counsel in each applicable jurisdiction) for the DIP Agent, each DIP Lender and their respective affiliates and their partners, directors, officers, employees, agents and advisors unless, in the reasonable opinion of such outside counsel, the representation of all such persons by one outside counsel would be inappropriate due to the existence of an actual or potential conflict of interest.

(c)      Reimbursement by DIP Lenders.  To the extent that the Borrower for any reason fails to pay any amount required under subsection (a) or (b) of this Section to be paid by it to the DIP Agent (or any sub-agent thereof) or any Related Party of any of the foregoing, each DIP Lender severally agrees to pay to the DIP Agent (or any such sub-agent), or such Related Party, as the case may be, such DIP Lender's DIP Loan Commitment Percentage (determined in each case as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount, provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the DIP Agent (or any such sub-agent) in its capacity as such, or against any Related Party of any of the foregoing acting for the DIP Agent (or any such sub-agent). The obligations of the DIP Lenders under this subsection (c) are subject to the provisions of Section 2.10(d).

Exhibit 3 - 122

(d)    <u>Waiver of Consequential Damages. Etc.</u>  To the fullest extent permitted by applicable law, the Borrower shall not assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Credit Agreement, any other Credit Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any DIP Loan or the use of the proceeds thereof. No Indemnitee referred to in subsection (b) above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by such Indemnitee through telecommunications, electronic or other information transmission systems in connection with this Credit Agreement or the other Credit Documents or the transactions contemplated hereby or thereby other than for direct or actual damages resulting from the bad faith, gross negligence or willful misconduct of such Indemnitee (or any of its Affiliates, officers, directors or employees), as determined by a final judgment of a court of competent jurisdiction.

(e)    <u>Payments.</u>  All amounts due under this Section shall be payable not later than ten (10) Business Days after demand therefor.

(f)    <u>Survival.</u>  The agreements in this Section shall survive the resignation of the DIP Agent, the replacement of any DIP Lender, the termination of the Aggregate DIP Loan Commitments and the repayment, satisfaction or discharge of all the other Obligations.

## Section 11.05    <u>Payments Set Aside.</u>

To the extent that any payment by or on behalf of the Borrower is made to the DIP Agent or any DIP Lender, or the DIP Agent or any DIP Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the DIP Agent or such DIP Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each DIP Lender severally agrees to pay to the DIP Agent on demand its applicable share (without duplication) of any amount so recovered from or repaid by the DIP Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate from time to time in effect. The obligations of the DIP Lenders under clause (b) of the preceding sentence shall survive the payment in full of the Obligations and the termination of this Credit Agreement.

## Section 11.06    <u>Successors and Assigns.</u>

(a)    <u>Successors and Assigns Generally.</u>  The provisions of this Credit Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that neither the Borrower nor any

Exhibit 3 - 123

other Credit Party may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the DIP Agent and each DIP Lender and no DIP Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an assignee in accordance with the provisions of underline subsection (b) of this Section, (ii) by way of participation in accordance with the provisions of underline subsection (d) of this Section, or (iii) by way of pledge or assignment of a security interest subject to the restrictions of underline subsection (f) of this Section (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Credit Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in underline subsection (d) of this Section and, to the extent expressly contemplated hereby, the Related Parties of each of the DIP Agent and the DIP Lenders) any legal or equitable right, remedy or claim under or by reason of this Credit Agreement.

(b)     **Assignments by DIP Lenders.** Any DIP Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Credit Agreement (including all or a portion of its DIP Loan Commitment and the DIP Loans at the time owing to it); underline provided that any such assignment shall be subject to the following conditions:

(i)     **Minimum Amounts.**

(A)     in the case of an assignment of the entire remaining amount of the assigning DIP Lender's DIP Loan Commitment and the DIP Loans at the time owing to it or in the case of an assignment to a DIP Lender, an Affiliate of a DIP Lender, a Prepetition Lender, an Affiliate of a Prepetition Lender or an Approved Fund, no minimum amount need be assigned; and

(B)     in any case not described in underline subsection (b)(i)(A) of this Section, the aggregate amount of the DIP Loan Commitment (which for this purpose includes DIP Loans outstanding thereunder) or, if the DIP Loan Commitment is not then in effect, the principal outstanding balance of the DIP Loans of the assigning DIP Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the DIP Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date, shall not be less than $100,000, unless the DIP Agent otherwise consents (such consent not to be unreasonably withheld or delayed); underline provided, underline however, that concurrent assignments to members of an Assignee Group and concurrent assignments from members of an Assignee Group to a single Eligible Assignee (or to an Eligible Assignee and members of its Assignee Group) will be treated as a single assignment for purposes of determining whether such minimum amount has been met.

(ii)     **Proportionate Amounts.** Each partial assignment shall be made as an assignment of a proportionate part of all the assigning DIP Lender's rights and

Exhibit 3 - 124

obligations under this Credit Agreement with respect to the DIP Loans or the DIP Loan Commitment assigned;

(iii)    <u>Required Consents.</u>  No consent shall be required for any assignment except to the extent required by <u>subsection (b)(i)(B)</u> of this Section and, in addition:

(A)    the consent of the Borrower (such consent not to be unreasonably withheld or delayed) shall be required unless (1) an Event of Default has occurred and is continuing at the time of such assignment or (2) such assignment is to a Lender, an Affiliate of a Lender, a Prepetition Lender, an Affiliate of a Prepetition Lender or an Approved Fund; and

(B)    the consent of the DIP Agent (such consent not to be unreasonably withheld or delayed) shall be required if such assignment is to a Person that is not a Lender, an Affiliate of a Lender, a Prepetition Lender, an Affiliate of a Prepetition Lender or an Approved Fund; and

(iv)    <u>Assignment and Assumption.</u>  The parties to each assignment shall execute and deliver to the DIP Agent an Assignment and Assumption, together with a processing and recordation fee in the amount of $3,500; <u>provided</u>, <u>however</u>, that (i) no such processing and recordation fee shall be required in the case of an assignment to a DIP Lender, an Affiliate of a DIP Lender, a Prepetition Lender, an Affiliate of a Prepetition Lender or an Approved Fund, and (ii) the DIP Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment. The assignee, if it is not a DIP Lender or a Prepetition Lender, shall deliver to the DIP Agent an Administrative Questionnaire.

(v)    <u>No Assignment to Borrower.</u>  No such assignment shall be made to any Credit Party or any Credit Party's Affiliates or Subsidiaries.

(vi)    <u>No Assignment to Natural Persons.</u>  No such assignment shall be made to a natural person.

(vii)    <u>Assignments to Competitors.</u>  It is acknowledged and agreed that the Borrower's refusal to provide consent to a proposed assignment to a competitor would not be considered unreasonably withheld or delayed.

Subject to acceptance and recording thereof by the DIP Agent pursuant to <u>subsection (c)</u> of this Section, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Credit Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a DIP Lender under this Credit Agreement, and the assigning DIP Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Credit Agreement (and, in the case of an Assignment and Assumption covering all of the assigning DIP Lender's rights and obligations under this Credit Agreement, such DIP Lender shall cease to be a party hereto)

-78-

Exhibit 3 - 125

but shall continue to be entitled to the benefits of <u>Sections 3.01</u>, <u>3.04</u> and <u>11.04</u> with respect to facts and circumstances occurring prior to the effective date of such assignment. Upon request, the Borrower (at its expense) shall execute and deliver a Note to the assignee DIP Lender. Any assignment or transfer by a DIP Lender of rights or obligations under this Credit Agreement that does not comply with this subsection shall be treated for purposes of this Credit Agreement as a sale by such DIP Lender of a participation in such rights and obligations in accordance with <u>subsection (d)</u> of this Section.

(c)      <u>Register.</u>   The DIP Agent, acting solely for this purpose as a non-fiduciary agent of the Borrower, shall maintain at the DIP Agent's Office a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the DIP Lenders, and the DIP Loan Commitments of, and principal amounts of the DIP Loans owing to, each DIP Lender pursuant to the terms hereof from time to time (the "<u>Register</u>"). The entries in the Register shall be conclusive, and the Borrower, the DIP Agent and the DIP Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a DIP Lender hereunder for all purposes of this Credit Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower and any DIP Lender, at any reasonable time and from time to time upon reasonable prior notice.

(d)      <u>Participations.</u>   Any DIP Lender may at any time, without the consent of, or notice to, any Borrower or the DIP Agent, sell participations to any Person (other than (i) a natural person, (ii) any Credit Party or any Credit Party's Affiliates or Subsidiaries), or (iii) a competitor of a Credit Party (each, a "<u>Participant</u>") in all or a portion of such DIP Lender's rights and/or obligations under this Credit Agreement (including all or a portion of its DIP Loan Commitment and/or the DIP Loans owing to it); <u>provided</u> that (i) such DIP Lender's obligations under this Credit Agreement shall remain unchanged, (ii) such DIP Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower, the DIP Agent, and the DIP Lenders shall continue to deal solely and directly with such DIP Lender in connection with such DIP Lender's rights and obligations under this Credit Agreement.

Any agreement or instrument pursuant to which a DIP Lender sells such a participation shall provide that such DIP Lender shall retain the sole right to enforce this Credit Agreement and to approve any amendment, modification or waiver of any provision of this Credit Agreement; <u>provided</u> that such agreement or instrument may provide that such DIP Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in the first proviso to <u>Section 11.01</u> that affects such Participant. Subject to <u>subsection (e)</u> of this Section, the Borrower agrees that each Participant shall be entitled to the benefits of <u>Sections 3.01</u> and <u>3.04</u> to the same extent as if it were a DIP Lender and had acquired its interest by assignment pursuant to <u>subsection (b)</u> of this Section. To the extent permitted by law, each Participant also shall be entitled to the benefits of <u>Section 11.08</u> as though it were a DIP Lender, <u>provided</u> such Participant agrees to be subject to <u>Section 2.11</u> as though it were a DIP Lender.

Exhibit 3 - 126

(e)    <u>Limitations upon Participant Rights.</u>  A Participant shall not be entitled to receive any greater payment under <u>Section 3.01</u> or <u>3.04</u> than the applicable DIP Lender would have been entitled to receive with respect to the participation sold to such Participant. A Participant that would be a Foreign DIP Lender if it were a DIP Lender shall not be entitled to the benefits of <u>Section 3.01</u> unless the Borrower is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Borrower, to comply with <u>Section 3.01(e)</u> as though it were a DIP Lender.

(f)    <u>Certain Pledges.</u>  Any DIP Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Credit Agreement (including under its Note(s), if any) to secure obligations of such DIP Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; <u>provided</u> that no such pledge or assignment shall release such DIP Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such DIP Lender as a party hereto.

<h3 style="text-align:center">Section 11.07    <u>Treatment of Certain Information; Confidentiality.</u></h3>

Each of the DIP Agent and the DIP Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates and to its and its Affiliates' respective partners, directors, officers, employees, agents, advisors and representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Credit Document or any action or proceeding relating to this Credit Agreement or any other Credit Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Credit Agreement or any Eligible Assignee invited to be a DIP Lender pursuant to <u>Section 2.01(c) and (d)</u> or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Borrower and its obligations (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such information confidential), (g) with the consent of the Borrower and (h) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section or (y) becomes available to the DIP Agent, any DIP Lender or any of their respective Affiliates on a nonconfidential basis from a source other than a Credit Party or a member of the Sponsor Group.

For purposes of this Section, "<u>Information</u>" means all information received from any Credit Party relating to any Credit Party or any of their respective businesses, other than any such information that is available to the DIP Agent or any DIP Lender on a nonconfidential basis prior to disclosure by any Credit Party. Any Person required to

-80-

Exhibit 3 - 127

maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Each of the DIP Agent and the DIP Lenders acknowledges that (a) the Information may include material non-public information concerning a Credit Party, (b) it has developed compliance procedures regarding the use of material non-public information and (c) it will handle such material non-public information in accordance with applicable Law, including United States federal and state securities Laws.

### Section 11.08    Right of Setoff.

If an Event of Default shall have occurred and be continuing, each DIP Lender and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such DIP Lender or any such Affiliate to or for the credit or the account of the Borrower or any other Credit Party against any and all of the obligations of such Borrower or such Credit Party now or hereafter existing under this Credit Agreement or any other Credit Document to such DIP Lender, irrespective of whether or not such DIP Lender shall have made any demand under this Credit Agreement or any other Credit Document and although such obligations of such Borrower or such Credit Party may be contingent or unmatured or are owed to a branch or office of such DIP Lender different from the branch or office holding such deposit or obligated on such indebtedness. The rights of each DIP Lender and their respective Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such DIP Lender or their respective Affiliates may have. Each DIP Lender agrees to notify the Borrower and the DIP Agent in writing promptly after any such setoff and application, provided that the failure to give such notice shall not affect the validity of such setoff and application.

### Section 11.09    Interest Rate Limitation.

Notwithstanding anything to the contrary contained in any Credit Document, the interest paid or agreed to be paid under the Credit Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "Maximum Rate"). If the DIP Agent or any DIP Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the DIP Loans or, if it exceeds such unpaid principal, refunded to the Borrower. In determining whether the interest contracted for, charged, or received by the DIP Agent or a DIP Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

Exhibit 3 - 128

**Section 11.10    Counterparts; Integration; Effectiveness.**

This Credit Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Credit Agreement and the other Credit Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 5.01, this Credit Agreement shall become effective when it shall have been executed by the DIP Agent and when the DIP Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto. Delivery of an executed counterpart of a signature page of this Credit Agreement by telecopy or other electronic imaging means shall be effective as delivery of a manually executed counterpart of this Credit Agreement.

**Section 11.11    Survival of Representations and Warranties.**

All representations and warranties made hereunder and in any other Credit Document or other document delivered pursuant hereto or thereto shall survive the execution and delivery hereof and thereof. Such representations and warranties have been or will be relied upon by the DIP Agent and each DIP Lender, regardless of any investigation made by the DIP Agent or any DIP Lender or on their behalf and notwithstanding that the DIP Agent or any DIP Lender may have had notice or knowledge of any Default at the time of any Borrowing, and shall continue in full force and effect as long as any DIP Loan or any other Obligation hereunder shall remain unpaid or unsatisfied.

**Section 11.12    Severability.**

If any provision of this Credit Agreement or the other Credit Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Credit Agreement and the other Credit Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

**Section 11.13    Replacement of DIP Lenders.**

If (a) any DIP Lender requests compensation under Section 3.04, (b) any Borrower is required to pay any additional amount to any DIP Lender or any Governmental Authority for the account of any DIP Lender pursuant to Section 3.01, (c) a DIP Lender (a "Non-Consenting DIP Lender") does not consent to a proposed amendment, consent, change, waiver, discharge or termination with respect to any Credit Document that has been approved by the Required DIP Lenders (including, without limitation, by a failure to respond in writing to a proposed amendment by the date and time specified by the DIP Agent) as provided in Section 11.01 but requires unanimous consent of all DIP Lenders or all DIP Lenders directly

-82-

Exhibit 3 - 129

affected thereby (as applicable), or (d) any DIP Lender is a Defaulting DIP Lender, then the Borrower may, at its sole expense and effort, upon notice to such DIP Lender and the DIP Agent, require such DIP Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, <u>Section 11.06</u>), all of its interests, rights and obligations under this Credit Agreement and the related Credit Documents to an assignee that shall assume such obligations (which assignee may be another DIP Lender, if a DIP Lender accepts such assignment), <u>provided</u> that:

(i)    the Borrower shall have paid to the DIP Agent the assignment fee specified in <u>Section 11.06(b)(iv)</u>;

(ii)    such DIP Lender shall have received payment of an amount equal to the outstanding principal of its DIP Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Credit Documents from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts);

(iii)    in the case of any such assignment resulting from a claim for compensation under <u>Section 3.04</u> or payments required to be made pursuant to <u>Section 3.01</u>, such assignment will result in a reduction in such compensation or payments thereafter;

(iv)    such assignment does not conflict with applicable Laws; and

(v)    in the case of any such assignment resulting from a Non-Consenting DIP Lender's failure to consent to a proposed amendment, consent change, waiver, discharge or termination with respect to any Credit Document, the applicable replacement bank or financial institution consents to the proposed change, waiver, discharge or termination;

<u>provided</u> that the failure by such Non-Consenting DIP Lender to execute and deliver an Assignment and Assumption shall not impair the validity of the removal of such Non-Consenting DIP Lender and the mandatory assignment of such Non-Consenting DIP Lender's DIP Loan Commitments and outstanding DIP Loans pursuant to this <u>Section 11.13</u> shall nevertheless be effective without the execution by such Non-Consenting DIP Lender of an Assignment and Assumption.

A DIP Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such DIP Lender or otherwise, the circumstances entitling the respective Borrower to require such assignment and delegation cease to apply.

## Section 11.14    <u>Governing Law; Jurisdiction; Etc.</u>

(a)    <u>GOVERNING LAW.</u>    THIS CREDIT AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE BANKRUPTCY CODE AND THE LAW OF THE STATE OF NEW YORK (INCLUDING, WITHOUT

Exhibit 3 - 130

LIMITATION, SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW).

(b)     SUBMISSION TO JURISDICTION.     IF (I) THE BANKRUPTCY CASE IS DISMISSED, (II) THE BANKRUPTCY COURT ABSTAINS FROM HEARING ANY ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS CREDIT AGREEMENT OR ANY OF THE OTHER CREDIT DOCUMENTS (OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO IN RESPECT OF THIS CREDIT AGREEMENT OR ANY OF THE OTHER CREDIT DOCUMENTS OR THE TRANSACTIONS RELATED HERETO OR THERETO) OR (III) THE BANKRUPTCY COURT REFUSES TO EXERCISE JURISDICTION OVER ANY ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS CREDIT AGREEMENT OR ANY OF THE OTHER CREDIT DOCUMENTS (OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO IN RESPECT OF THIS CREDIT AGREEMENT OR ANY OF THE OTHER CREDIT DOCUMENTS OR THE TRANSACTIONS RELATED HERETO OR THERETO), THEN EACH CREDIT PARTY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE NONEXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK SITTING IN THE BOROUGH OF MANHATTAN AND OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF SUCH STATE AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS CREDIT AGREEMENT OR ANY OTHER CREDIT DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS CREDIT AGREEMENT OR IN ANY OTHER CREDIT DOCUMENT SHALL AFFECT ANY RIGHT THAT THE DIP AGENT OR ANY DIP LENDER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS CREDIT AGREEMENT OR ANY OTHER CREDIT DOCUMENT AGAINST THE BORROWER OR ANY OTHER CREDIT PARTY OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(c)     WAIVER OF VENUE.     EACH CREDIT PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS CREDIT AGREEMENT OR ANY OTHER CREDIT DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (B) OF THIS SECTION. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO

-84-

Exhibit 3 - 131

THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d)    <u>SERVICE OF PROCESS.</u>    EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN <u>SECTION 11.02.</u> NOTHING IN THIS CREDIT AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

### Section 11.15    <u>Waiver of Jury Trial</u>.

EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS CREDIT AGREEMENT OR ANY OTHER CREDIT DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS CREDIT AGREEMENT AND THE OTHER CREDIT DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

### Section 11.16    <u>No Advisory or Fiduciary Responsibility</u>.

In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Credit Document), the Borrower and each other Credit Party acknowledges and agrees that: (i) (A) the arranging and other services regarding this Credit Agreement provided by the DIP Agent are arm's-length commercial transactions between the Borrower, each other Credit Party and their respective Affiliates, on the one hand, and the DIP Agent, on the other hand, (B) each of the Borrower and the other Credit Parties has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) each of the Borrower and the other Credit Parties is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Credit Documents; (ii) (A) the DIP Agent is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Borrower, any other Credit Party or any of their respective Affiliates, or any other Person and (B) the DIP Agent has no obligation to the Borrower, any other Credit Party or any of their respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Credit Documents; and (iii) the DIP Agent and its Affiliates may be

Exhibit 3 - 132

engaged in a broad range of transactions that involve interests that differ from those of the Borrower, the other Credit Parties and their respective Affiliates, and the DIP Agent has no obligation to disclose any of such interests to the Borrower, any other Credit Party or any of their respective Affiliates. To the fullest extent permitted by law, each of the Borrower and the other Credit Parties hereby waives and releases any claims that it may have against the DIP Agent with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

**Section 11.17    Electronic Execution of Assignments and Certain Other Documents.**

The words "execution," "signed," "signature" and words of like import in any Assignment and Assumption or in any amendment or other modification hereof (including waivers and consents) shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

**Section 11.18    Termination.**

Notwithstanding anything to the contrary contained in this Credit Agreement, this Credit Agreement and the other Credit Documents shall terminate immediately upon the "Termination Date" (as defined in the then applicable Financing Order) (other than any provisions hereof or thereof that by their terms expressly survive the payment in full of the Obligations and the termination of this Credit Agreement), unless otherwise waived or modified in writing by DIP Agent (acting at the direction of the Required DIP Lenders or DIP Lenders, as applicable).

**Section 11.19    USA PATRIOT Act.**

Each DIP Lender that is subject to the PATRIOT Act (as hereinafter defined) and the DIP Agent (for itself and not on behalf of any DIP Lender) hereby notifies the Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Patriot Act"), it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such DIP Lender or the DIP Agent, as applicable, to identify such Borrower in accordance with the Act. The Borrower shall, promptly following a request by the DIP Agent or any DIP Lender, provide all documentation and other information that the DIP Agent or such DIP Lender requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the Act.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

Exhibit 3 - 133

IN WITNESS WHEREOF, the parties hereto have caused this Credit Agreement to be duly executed as of the date first above written.

## BORROWER:

**SEXY HAIR CONCEPTS, LLC,**
a California limited liability company

By: _____

Name: _____

Title: _____

## GUARANTORS:

**LUXE BEAUTY MIDCO CORPORATION,**
a Delaware corporation

By: _____

Name: _____

Title: _____

**ECOLY INTERNATIONAL, INC.,**
a California corporation

By: _____

Name: _____

Title: _____

**DIP Credit Agreement**

Exhibit 3 - 134

**DIP AGENT:**

**BANK OF MONTREAL**,
as DIP Agent and DIP Collateral Agent

By: _____

Name: _____

Title: _____

**DIP LENDERS:**

**BANK OF MONTREAL**

By: _____

Name: _____

Title: _____

Schedule 2.01
DIP LENDERS AND DIP LOAN COMMITMENTS

| DIP Lender | DIP Loan Commitment Percentage | DIP Loan Commitment |
|---|---|---|
| Bank of Montreal | 100.000000000% | $5,000,000 |
| Total | 100.000000000% | $5,000,000 |

<u>Schedule 6.02(B)</u>
AUTHORIZATION; NO CONTRAVENTION

1.      The execution, delivery and performance by each Credit Party of each Credit
        Document would violate sections 6A and 6C of the Securities Purchase and Guaranty
        Agreement, by and between the Borrower, Ecoly International, Inc., Luxe Beauty
        Midco Corporation, Luxe Beauty Holdings Corporation and Northwestern Mutual
        Life, dated April 9, 2008.

Exhibit 3 - 137

<u>Schedule 6.14</u>
SUBSIDIARIES

<u>SUBSIDIARIES OF LUXE BEAUTY MIDCO CORPORATION</u>

| Entity Name | Jurisdiction of Organization | Class(es) of Capital Stock | Shareholder(s)/ Percentage Ownership | Buy/Sell or Shareholder Agreements |
|---|---|---|---|---|
| Ecoly International, Inc. | California | Common | 70.54% | None |

<u>SUBSIDIARIES OF ECOLY INTERNATIONAL, INC.</u>

| Entity Name | Jurisdiction of Organization | Class(es) of Capital Stock | Shareholder(s)/ Percentage Ownership | Buy/Sell or Shareholder Agreements |
|---|---|---|---|---|
| Sexy Hair Concepts, LLC | California | N/A | 100% | None |

The Borrower has no Subsidiaries as of the Closing Date.

Exhibit 3 - 138

Schedule 6.17

TAXPAYER IDENTIFICATION NUMBERS

| Entity Name | Taxpayer Identification Number |
| --- | --- |
| Luxe Beauty Midco Corporation | 26-2223819 |
| Ecoly International, Inc. | 95-4512202 |
| Sexy Hair Concepts, LLC | 52-2355406 |

<u>Schedule 6.20</u>

CLAIMS WITH RESPECT TO INTELLECTUAL PROPERTY

The following Actions challenging the legality, validity, enforceability, use or ownership of the Intellectual Property Assets are currently open:

<u>Victoria's Secret</u>

All proceedings (listed in the settlement agreement terminating the appeal before the U.S. District Court for the Southern District of New York) have been terminated except (and pursuant to the settlement agreement):  Victoria's Secret Stores Brand Management v. Sexy Hair Concepts, Opposition No. 91,178,324 presently stayed pending disposition of the Victoria's Secret application for registration of SEXY for goods in Class 3 other than hair care preparations. The letter of consent from Borrower to Victoria's Secret has been submitted to the PTO.

Exhibit 3 - 140

<u>Schedule 6.24</u>

REAL PROPERTY OWNED

None.

REAL PROPERTY LEASED

| Entity Name | Property Location |
|---|---|
| Sexy Hair Concepts, LLC | 21551 Prairie Street<br>Chatsworth, CA 91311 |
| Sexy Hair Concepts, LLC | 1135 North Topanga Canyon Blvd.<br>Topanga, CA 90290 |

Schedule 6.24 - 1

Exhibit 3 - 141

## Schedule 8.01

## EXISTING LIENS

| Secured Party | Filing No. | Filing Date | Collateral Description | Remaining Amount Due |
|---|---|---|---|---|
| Wells Fargo Bank, N.A. | 08-7175088964 (California) | 10/22/2008 | Two Drexel Forklifts | $53,614.55 |
| NMHG Financial Services, Inc. | 09-7212865232 (California) | 10/30/2009 | Two Forklifts | $50,272.14 |
| Bank of Montreal, as assignee of Bank of America, N.A. | 09-72031311 (California) | 07/22/2009 | All assets | Not less than $[61,558,811.64 ] |

Schedule 8.02
EXISTING INVESTMENTS

1.      Note issued by James M. Morrison in favor of Ecoly International, Inc. dated
        March 9, 2006 in the principal amount of $1,916,298.64 as part of the rollover of
        Mr. Morrison's stock.

Exhibit 3 - 143

<u>Schedule 8.03</u>
EXISTING INDEBTEDNESS

None

Schedule 11.02

NOTICE ADDRESSES

**BORROWER AND OTHER CREDIT PARTIES:**

Ecoly International, Inc. and Sexy Hair Concepts, LLC
21551 Prairie Street
Chatsworth, California  91311
Attention:      Mark Milner
Telephone:    (818) 435-0810
Facsimile:     (818) 435-0806
Email:           mark.milner@sexyhair.com
Website:        http://www.sexyhairconcepts.com

**DIP AGENT'S OFFICE:**

Notices:
Bank of Montreal
115 South LaSalle Street
Chicago, Illinois  60603
Attention:      David Bechstein
Telephone:    (312) 461-5697
Facsimile:     (312) ___-____
Email:           david.bechstein@bmo.com

Payments:
Bank of Montreal
Chicago, Illinois
ABA No.:       0710-000-288
Account No:   183-320-1
FFC:              BMO Chicago Branch
Attention:      David Bechstein
Reference:     Sexy Hair Concepts, LLC

<u>Exhibit 1.01</u>
BUDGET


[Attached]

Exhibit 1.01 - 1

Exhibit 3 - 146

Exhibit 2.02

[FORM OF] LOAN NOTICE

Date: _____

Bank of Montreal, as DIP Agent

Debtor-In-Possession Credit Agreement, dated as of dated as of _____, 2010 (as amended, modified, supplemented, increased or extended from time to time, the "Credit Agreement"), by and among Sexy Hair Concepts, LLC, a California limited liability company (the "Borrower"), the Guarantors identified therein, the DIP Lenders party thereto, and Bank of Montreal, as DIP Agent and DIP Collateral Agent.  Capitalized terms used but not otherwise defined herein have the meanings provided in the Credit Agreement.

Ladies and Gentlemen:

1.      The undersigned hereby requests a DIP Loan Borrowing

2.      Date of Borrowing (which shall be a Business Day): _____

3.      Amount of Borrowing: _____

Exhibit 2.02 - 1                                                                                      Exhibit 3 - 147

The Borrower hereby represents and warrants that (a) this request for a Borrowing complies with the requirements of Section 2.01(a), with respect to DIP Loans, and with the requirements of Section 2.02 of the Credit Agreement and (b) the conditions set forth in Section 5.02(a) and (b) of the Credit Agreement have been met on and as of the date of the requested Borrowing.

<u>BORROWER</u>:

SEXY HAIR CONCEPTS, LLC,
a California limited liability company

By: _____

Name: _____

Title: _____

Exhibit 2.02 - 2                                                   Exhibit 3 - 148

<u>Exhibit 2.12</u>

[FORM OF] DIP LOAN NOTE

_____, 20___

FOR VALUE RECEIVED, SEXY HAIR CONCEPTS, LLC, a California limited liability company (the "<u>Borrower</u>"), hereby promises to pay to _____ or its registered assigns (the "<u>DIP Lender</u>"), in accordance with the provisions of the Credit Agreement (as hereinafter defined), the principal amount of each DIP Loan from time to time made by the DIP Lender to the Borrower when and as provided under that certain Debtor-In-Possession Credit Agreement, dated as of dated as of _____, 2010 (as amended, modified, supplemented, increased or extended from time to time, the "<u>Credit Agreement</u>"), by and among the Borrower, the Guarantors identified therein, the DIP Lenders from time to time party thereto and Bank of Montreal, as DIP Agent and DIP Collateral Agent. Capitalized terms used but not otherwise defined herein have the meanings provided in the Credit Agreement.

The Borrower hereby promises to pay interest on the unpaid principal amount of each DIP Loan from the date of such DIP Loan until such principal amount is paid in full, at such interest rates and at such times as provided in the Credit Agreement.  All payments of principal and interest shall be made to the DIP Agent for the account of the DIP Lender in Dollars in immediately available funds at the DIP Agent's Office If any amount is not paid in full when due hereunder, such unpaid amount shall bear interest, to be paid upon demand, from the due date thereof until the date of actual payment (and before as well as after judgment) computed at the per annum rate set forth in the Credit Agreement.

This DIP Loan Note is one of the DIP Loan Notes referred to in the Credit Agreement, is entitled to the benefits thereof and may be prepaid in whole or in part subject to the terms and conditions provided therein.  Upon the occurrence and continuation of one or more of the Events of Default specified in the Credit Agreement, all amounts then remaining unpaid on this DIP Loan Note shall become, or may be declared to be, immediately due and payable all as provided in the Credit Agreement.  DIP Loans made by the DIP Lender may be evidenced by one or more loan accounts or records maintained by the DIP Lender in the ordinary course of business.  The DIP Lender may also attach schedules to this DIP Loan Note and endorse thereon the date, amount and maturity of its DIP Loans and payments with respect thereto.

The Borrower, for itself, its successors and assigns, hereby waives diligence, presentment, protest and demand and notice of protest, demand, dishonor and nonpayment of this DIP Loan Note.

THIS DIP LOAN NOTE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE BANKRUPTCY CODE AND THE LAWS OF THE STATE OF NEW YORK (INCLUDING, WITHOUT LIMITATION, SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW).

Exhibit 2.12 - 1                                               Exhibit 3 - 149

<u>BORROWER</u>:

SEXY HAIR CONCEPTS, LLC,
a California limited liability company


By: _____

Name: _____

Title: _____

Exhibit 2.12 - 2                                    Exhibit 3 - 150

Exhibit 7.02(b)
[FORM OF] COMPLIANCE CERTIFICATE

Financial Statement Date:      _____, 20__

To:      Bank of Montreal, as DIP Agent

Re:      Debtor-In-Possession Credit Agreement, dated as of dated as of _____, 2010 (as amended, modified, supplemented, increased or extended from time to time, the "Credit Agreement"), by and among Sexy Hair Concepts, LLC, a California limited liability company (the "Borrower"), the Guarantors identified therein, the DIP Lenders party thereto, and Bank of Montreal, as DIP Agent and DIP Collateral Agent.  Capitalized terms used but not otherwise defined herein have the meanings provided in the Credit Agreement.


Ladies and Gentlemen:

The undersigned Responsible Officer of the Borrower hereby certifies as of the date hereof that [he/she] is the _____ of the Borrower, and that, in [his/her] capacity as such, [he/she] is authorized to execute and deliver this Certificate to the DIP Agent on the behalf of the Borrower, and that:

[Use following paragraph 1 for fiscal year-end financial statements:]

[l.      [Attached hereto as Schedule 1 are the] [The] year-end audited financial statements required by Section 701(a) of the Credit Agreement for the fiscal year of the Borrower ended as of the above date, together with the report and opinion of an independent certified public accountant of nationally recognized standing required by such section [have been electronically delivered to the DIP Agent pursuant to the conditions set forth in Section 7.02 of the Credit Agreement].]

[Use following paragraph 1 for fiscal month-end financial statements:]

[1.      [Attached hereto as Schedule 1 are the] [The] unaudited financial statements required by Section 7.01(b) of the Credit Agreement for the fiscal month of the Borrower ended as of the above date [have been electronically delivered to the DIP Agent pursuant to the conditions set forth in Section 7.02 of the Credit Agreement].  Such financial statements are fairly stated in all material respects when considered in relation to the consolidated financial statements of the Borrower and its Subsidiaries and are in accordance with GAAP as at such date and for such period, subject only to normal year-end audit adjustments and the absence of footnotes.]

2.      The undersigned has reviewed and is familiar with the terms of the Credit Agreement and has made, or has caused to be made, a detailed review of the transactions and

Exhibit 7.02(b) - 1                                                    Exhibit 3 - 151

financial condition of each Credit Party during the accounting period covered by the attached financial statements.

3.     A review of the activities of each Credit Party during such fiscal period has been made under the supervision of the undersigned with a view to determining whether during such fiscal period the Credit Parties have performed and observed all their respective Obligations under the Credit Documents, and

[select one:]

[during such fiscal period, each of the Credit Parties has performed and observed each covenant and condition of the Credit Documents applicable to it.]

[or:]

[the following covenants or conditions have not been performed or observed and the following is a list of each such Default or Event of Default and its nature and status:]

4.     The representations and warranties of the Credit Parties contained in the Credit Agreement or any other Credit Document, are true and correct in all material respects on and as of the date hereof, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they are true and correct in all material respects as of such earlier date.

IN WITNESS WHEREOF, the undersigned has executed this Certificate as of 20__.

BORROWER:

SEXY HAIR CONCEPTS, LLC,
a California limited liability company


By: _____
Name: _____
Title: _____

Exhibit 7.02(b) - 2                                    Exhibit 3 - 152

Exhibit 11.06
[FORM OF] ASSIGNMENT AND ASSUMPTION

This Assignment and Assumption (this "Assignment and Assumption") is dated as of the Effective Date set forth below and is entered into by and between [the] [each][1] Assignor identified in item 1 below ([the] [each, an] "Assignor") and [the] [each][2] Assignee identified in item 2 below ([the] [each, an] "Assignee").  [It is understood and agreed that the rights and obligations of [the Assignors][the Assignees][3] hereunder are several and not joint.][4] Capitalized terms used but not defined herein shall have the meanings given to them in the Debtor-In-Possession Credit Agreement identified below (the "Credit Agreement"), receipt of a copy of which is hereby acknowledged by the Assignee.  The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full.

For an agreed consideration, [the] [each] Assignor hereby irrevocably sells and assigns to [the Assignee][the respective Assignees], and [the][each] Assignee hereby irrevocably purchases and assumes from [the Assignor][the respective Assignors], subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the DIP Agent as contemplated below (i) all of [the Assignor's][the respective Assignors'] rights and obligations in [its capacity as a DIP Lender] [their respective capacities as DIP Lenders] under the Credit Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of [the Assignor] [the respective Assignors] under the respective facilities identified below and (ii) to the extent permitted to be assigned under applicable Law, all claims, suits, causes of action and any other right of [the Assignor (in its capacity as a DIP Lender)][the respective Assignors (in their respective capacities as DIP Lenders)] against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including, but not limited to, contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned by [the][any] Assignor to [the][any] Assignee pursuant to clauses (i) and (ii) above being referred to herein collectively as [the][an] "Assigned Interest").  Each such sale and assignment is without recourse to

---

[1] For bracketed language here and elsewhere in this form relating to the Assignor(s), if the assignment is to a single Assignor, choose the first bracketed language. If the assignment is to multiple Assignors, choose the second bracketed language.

[2] For bracketed language here and elsewhere in this form relating to the Assignee(s), if the assignment is from a single Assignee, choose the first bracketed language. If the assignment is from multiple Assignees, choose the second bracketed language.

[3] Select as appropriate.

[4] Include bracketed language if there are either multiple Assignors or multiple Assignees.

Exhibit 11.06 - 1                                                                    Exhibit 3 - 153

[the][any] Assignor and, except as expressly provided in this Assignment and Assumption, without representation or warranty by [the][any] Assignor.

Assignor[s]:                   _____

Assignee[s]:                   _____

[for each Assignee, indicate [Affiliate] [Approved Fund] of *[identify DIP Lender]*]

Borrower:                  Sexy Hair Concepts, LLC

DIP Agent:                 Bank of Montreal, as the DIP Agent under the Credit Agreement.

Credit Agreement:          Debtor-In-Possession Credit Agreement, dated as of dated as of _____, 2010 (as amended, modified, supplemented, increased or extended from time to time, the "Credit Agreement"), by and among Sexy Hair Concepts, LLC, a California limited liability company (the "Borrower"), the Guarantors identified therein, the DIP Lenders party thereto, and Bank of Montreal, as DIP Agent and DIP Collateral Agent.

Assigned Interest[s]:

| Assignor[s][5] | Assignee[s][6] | Amount of DIP Loan Commitments | Percentage Assigned of DIP Loan Commitments[7] |
|---|---|---|---|
| | | $_____ | _____% |
| | | $_____ | _____% |
| | | $_____ | _____% |

Trade Date:                       _____][8]

---

[5] List each Assignor, as appropriate.

[6] List each Assignee, as appropriate.

[7] Set forth, to at least 9 decimals, as a percentage of the DIP Loan Commitments of all DIP Lenders thereunder.

[8] To be completed if the Assignor and the Assignee intend that the minimum assignment amount is to be determined as of the Trade Date.

Exhibit 11.06 - 2                                              Exhibit 3 - 154

Effective Date: _____, 20___ [TO BE INSERTED BY DIP AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR.]

[SIGNATURES ON FOLLOWING PAGE]

Exhibit 11.06 - 3                                   Exhibit 3 - 155

The terms set forth in this Assignment and Assumption are hereby agreed to:

ASSIGNOR
[NAME OF ASSIGNOR]


By: _____
Name: _____
Title: _____


ASSIGNEE
[NAME OF ASSIGNEE]


By: _____
Name: _____
Title: _____



[Consented to and][9] Accepted:

BANK OF MONTREAL,
as DIP Agent


By:_____
Name:_____
Title:_____



[Consented to:][10]

SEXY HAIR CONCEPTS, LLC,
as Borrower


By:_____
Name:_____
Title:_____

---

[9] To be added only if the consent of the DIP Agent is required by the terms of the Credit Agreement.

[10] To be added only if the consent of the Borrower is required by the terms of the Credit Agreement.

Exhibit 11.06 - 4                                                        Exhibit 3 - 156

STANDARD TERMS AND CONDITIONS FOR

ASSIGNMENT AND ASSUMPTION

1.    Representations and Warranties.

1.1.    Assignor.  [The] [Each] Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of [the] [[the relevant] Assigned Interest, (ii) [the] [such] Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Credit Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Credit Documents or any collateral thereunder, (iii) the financial condition of the Borrower, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Credit Document or (iv) the performance or observance by the Borrower, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Credit Document.

1.2.    Assignee.  [The] [Each] Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a DIP Lender under the Credit Agreement, (ii) it meets all the requirements to be an assignee under Section 11.06(b)(iii), (v) and (vi) of the Credit Agreement (subject to such consents, if any, as may be required under Section 11.06(b)(iii) of the Credit Agreement), (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement as a DIP Lender thereunder and, to the extent of [the] [the relevant] Assigned Interest, shall have the obligations of a DIP Lender thereunder, (iv) it is sophisticated with respect to decisions to acquire assets of the type represented by [the] [such] Assigned Interest and either it, or the Person exercising discretion in making its decision to acquire [the][such] Assigned Interest, is experienced in acquiring assets of such type, (v) it has received a copy of the Credit Agreement, and has received or has been accorded the opportunity to receive copies of the most recent financial statements delivered pursuant to Section 7.01 thereof, as applicable, and such other documents and information as it deems appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase [the][such] Assigned Interest, (vi) it has, independently and without reliance upon the DIP Agent or any other DIP Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Assignment and Assumption and to purchase [the][such] Assigned Interest, and (vii) attached hereto is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement (including Section 3.01(e)), duly completed and executed by [the][such] Assignee; and (b) agrees that (i) it will, independently and without reliance upon the DIP Agent, [the][any] Assignor or any other DIP Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Credit Documents, and (ii) it will perform

in accordance with their terms all of the obligations which by the terms of the Credit Documents are required to be performed by it as a DIP Lender.

2.      Payments.    From and after the Effective Date, the DIP Agent shall make all payments in respect of [the] [each] Assigned Interest (including payments of principal, interest, fees and other amounts) to [the][the relevant] Assignor for amounts which have accrued to but excluding the Effective Date and to [the][the relevant] Assignee for amounts which have accrued from and after the Effective Date.

3.      General Provisions.    This Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.  This Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument.  Delivery of an executed counterpart of a signature page of this Assignment and Assumption by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment and Assumption.  This Assignment and Assumption shall be governed by, and construed in accordance with, the law of the State of New York (including, without limitation, Sections 5-1401 and 5-1402 of the New York General Obligations Law).

Exhibit 4

## SECURITY AGREEMENT

THIS SECURITY AGREEMENT (this "Security Agreement"), dated as of December __, 2010, is by and among each of the parties identified as a "Grantor" on the signature pages hereto and such other parties as may become Grantors hereunder after the date hereof (individually a "Grantor", and collectively the "Grantors") and BANK OF MONTREAL, as collateral agent (in such capacity, the "DIP Collateral Agent") for the holders of the Secured Obligations referenced below.

## WITNESSETH

WHEREAS, a senior debtor-in-possession credit facility has been established in favor of Sexy Hair Concepts, LLC, a California limited liability company (the "Borrower"), pursuant to the terms of that certain Debtor-In-Possession Credit Agreement, dated as of the date hereof (as amended, modified, increased, extended, renewed or replaced, the "Credit Agreement") among the Borrower and the Guarantors identified therein, the Lenders from time to time party thereto and Bank of Montreal, as DIP Agent and DIP Collateral Agent; and

WHEREAS, this Security Agreement is required under the terms of the Credit Agreement.

NOW, THEREFORE, in consideration of these premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    Definitions and Interpretive Provisions.

(a)    Capitalized terms used and not otherwise defined herein shall have the meanings provided in the Credit Agreement. In addition, the following terms, which are defined in the UCC as in effect in the State of New York on the date hereof, are used as defined therein: Accession, Account, As-Extracted Collateral, Chattel Paper, Commercial Tort Claim, Consumer Goods, Deposit Account, Document, Equipment, Farm Products, Fixtures, General Intangibles, Goods, Instrument, inventory, investment Property, Letter-of-Credit Right, Manufactured Homes, Proceeds, Software, Standing Timber, Supporting Obligation and Tangible Chattel Paper.

(b)    As used herein, the following terms shall have the meanings set forth below:

"Borrower" has the meaning provided in the recitals hereof, together with its successors and assigns.

"Collateral" has the meaning provided in Section 2 hereof.

"Copyright License" means any written agreement, naming any Grantor as licensor, granting any right under any Copyright including any thereof referred to in Schedule 1(b) attached hereto.

"Copyrights" means (a) all registered United States copyrights in all Works, now existing or hereafter created or acquired, all registrations and recordings thereof, and all applications in connection therewith, including registrations, recordings and applications in the United States Copyright Office including any thereof referred to in Schedule 1(b) attached hereto, and (b) all renewals thereof including any thereof referred to in Schedule 1(b) attached hereto.

"Credit Agreement" has the meaning provided in the recitals hereof

"DIP Collateral Agent" has the meaning provided in the introductory paragraph hereof, and its successors and assigns in such capacity.

"Grantor" and "Grantors" has the meaning provided in the introductory paragraph hereof.

"Indemnified Party" has the meaning provided in Section 7(b) hereof.

"Patent License" means any agreement, whether written or oral, providing for the grant by or to a Grantor of any right to manufacture, use or sell any invention covered by a Patent, including any thereof referred to in Schedule 1(b) attached hereto.

"Patents" means (a) all letters patent of the United States or any other country and all reissues and extensions thereof, including any letters patent referred to in Schedule 1(b) attached hereto, and (b) all applications for letters patent of the United States or any other country and all divisions, continuations and continuations-in-part thereof, including any thereof referred to in Schedule 1(b) attached hereto.

"Secured Obligations" means, without duplication, (a) all Obligations and (b) all reasonable out-of-pocket costs and expenses incurred in connection with enforcement and collection of the Obligations, including reasonable attorneys' fees and disbursements.

"Security Agreement" has the meaning provided in the introductory paragraph hereof, as the same may be amended, supplemented and modified from time to time.

"Trademark License" means any agreement, written or oral, providing for the grant by or to a Grantor of any right to use any Trademark, including any thereof referred to in Schedule 1(b) attached hereto.

"Trademarks" means (a) all trademarks, trade names, corporate names, company names, business names, fictitious business names, trade styles, service marks, logos and other source or business identifiers, and the goodwill associated therewith, now existing or hereafter adopted or acquired, all registrations and recordings thereof, and all applications in connection therewith, whether in the United States Patent and Trademark Office or in any

Exhibit 4 - 160

similar office or agency of the United States, any state thereof or any other country or any political subdivision thereof, or otherwise, including any thereof referred to in <u>Schedule 1(b)</u> attached hereto, and (b) all renewals thereof.

"<u>UCC</u>" means the Uniform Commercial Code.

"<u>Work</u>" means any work that is subject to copyright protection pursuant to Title 17 of the United States Code.

(c)     Each of the terms and provisions of Sections 1.01 and 1.02 of the Credit Agreement (in each case as the same may be amended or modified as provided therein) are incorporated herein by reference to the same extent and with the same effect as if fully set forth herein.

2.     <u>Grant of Security Interest in the Collateral.</u>    To secure the prompt payment and performance in full when due, whether by lapse of time, acceleration, mandatory prepayment or otherwise, of the Secured Obligations, each Grantor hereby grants to the DIP Collateral Agent, for the benefit of the holders of the Secured Obligations, a continuing security interest in, and a right to set off against, any and all right, title and interest of such Grantor in and to all of the following personal property, whether now owned or existing or owned, acquired, or arising hereafter, including the following (collectively, the "<u>Collateral</u>"):

(a)     all Accounts;

(b)     all cash and currency;

(c)     all Chattel Paper;

(d)     those Commercial Tort Claims identified on <u>Schedule 2(d)</u> attached hereto;

(e)     all Copyright Licenses;

(f)     all Copyrights;

(g)     all Deposit Accounts (other than payroll accounts);

(h)     all Documents;

(i)     all Equipment;

(j)     all Fixtures;

(k)     all General Intangibles;

(l)     all Instruments;

-3-

Exhibit 4 - 161

(m)    all Inventory;

(n)    all Investment Property;

(o)    all Letter-of-Credit Rights;

(p)    all Patent Licenses;

(q)    all Patents;

(r)    all Software;

(s)    all Supporting Obligations;

(t)    all Trademark Licenses;

(u)    all Trademarks;

(v)    all other assets identified as collateral for the Secured Obligations in the Financing Orders, including all Avoidance Actions and Avoidance Action Recoveries to the extent provided by the Financing Orders; and

(w)    to the extent not otherwise included, all Accessions and all Proceeds of any and all of the foregoing.

The Grantors and the DIP Collateral Agent, on behalf of the holders of the Secured Obligations, hereby acknowledge and agree that the security interest created hereby in the Collateral (A) constitutes continuing collateral security for all of the Secured Obligations, whether now existing or hereafter arising and (B) is not to be construed as an assignment of any Copyrights, Copyright Licenses, Patents, Patent Licenses, Trademarks or Trademark Licenses.

3.    <u>Provisions Relating to Accounts</u>.

(a)    Anything herein to the contrary notwithstanding, each of the Grantors shall remain liable under each of the Accounts included in the Collateral to observe and perform all the conditions and obligations to be observed and performed by it thereunder, all in accordance with the terms of any agreement giving rise to each such Account. Neither the DIP Collateral Agent nor any holder of the Secured Obligations shall have any obligation or liability under any Account (or any agreement giving rise thereto) by reason of or arising out of this Security Agreement or the receipt by the DIP Collateral Agent or any holder of the Secured Obligations of any payment relating to such Account pursuant hereto, nor shall the DIP Collateral Agent or any holder of the Secured Obligations be obligated in any manner to perform any of the obligations of a Grantor under or pursuant to any Account (or any agreement giving rise thereto), to make any payment, to make any inquiry as to the nature or the sufficiency of any payment received by it or as to the sufficiency of any performance by any party under any Account (or any agreement giving rise thereto), to present or file any

-4-

Exhibit 4 - 162

claim, to take any action to enforce any performance or to collect the payment of any amounts that may have been assigned to it or to which it may be entitled at any time or times.

(b)     At any time after the occurrence and during the continuation of an Event of Default, (i) the DIP Collateral Agent shall have the right, but not the obligation, to make test verifications of the Accounts in any manner and through any medium that it reasonably considers advisable, and the Grantors shall furnish all such assistance and information as the DIP Collateral Agent may reasonably require in connection with such test verifications, (ii) upon the DIP Collateral Agent's reasonable request and at the expense of the Grantors, the Grantors shall furnish to the DIP Collateral Agent reports showing reconciliations, aging and test verifications of, and trial balances for, the Accounts, and (iii) upon prior written notice to the Grantors, the DIP Collateral Agent in its own name or in the name of others may communicate with account debtors on the Accounts to verify with them to the DIP Collateral Agent's reasonable satisfaction the existence, amount and terms of any Accounts.

4.     <u>Representations and Warranties.</u>  Each Grantor hereby represents and warrants to the DIP Collateral Agent, for the benefit of the DIP Collateral Agent and the holders of the Secured Obligations, that:

(a)     <u>Legal Name; Chief Executive Office.</u> As of the date hereof

(i)     The Grantor's exact legal name is (and for the prior five years, or since its formation if less than five years, has been) and state of incorporation or formation, principal place of business and chief executive office are (and for the prior five months, or since its formation if less than five months, have been) as set forth on <u>Schedule 4(a)(i)</u> attached hereto.

(ii)     Other than as set forth on <u>Schedule 4(a)(ii)</u> attached hereto, the Grantor has not been party to a merger, consolidation or other change in structure in the prior five years.

(b)     <u>Ownership</u>.  As of the date hereof, the Grantor is the legal and beneficial owner of its Collateral (subject to the Liens created under this Security Agreement and Permitted Liens) and has the right to pledge, sell, assign or transfer the same.

(c)     <u>Security Interest</u>. This Security Agreement creates a valid security interest in favor of the DIP Collateral Agent, for the benefit of the holders of the Secured Obligations, in the Collateral of the Grantor and, when properly perfected by the Financing Orders or filing, shall constitute a valid perfected security interest in such Collateral, free and clear of all Liens except for Permitted Liens, subject to and limited by the effect of any applicable bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other similar laws of general application affecting the rights and remedies of creditors and to general principles of equity (including, without limitation, concepts of materiality, reasonableness, good faith, fair dealing and unconscionability), regardless of whether considered in a proceeding in equity or law.

Exhibit 4 - 163

(d)    <u>Types of Collateral</u>.  As of the date hereof, none of the Collateral consists of, or is the Accessions or the Proceeds of, As-Extracted Collateral, Consumer Goods, Farm Products, Manufactured Homes, or Standing Timber.

(e)    <u>Accounts</u>.  (i) To the Grantor's knowledge, each Account arises out of (A) a bona fide sale of goods sold and delivered by the Grantor (or is in the process of being delivered) or (B) services theretofore actually rendered by the Grantor to, the account debtor named therein, (ii) no Account of the Grantor is evidenced by any Instrument or Chattel Paper unless, if required by Section 5(c), such Instrument or Chattel Paper has been theretofore endorsed over and delivered to, or submitted to the control of, the DIP Collateral Agent and (iii) no surety bond was required or given in connection with any Account of the Grantor or the contracts or purchase orders out of which they arose.

(f)    <u>Inventory</u>.  Except as set forth on <u>Schedule 4(f)</u>, as of the date hereof, no Inventory of the Grantor is held by any Person other than the Grantor pursuant to consignment, sale or return, sale on approval or similar arrangement.

(g)    <u>Copyrights, Patents and Trademarks</u>.

(i)    <u>Schedule 1(b)</u> attached hereto includes all Copyrights, Copyright Licenses, Patents, Patent Licenses, registered Trademarks and Trademark Licenses owned by the Grantor in its own name, or to which the Grantor is a party, as of the date hereof.

(ii)    To the best of the Grantor's knowledge, each such Copyright, Patent and Trademark of the Grantor is valid, subsisting, unexpired, enforceable and has not been abandoned.

(iii)    Except as set forth in <u>Schedule 1(b)</u> attached hereto, none of such Copyrights, Patents and Trademarks is the subject of any licensing or franchise agreement.

(iv)    To the best of the Grantor's knowledge, no holding, decision or judgment has been rendered by any Governmental Authority that would limit, cancel or question the validity of any such Copyright, Patent or Trademark.

(v)    Except as set forth on <u>Schedule 4(g)(v)</u>, no action or proceeding is pending seeking to limit, cancel or question the validity of any Copyright, Patent or Trademark, or that, if adversely determined, would reasonably be expected to have a Material Adverse Effect.

(vi)    All applications pertaining to the Copyrights, Patents and Trademarks of the Grantor have been duly and properly filed, and all registrations or letters pertaining to such Copyrights, Patents and Trademarks have been duly and properly filed and issued, and all of such Copyrights, Patents and Trademarks are valid and enforceable except as would not reasonably be expected to cause a Material Adverse Effect.

-6-

Exhibit 4 - 164

(vii)   The Grantor has not made any assignment or agreement in conflict with the security interest in the Copyrights, Patents or Trademarks of the Grantor hereunder.

5.      <u>Covenants</u>.  Each Grantor covenants that, so long as any of the Secured Obligations remains outstanding and until all of the commitments relating thereto have been terminated, such Grantor shall:

(a)     <u>Other Liens</u>.  Defend the Collateral against the known material claims and demands of all other parties claiming an interest therein, keep the Collateral free from all Liens, except for Permitted Liens, and not sell, exchange, transfer, assign, lease or otherwise dispose of the Collateral or any interest therein, except as permitted under the Credit Agreement.

(b)     <u>Preservation of Collateral</u>.  Unless the failure to do so would not reasonably be expected to have a Material Adverse Effect, keep the Collateral in good order, condition and repair (ordinary wear and tear excepted) and not use the Collateral in violation of the provisions of this Security Agreement and any policy insuring the Collateral or any applicable Law.

(c)     <u>Instruments/Tangible Chattel Paper/Documents</u>.  If any amount payable under or in connection with any of the Collateral shall be or become evidenced by any Instrument or Tangible Chattel Paper, or if any property constituting Collateral shall be stored or shipped subject to a Document, and the principal or face amount or value thereof for such Instrument, Tangible Chattel Paper and Document exceeds $50,000, the Grantor shall ensure that such Instrument, Tangible Chattel Paper or Document is either in the possession of the Grantor at all times or, if requested by the DIP Collateral Agent, is promptly delivered to the DIP Collateral Agent, duly endorsed in a manner reasonably satisfactory to the DIP Collateral Agent. The Grantor shall ensure that any Collateral consisting of Tangible Chattel Paper that has a face amount that exceeds $50,000 is marked with a legend reasonably acceptable to the DIP Collateral Agent indicating the DIP Collateral Agent's security interest in such Tangible Chattel Paper.

(d)     <u>Change in Structure, Location or Type</u>.  Not, without providing five (5) days' prior written notice to the DIP Collateral Agent and without filing such financing statements and amendments to any previously filed financing statements as the DIP Collateral Agent may reasonably require, change its name or state of formation or be party to a merger, consolidation or other change in structure or use any tradename other than as set forth on <u>Schedule 4(a)(ii)</u> attached hereto.

(e)     <u>Inspection</u>.  Upon reasonable notice, and during normal business hours, at all times allow the DIP Collateral Agent or its representatives to visit and inspect the Collateral as set forth in Section 7.10 of the Credit Agreement.

(f)     <u>Perfection of Security Interest</u>.  Execute and deliver to the DIP Collateral Agent such agreements, assignments or instruments (including affidavits, notices,

Exhibit 4 - 165

reaffirmations and amendments and restatements of existing documents, as the DIP Collateral Agent may reasonably request) and do all such other things as the DIP Collateral Agent may reasonably deem necessary (i) to assure to the DIP Collateral Agent the effectiveness and priority of its security interests hereunder, including (A) such financing statements (including renewal statements), amendments and supplements or such other instruments as the DIP Collateral Agent may from time to time reasonably request in order to perfect and maintain the security interests granted hereunder in accordance with the UCC, (B) with regard to Copyrights, a Notice of Grant of Security Interest in Copyrights for filing with the United States Copyright Office in the form of <u>Exhibit 5(f)(i)</u> attached hereto, (C) with regard to Patents, a Notice of Grant of Security Interest in Patents for filing with the United States Patent and Trademark Office in the form of <u>Exhibit 5(f)(ii)</u> attached hereto and (D) with regard to Trademarks, a Notice of Grant of Security Interest in Trademarks for filing with the United States Patent and Trademark Office in the form of <u>Exhibit 5(f)(iii)</u> attached hereto, (ii) to consummate the transactions contemplated hereby and (iii) to otherwise protect and assure the DIP Collateral Agent of its rights and interests hereunder. To that end, the Grantor authorizes the DIP Collateral Agent to file one or more financing statements (with collateral descriptions that may be broader and/or less specific than the description of Collateral contained herein and which may describe the collateral as "all personal property") disclosing the DIP Collateral Agent's security interest in any or all of the Collateral of the Grantor without the Grantor's signature thereon, and further the Grantor also hereby irrevocably makes, constitutes and appoints the DIP Collateral Agent, its nominee or any other Person whom the DIP Collateral Agent may designate, as the Grantor's attorney-in-fact with full power and for the limited purpose to sign in the name of the Grantor any such financing statements (including renewal statements), amendments and supplements, notices or any similar documents that in the DIP Collateral Agent's reasonable discretion would be necessary in order to perfect and maintain perfection of the security interests granted hereunder, such power, being coupled with an interest, being and remaining irrevocable so long as the Secured Obligations remain unpaid and until the commitments relating thereto shall have been terminated. The Grantor hereby agrees that a carbon, photographic or other reproduction of this Security Agreement or any such financing statement is sufficient for filing as a financing statement by the DIP Collateral Agent without notice thereof to the Grantor wherever the DIP Collateral Agent may reasonably desire to file the same. In the event for any reason the Law of any jurisdiction other than New York becomes or is applicable to the Collateral of the Grantor or any part thereof, or to any of the Secured Obligations, the Grantor agrees to execute and deliver all such instruments and to do all such other things as the DIP Collateral Agent in its reasonably deems necessary to preserve, protect and enforce the security interests of the DIP Collateral Agent under the Law of such other jurisdiction (and, if the Grantor shall fail to do so promptly upon the request of the DIP Collateral Agent, then the DIP Collateral Agent may execute any and all such requested documents on behalf of the Grantor pursuant to the power of attorney granted hereinabove). If any Collateral is in the possession or control of the Grantor's agents and the DIP Collateral Agent so requests, the Grantor agrees to notify such agents in writing of the DIP Collateral Agent's security interest therein and, at any time after the occurrence and during the continuance of an Event of Default, upon the DIP Collateral Agent's request, instruct them to

Exhibit 4 - 166

hold all such Collateral for the account of the holders of the Secured Obligations and subject to the DIP Collateral Agent's instructions.

(g)     Control.  Execute and deliver all agreements, assignments, instruments or other documents as the DIP Collateral Agent shall reasonably request for the purpose of obtaining and maintaining control within the meaning of the UCC with respect to any Collateral consisting of Investment Property, Letter-of-Credit Rights and Electronic Chattel Paper involving more than $50,000; provided that, for the avoidance of doubt, in no event shall any Grantor be required to enter into control agreements with respect to cash, securities or deposit accounts.

(h)     Collateral held by Warehouseman, Bailee, etc.  If any Collateral with an aggregate value in excess of $100,000 is at any time in the possession or control of a warehouseman, bailee, agent or processor of the Grantor, (i) notify the DIP Collateral Agent of such possession or control and (ii) use commercially reasonable efforts to obtain a fully a duly executed bailee letter in the form of Exhibit 5(h).

(i)     Treatment of Accounts.  Not grant or extend the time for payment of any Account, or compromise or settle any Account for less than the full amount thereof, or release any Person or property, in whole or in part, from payment thereof, or allow any credit or discount thereon, other than in the ordinary course of the Grantor's business or as required by Law.

(j)     Covenants Relating to Copyrights.  Except as would not reasonably be expected to have a Material Adverse Effect:

(i)     Not do any act or knowingly omit to do any act whereby any material Copyright may become invalidated and (A) not do any act, or knowingly omit to do any act, whereby any material Copyright may become injected into the public domain; (B) notify the DIP Collateral Agent promptly if it knows that any material Copyright may become injected into the public domain or of any adverse determination or development (including the institution of, or any such determination or development in, any court or tribunal in the United States or any other country) regarding the Grantor's ownership of any such Copyright or its validity; (C) take all necessary steps as it shall deem appropriate under the circumstances as determined by the Grantor in its reasonable business judgment, to maintain and pursue each application (and to obtain the relevant registration) and to maintain each registration of each material Copyright owned by the Grantor including filing of applications for renewal where necessary; and (D) promptly notify the DIP Collateral Agent of any material infringement of any material Copyright of the Grantor of which it becomes aware and take such actions as it shall deem appropriate under the circumstances as determined by the Grantor in its reasonable business judgment to protect such Copyright, including, where appropriate, the bringing of suit for infringement, seeking injunctive relief and seeking to recover any and all damages for such infringement.

-9-

Exhibit 4 - 167

(ii)     Not make any assignment or agreement in conflict with the security interest in the Copyrights of the Grantor hereunder (except as permitted by the Credit Agreement).

(k)     <u>Covenants Relating to Patents and Trademarks</u>.

Except as would not reasonably be expected to have a Material Adverse Effect:

(i)     (A) Continue to use each material Trademark on every material trademark class of Goods applicable to its then current line as reflected in its then current catalogs, brochures and price lists in order to maintain such Trademark in full force free from any claim of abandonment for non-use, (B) maintain as in the past the quality of products and services offered under such Trademark, (C) employ such Trademark with the appropriate notice of registration, (D) not adopt or use any mark that is confusingly similar or a colorable imitation of such Trademark unless the DIP Collateral Agent, for the ratable benefit of the holders of the Secured Obligations, shall obtain a perfected security interest in such mark pursuant to this Security Agreement, and (E) not (and not permit any licensee or sublicensee thereof to) do any act or knowingly omit to do any act whereby any Trademark may become invalidated.

(ii)     Not do any act, or omit to do any act, whereby any material Patent may become abandoned or dedicated.

(iii)     Notify the DIP Collateral Agent promptly if it knows that any application or registration relating to any Patent or Trademark may become abandoned or dedicated, or of any adverse determination or development (including the institution of, or any such determination or development in, any proceeding in the United States Patent and Trademark Office of any court or tribunal in any other country or any political subdivision thereof) regarding the Grantor's ownership of any Patent or Trademark or its right to register the same or to keep and maintain the same.

(iv)     Whenever the Grantor, either by itself or through an agent, employee, licensee or designee, shall file an application for the registration of any Patent or Trademark with the United States Patent and Trademark Office or any similar office or agency in any other country or any political subdivision thereof, the Grantor shall report such filing to the DIP Collateral Agent within ten (10) Business Days after the last day of the fiscal quarter in which such filing occurs. Upon request of the DIP Collateral Agent, the Grantor shall execute and deliver any and all agreements, instruments, documents and papers as the DIP Collateral Agent may reasonably request to evidence the security interest of the DIP Collateral Agent and the holders of

-10-

Exhibit 4 - 168

the Secured Obligations in any Patent or Trademark and the goodwill and General Intangibles of the Grantor relating thereto or represented thereby.

(v)    Use commercially reasonable efforts to take reasonable and necessary steps, including in any proceeding before the United States Patent and Trademark Office, or any similar office or agency in any other country or any political subdivision thereof, to maintain and pursue each application (and to obtain the relevant registration) and to maintain each registration of the Patents and Trademarks, including filing of applications for renewal, affidavits of use and affidavits of incontestability.

(vi)    Promptly notify the DIP Collateral Agent after it learns that any material Patent or Trademark included in the Collateral is materially infringed, misappropriated or diluted by a third party and take such other actions as it shall reasonably deem appropriate under the circumstances to protect such Patent or Trademark.

(vii)    Not make any assignment or agreement in conflict with the security interest in the Patents or Trademarks of the Grantor hereunder (except as permitted by the Credit Agreement).

(l)    <u>New Patents, Copyrights and Trademarks</u>.  Upon the request of the DIP Collateral Agent, promptly provide the DIP Collateral Agent with (i) a listing of all applications, if any, for new Copyrights, Patents or Trademarks (together with a listing of the issuance of registrations or letters on present applications), which new applications and issued registrations or letters shall be subject to the teens and conditions hereunder, and (ii) (A) with respect to Copyrights, a duly executed Notice of Security Interest in Copyrights, (B) with respect to Patents, a duly executed Notice of Security Interest in Patents, (C) with respect to Trademarks, a duly executed Notice of Security Interest in Trademarks or (D) such other duly executed documents as the DIP Collateral Agent may reasonably request in a form reasonably acceptable to counsel for the DIP Collateral Agent.

(m)    <u>Insurance</u>.  Insure, repair and replace the Collateral of the Grantor as set forth in the Credit Agreement. All insurance proceeds paid in connection with any insurance providing coverage with respect to any Collateral shall be subject to the security interest of the DIP Collateral Agent hereunder.

(n)    <u>Commercial Tort Claims</u>.

(i)    Promptly notify the DIP Collateral Agent in writing of the initiation of any Commercial Tort Claim in excess of $50,000 before any Governmental Authority by or in favor of the Grantor or any of its Subsidiaries.

(ii)    Execute and deliver such statements, documents and notices and do and cause to be done all such things as the DIP Collateral Agent may

-11-

Exhibit 4 - 169

reasonably deem necessary or as are required by Law, to create, perfect and maintain the DIP Collateral Agent's security interest in any Commercial Tort Claim.

6.      Advances by Holders of the Secured Obligations.  After the occurrence and during the continuance of an Event of Default, the DIP Collateral Agent may, at its sole option and in its sole discretion, perform the same and in so doing may expend such sums as the DIP Collateral Agent may reasonably deem advisable in the performance thereof, including the payment of any insurance premiums, the payment of any taxes, a payment to obtain a release of a Lien or potential Lien, expenditures made in defending against any adverse claim and all other expenditures that the DIP Collateral Agent or any holder of the Secured Obligations may make for the protection of the security hereof or may be compelled to make by operation of Law. All such sums and amounts so expended shall be repayable by the Grantors on a joint and several basis (subject to Section 23 hereof) promptly upon timely notice thereof and demand therefor, shall constitute additional Secured Obligations and shall, subject to Section 2.07 of the Credit Agreement, bear interest from the date said amounts are expended at the rate then applicable to DIP Loans. No such performance of any covenant or agreement by the DIP Collateral Agent or any holder of the Secured Obligations on behalf of any Grantor, and no such advance or expenditure therefor, shall relieve the Grantors of any default under the terms of this Security Agreement, the other Credit Documents or any other documents relating to the Secured Obligations. The DIP Collateral Agent may make any payment hereby authorized in accordance with any bill, statement or estimate procured from the appropriate public office or holder of the claim to be discharged without inquiry into the accuracy of such bill, statement or estimate or into the validity of any tax assessment, sale, forfeiture, tax lien, title or claim except to the extent such payment is being contested in good faith by a Grantor in appropriate proceedings and against which adequate reserves are being maintained in accordance with GAAP.

7.      Remedies.

(a)      General Remedies.  Upon the occurrence of an Event of Default and during the continuation thereof, the DIP Collateral Agent and the holders of the Secured Obligations shall have, in addition to the rights and remedies provided herein, in the Financing Orders, in the Credit Documents, in any other documents relating to the Secured Obligations, or by Law (including levy of attachment and garnishment), the rights and remedies of a secured party under the UCC of the jurisdiction applicable to the affected Collateral and, further, the DIP Collateral Agent may, with or without judicial process or the aid and assistance of others, (i) enter on any premises on which any of the Collateral may be located and, without resistance or interference by the Grantors, take possession of the Collateral, (ii) dispose of any Collateral on any such premises, (iii) require the Grantors to assemble and make available to the DIP Collateral Agent at the expense of the Grantors any Collateral at any place and time designated by the DIP Collateral Agent that is reasonably convenient to both parties, (iv) remove any Collateral from, any such premises for the purpose of effecting sale or other disposition thereof, and/or (v) upon ten (10) days' notice, without demand and without advertisement, hearing or process of Law, all of which each of the Grantors hereby waives to the fullest extent permitted by Law, at any place and time or

-12-

Exhibit 4 - 170

times, sell and deliver any or all Collateral held by or for it at public or private sale, by one or more contracts, in one or more parcels, for cash, upon credit or otherwise, at such prices and upon such terms as the DIP Collateral Agent reasonably deems advisable, in a commercially reasonable manner (subject to any and all mandatory legal requirements). Each of the Grantors acknowledges that any private sale referenced above may be at prices and on terms less favorable to the seller than the prices and terms that might have been obtained at a public sale. Neither the DIP Collateral Agent's compliance with applicable Law nor its disclaimer of warranties relating to the Collateral shall be considered to adversely affect the commercial reasonableness of any sale. In addition to all other sums due the DIP Collateral Agent and the holders of the Secured Obligations with respect to the Secured Obligations, the Grantors shall pay the DIP Collateral Agent and each of the holders of the Secured Obligations all reasonable out-of-pocket costs and expenses incurred by the DIP Collateral Agent or any such holder of the Secured Obligations (including reasonable outside attorneys' fees and disbursements and court costs) in obtaining or liquidating the Collateral, in enforcing payment of the Secured Obligations, or in the prosecution or defense of any action or proceeding by or against the DIP Collateral Agent or the holders of the Secured Obligations or the Grantors concerning any matter arising out of or connected with this Security Agreement, any Collateral or the Secured Obligations, including any of the foregoing arising in, arising under or related to a case under Debtor Relief Laws. To the extent the rights of notice cannot be legally waived hereunder, each Grantor agrees that any requirement of reasonable notice shall be met if such notice is personally served on or mailed, postage prepaid, to the Borrower in accordance with the notice provisions of Section 11.02 of the Credit Agreement at least ten (10) Business Days before the time of sale or other event giving rise to the requirement of such notice. The DIP Collateral Agent and the holders of the Secured Obligations shall not be obligated to make any sale or other disposition of the Collateral regardless of notice having been given. To the extent permitted by Law, any holder of the Secured Obligations may be a purchaser at any such sale. Subject to the provisions of applicable Law, the DIP Collateral Agent and the holders of the Secured Obligations may postpone or cause the postponement of the sale of all or any portion of the Collateral by announcement at the time and place of such sale, and such sale may, without further notice, to the extent permitted by Law, be made at the time and place to which the sale was postponed, or the DIP Collateral Agent and the holders of the Secured Obligations may further postpone such sale by announcement made at such time and place.

(b)    Remedies relating to Accounts.  Upon the occurrence of an Event of Default and during the continuation thereof, and upon prior written notice to such Grantor, whether or not the DIP Collateral Agent has exercised any or all of its rights and remedies hereunder, each Grantor will promptly upon request of the DIP Collateral Agent instruct all account debtors to remit all payments in respect of Accounts to a mailing location selected by the DIP Collateral Agent. In addition, upon the occurrence and during the continuance of an Event of Default and prior written notice to such Grantor, the DIP Collateral Agent shall have the right to enforce any Grantor's rights against its customers and account debtors, and the DIP Collateral Agent or its designee may notify any Grantor's customers and account debtors that the Accounts of such Grantor have been assigned to the DIP Collateral Agent or of the DIP Collateral Agent's security interest therein, and may (either in its own name or in

-13-

Exhibit 4 - 171

the name of a Grantor or both) demand, collect (including by way of a lockbox arrangement), receive, take receipt for, sell, sue for, compound, settle, compromise and give acquittance for any and all amounts due or to become due on any Account, and, in the DIP Collateral Agent's reasonable discretion, file any claim or take any other action or proceeding to protect and realize upon the security interest of the holders of the Secured Obligations in the Accounts. Each Grantor acknowledges and agrees that the Proceeds of its Accounts remitted to or on behalf of the DIP Collateral Agent in accordance with the provisions hereof shall be solely for the DIP Collateral Agent's own convenience and that such Grantor shall not have any right, title or interest in such Accounts or in any such other amounts except as expressly provided herein. The DIP Collateral Agent and the holders of the Secured Obligations shall have no liability or responsibility to any Grantor for acceptance of a check, draft or other order for payment of money bearing the legend "payment in full" or words of similar import or any other restrictive legend or endorsement or be responsible for determining the correctness of any remittance. Each Grantor hereby agrees to indemnify the DIP Collateral Agent and the holders of the Secured Obligations from and against all liabilities, damages, losses, actions, claims, judgments, costs, expenses, charges and reasonable outside attorneys' fees and disbursements suffered or incurred by the DIP Collateral Agent or the holders of the Secured Obligations (each, an "Indemnified Party") because of the maintenance of the foregoing arrangements except as relating to or arising out of the gross negligence, bad faith or willful misconduct of the Indemnified Party or the material breach of contract of such Indemnified Party's obligations hereunder (if the Grantor has obtained a final judgment in its favor on such claim as determined by a court of competent jurisdiction) or such Indemnified Party's officers, employees or agents. In the case of any investigation, litigation or other proceeding, the foregoing indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by a Grantor, or its directors, shareholders or creditors (other than an Indemnified Party). All amounts due under this subsection shall be payable within thirty (30) Business Days after demand therefor.

(c)     Access.  In addition to the rights and remedies hereunder, upon prior written notice to the Grantors, the DIP Collateral Agent shall have the right to enter and remain upon the various premises of the Grantors without cost or charge to the DIP Collateral Agent, and use the same, together with materials, supplies, books and records of the Grantors for the purpose of collecting and liquidating the Collateral, or for preparing for sale and conducting the sale of the Collateral, whether by foreclosure, auction or otherwise. In addition, the DIP Collateral Agent may remove Collateral, or any part thereof, from such premises and/or any records with respect thereto, in order to effectively collect or liquidate such Collateral.

(d)     Nonexclusive Nature of Remedies.  Failure by the DIP Collateral Agent or the holders of the Secured Obligations to exercise any right, remedy or option under this Security Agreement, any other Credit Document, any other documents relating to the Secured Obligations, or as provided by Law, or any delay by the DIP Collateral Agent or the holders of the Secured Obligations in exercising the same, shall not operate as a waiver of any such right, remedy or option. No waiver hereunder shall be effective unless it is in writing, signed by the party against whom such waiver is sought to be enforced and then only

-14-

Exhibit 4 - 172

to the extent specifically stated, which in the case of the DIP Collateral Agent or the holders of the Secured Obligations shall only be granted as provided herein. To the extent permitted by Law, neither the DIP Collateral Agent, the holders of the Secured Obligations, nor any party acting as attorney for the DIP Collateral Agent or the holders of the Secured Obligations, shall be liable hereunder for any acts or omissions or for any error of judgment or mistake of fact or Law other than their gross negligence, bad faith or willful misconduct or the material breach of contract of their obligations hereunder (if the Grantor has obtained a final judgment in its favor on such claim as determined by a court of competent jurisdiction). The rights and remedies of the DIP Collateral Agent and the holders of the Secured Obligations under this Security Agreement shall be cumulative and not exclusive of any other right or remedy that the DIP Collateral Agent or the holders of the Secured Obligations may have.

(e)    Retention of Collateral.  To the extent permitted under applicable Law, in addition to the rights and remedies hereunder, upon the occurrence and continuance of an Event of Default, the DIP Collateral Agent may, after providing the notices required by Sections 9-620 and 9-621 of the UCC or otherwise complying with the requirements of applicable Law of the relevant jurisdiction, accept or retain all or any portion of the Collateral in satisfaction of the Secured Obligations. Unless and until the DIP Collateral Agent shall have provided such notices, however, the DIP Collateral Agent shall not be deemed to have accepted or retained any Collateral in satisfaction of any Secured Obligations for any reason.

(f)    Deficiency.  In the event that the proceeds of any sale, collection or realization are insufficient to pay all amounts to which the DIP Collateral Agent or the holders of the Secured Obligations are legally entitled, the Grantors shall be jointly and severally liable for the deficiency (subject to Section 23 hereof, together with interest thereon (subject to Section 2.07 of the Credit Agreement, at the rate then applicable to DIP Loans) together with the reasonable out-of pocket costs and expenses of collection and reasonable outside attorneys' fees and disbursements. Any surplus remaining after the full payment and satisfaction of the Secured Obligations shall be returned to the Grantors or to whomsoever a court of competent jurisdiction shall determine to be entitled thereto.

8.    Rights of the DIP Collateral Agent.

(a)    Power of Attorney.  In addition to other powers of attorney contained herein, each Grantor hereby designates and appoints the DIP Collateral Agent, on behalf of the holders of the Secured Obligations, and each of its designees or agents, as attorney-in-fact of such Grantor, irrevocably and with power of substitution, with authority to take any or all of the following actions upon the occurrence and during the continuation of an Event of Default:

(i)    to demand, collect, settle, compromise and adjust, and give discharges and releases concerning the Collateral, all as the DIP Collateral Agent may reasonably deem appropriate;

-15-

Exhibit 4 - 173

(ii)    to commence and prosecute any actions at any court for the purposes of collecting any of the Collateral and enforcing any other right in respect thereof,

(iii)    to defend, settle or compromise any action brought and, in connection therewith, give such discharge or release as the DIP Collateral Agent may reasonably deem appropriate;

(iv)    to receive, open and dispose of mail addressed to a Grantor and endorse checks, notes, drafts, acceptances, money orders, bills of lading, warehouse receipts or other instruments or documents evidencing payment, shipment or storage of the Goods giving rise to the Collateral on behalf of and in the name of such Grantor, or securing, or relating to such Collateral;

(v)    to pay or discharge taxes, liens, security interests or other encumbrances levied or placed on or threatened against the Collateral;

(vi)    to direct any parties liable for any payment in connection with any of the Collateral to make payment of any and all monies due and to become due thereunder directly to the DIP Collateral Agent or as the DIP Collateral Agent shall direct;

(vii)    to receive payment of and receipt for any and all monies, claims, and other amounts due and to become due at any time in respect of or arising out of any Collateral;

(viii)    to sell, assign, transfer, make any agreement in respect of, or otherwise deal with or exercise rights in respect of, any Collateral or the Goods or services that have given rise thereto, as fully and completely as though the DIP Collateral Agent were the absolute owner thereof for all purposes;

(ix)    to adjust and settle claims under any insurance policy relating thereto;

(x)    to authorize or to execute and deliver all assignments, conveyances, statements, financing statements, renewal financing statements, security and pledge agreements, affidavits, notices and other agreements, instruments and documents that the DIP Collateral Agent may reasonably deem necessary in order to perfect and maintain the security interests and liens granted in this Security Agreement and in order to fully consummate all of the transactions contemplated therein;

(xi)    to institute any foreclosure proceedings that the DIP Collateral Agent may reasonably deem appropriate; and

-16-

Exhibit 4 - 174

(xii)    to do and perform all such other acts and things as the DIP Collateral Agent may reasonably deem appropriate or convenient in connection with the Collateral.

This power of attorney is a power coupled with an interest and shall be irrevocable for so long as any of the Secured Obligations shall remain outstanding and until all of the commitments relating thereto shall have been terminated. The DIP Collateral Agent shall be under no duty to exercise or withhold the exercise of any of the rights, powers, privileges and options expressly or implicitly granted to the DIP Collateral Agent in this Security Agreement, and shall not be liable for any failure to do so or any delay in doing so. The DIP Collateral Agent shall not be liable for any act or omission or for any error of judgment or any mistake of fact or Law in its individual capacity or its capacity as attorney-in-fact except acts or omissions resulting from its gross negligence, bad faith or willful misconduct or the material breach of contract its obligations hereunder (if the Grantor has obtained a final judgment in its favor on such claim as determined by a court of competent jurisdiction). This power of attorney is conferred on the DIP Collateral Agent solely to protect, preserve and realize upon its security interest in the Collateral.

(b)    <u>Assignment by the DIP Collateral Agent</u>.  The DIP Collateral Agent may from time to time assign the Secured Obligations and any portion thereof and/or the Collateral and any portion thereof in connection with its resignation as DIP Collateral Agent pursuant to Section 10.06 of the Credit Agreement, and the assignee shall be entitled to all of the rights and remedies of the DIP Collateral Agent under this Security Agreement in relation thereto.

(c)    <u>The DIP Collateral Agent's Duty of Care</u>.  Other than the exercise of reasonable care to assure the safe custody of the Collateral while being held by the DIP Collateral Agent hereunder, the DIP Collateral Agent shall have no duty or liability to preserve rights pertaining thereto, it being understood and agreed that the Grantors shall be responsible for preservation of all rights in the Collateral, and the DIP Collateral Agent shall be relieved of all responsibility for the Collateral upon surrendering it or tendering the surrender of it to the Grantors. The DIP Collateral Agent shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession if such Collateral is accorded treatment substantially equal to that which the DIP Collateral Agent accords its own property, of like value, which shall be no less than the treatment employed by a reasonable and prudent agent in the industry, it being understood that the DIP Collateral Agent shall not have responsibility for taking any necessary steps to preserve rights against any parties with respect to any of the Collateral. In the event of a public or private sale of Collateral pursuant to <u>Section 7</u> hereof, the DIP Collateral Agent shall have no obligation to clean, repair or otherwise prepare the Collateral for sale.

9.    <u>Rights of Required Lenders</u>.  If Bank of Montreal has resigned as DIP Collateral Agent and no successor collateral agent has been appointed pursuant to Section 10.06 of the Credit Agreement, all rights of the DIP Collateral Agent hereunder may be exercised by the Required Lenders.

-17-

Exhibit 4 - 175

10.    <u>Application of Proceeds</u>.    Upon the occurrence and during the continuation of an Event of Default, any payments in respect of the Secured Obligations and any proceeds of the Collateral, when received by the DIP Collateral Agent or any of the holders of the Secured Obligations in cash or its equivalent, will be applied in reduction of the Secured Obligations in the order set forth in the Credit Agreement or other document relating to the Secured Obligations, and each Grantor irrevocably waives the right to direct the application of such payments and proceeds and acknowledges and agrees that the DIP Collateral Agent shall have the continuing and exclusive right to apply and reapply any and all such payments and proceeds in the DIP Collateral Agent's sole discretion, notwithstanding any entry to the contrary upon any of its books and records.

11.    <u>Release of Collateral</u>. Upon request, the DIP Collateral Agent shall promptly deliver to the applicable Guarantor (at such Guarantor's expense) appropriate release documentation to the extent the release of Collateral is permitted under, and on the terms and conditions set forth in, the Credit Agreement; <u>provided</u> that any such release, or the substitution of any of the Collateral for other Collateral, will not alter, vary or diminish in any way the force, effect, lien, pledge or security interest of this Security Agreement as to any and all Collateral not expressly released or substituted, and this Security Agreement shall continue as a first priority lien (subject to Permitted Liens) on any and all Collateral not expressly released or substituted.

12.    <u>Costs and Expenses</u>.    At all times hereafter, whether or not upon the occurrence of an Event of Default, the Grantors agree to promptly pay upon demand any and all reasonable out-of-pocket costs and expenses (including reasonable attorneys' fees and disbursements) of the DIP Collateral Agent and the holders of the Secured Obligations (a) as required under Section 11.04 of the Credit Agreement and (b) as necessary to protect the Collateral. All of the foregoing costs and expenses shall constitute Secured Obligations hereunder.

13.    <u>Continuing Agreement.</u>

(a)    This Security Agreement shall be a continuing agreement in every respect and shall remain in full force and effect so long as any of the Secured Obligations remains outstanding (other than contingent indemnity obligations that are not yet due and payable) and until all of the commitments relating thereto have been terminated. Upon such payment and termination, this Security Agreement shall be automatically terminated and the DIP Collateral Agent shall, upon the request and at the expense of the Grantors, forthwith release all of its liens and security interests hereunder and shall execute and deliver all UCC termination statements and/or documents reasonably requested by the Grantors evidencing such termination. Notwithstanding the foregoing, all releases and indemnities provided hereunder shall survive termination of this Security Agreement.

(b)    This Security Agreement shall continue to be effective or be automatically reinstated, as the case may be, if at any time payment, in whole or in part, of any of the Secured Obligations is rescinded or must otherwise be restored or returned by the DIP Collateral Agent or any holder of the Secured Obligations as a preference, fraudulent

-18-

Exhibit 4 - 176

conveyance or otherwise under any bankruptcy, insolvency or similar Law, all as though such payment had not been made; provided that in the event payment of all or any part of the Secured Obligations is rescinded or must be restored or returned, all reasonable out-of-pocket costs and expenses (including reasonable outside attorneys' fees and disbursements) incurred by the DIP Collateral Agent or any holder of the Secured Obligations in defending and enforcing such reinstatement shall be deemed to be included as a part of the Secured Obligations.

14.   <u>Amendments and Waivers</u>.   This Security Agreement and the provisions hereof may not be amended, waived, modified, changed, discharged or terminated except by written agreement of (a) the Grantors and (b) the DIP Collateral Agent (with the consent or at the direction of the requisite Lenders under the Credit Agreement).

15.   <u>Successors in Interest</u>.   Thus Security Agreement shall create a continuing security interest in the Collateral and shall be binding upon each Grantor, its successors and assigns, and shall inure, together with the rights and remedies of the DIP Collateral Agent and the holders of the Secured Obligations hereunder, to the benefit of the DIP Collateral Agent and the holders of the Secured Obligations and their successors and permitted assigns; <u>provided,</u> however, that none of the Grantors may assign its rights or delegate its duties hereunder without the prior written consent of the requisite Lenders under the Credit Agreement.

16.   <u>Notices</u>.   All notices required or permitted to be given under this Security Agreement shall be given as provided in Section 11.02 of the Credit Agreement.

17.   <u>Counterparts</u>.   This Security Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be an original, but all of which shall constitute one and the same instrument. It shall not be necessary in making proof of this Security Agreement to produce or account for more than one such counterpart.

18.   <u>Governing Law; Submission to Jurisdiction; Waiver of Jury Trial; Venue; Service of Process.</u>

(a)   THIS SECURITY AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE BANKRUPTCY CODE AND THE LAW OF THE STATE OF NEW YORK (INCLUDING, WITHOUT LIMITATION, SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW)

(b)   IF (I) THE BANKRUPTCY CASE IS DISMISSED, (II) THE BANKRUPTCY COURT ABSTAINS FROM HEARING ANY ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS SECURITY AGREEMENT (OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO IN RESPECT OF THIS SECURITY AGREEMENT OR THE TRANSACTIONS RELATED HERETO) OR (III) THE

Exhibit 4 - 177

BANKRUPTCY COURT REFUSES TO EXERCISE JURISDICTION OVER ANY ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS SECURITY AGREEMENT (OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO IN RESPECT OF THIS SECURITY AGREEMENT OR THE TRANSACTIONS RELATED HERETO), THEN EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE NONEXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK SITTING IN THE BOROUGH OF MANHATTAN AND OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF SUCH STATE AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS SECURITY AGREEMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS SECURITY AGREEMENT SHALL AFFECT ANY RIGHT THAT THE DIP AGENT, THE DIP COLLATERAL AGENT, ANY LENDER OR ANY L/C ISSUER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS SECURITY AGREEMENT AGAINST ANY BORROWER OR ANY OTHER CREDIT PARTY OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(c)     EACH PARTY TO THIS SECURITY AGREEMENT HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS SECURITY AGREEMENT (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS SECURITY AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

(d)     EACH OF THE GRANTORS IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF

-20-

Exhibit 4 - 178

OR RELATING TO THIS SECURITY AGREEMENT IN ANY COURT REFERRED TO IN PARAGRAPH (B) OF THIS SECTION. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(e)    EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 11.02 OF THE CREDIT AGREEMENT. NOTHING IN THIS SECURITY AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

19.    Severability.  If any provision of this Security Agreement or any related document is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Security Agreement and any other related document shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

20.    Entirety.  This Security Agreement, the other Credit Documents, the Financing Orders and the other documents relating to the Secured Obligations comprise the complete and integrated agreement of the parties on the subject matter hereof and thereof and supersedes all prior agreements, written or oral, on such subject matter. This Security Agreement was drafted with the joint participation of the respective parties thereto and shall be construed neither against nor in favor of any party, but rather in accordance with the fair meaning thereof.

21.    Survival.  All representations and warranties made hereunder or other document delivered pursuant hereto or in connection herewith shall survive the execution and delivery hereof and thereof Such representations and warranties have been or will be relied upon by the DIP Agent, the DIP Collateral Agent and each Lender, regardless of any investigation made by the DIP Agent or any Lender or on their behalf and notwithstanding that the DIP Agent or any Lender may have had notice or knowledge of any Default at the time of any Credit Extension, and shall continue in full force and effect as long as any Loan or any other Obligation shall remain unpaid or unsatisfied or any Letter of Credit shall remain outstanding.

22.    Other Security.  To the extent that any of the Secured Obligations are now or hereafter secured by property other than the Collateral (including real property and securities owned by a Grantor), or by a guarantee, endorsement or property of any other Person, then the DIP Collateral Agent shall have the right to proceed against such other property, guarantee or endorsement upon the occurrence of any Event of Default, and the DIP Collateral Agent shall have the right, in its sole discretion, to determine which rights, security, liens, security interests or remedies the DIP Collateral Agent shall at any time

-21-

Exhibit 4 - 179

pursue, relinquish, subordinate, modify or take with respect thereto, without in any way modifying or affecting any of them or the Secured Obligations or any of the rights of the DIP Collateral Agent or the holders of the Secured Obligations under this Security Agreement, under any of the other Credit Documents or under any other document relating to the Secured Obligations.

23.    Joint and Several Obligations of Grantors.

(a)    Subject to subsection (c) of this Section 23, each of the Grantors is accepting joint and several liability hereunder in consideration of the financial accommodation to be provided by the holders of the Secured Obligations, for the mutual benefit, directly and indirectly, of each of the Grantors and in consideration of the undertakings of each of the Grantors to accept joint and several liability for the obligations of each of them.

(b)    Subject to subsection (c) of this Section 23, each of the Grantors jointly and severally hereby irrevocably and unconditionally accepts, not merely as a surety but also as a co-debtor or guarantor, joint and several liability with the other Grantors with respect to the payment and performance of all of the Secured Obligations arising under this Security Agreement, the other Credit Documents and any other documents relating to the Secured Obligations, it being the intention of the parties hereto that all the Secured Obligations shall be the joint and several obligations of each of the Grantors without preferences or distinction among them.

(c)    Notwithstanding any provision to the contrary contained herein, in any other of the Credit Documents or in any other documents relating to the Secured Obligations, the obligations of each Grantor that is a Guarantor under the Credit Agreement and the other Credit Documents shall be limited to an aggregate amount equal to the largest amount that would not render such obligations subject to avoidance under Section 548 of the Bankruptcy Code of the United States or any other applicable Debtor Relief Law (including any comparable provisions of any applicable state Law).

**[SIGNATURES ON THE FOLLOWING PAGES]**

Exhibit 4 - 180

Each of the parties hereto has caused a counterpart of this Security Agreement to be duly executed and delivered as of the date first above written.

**GRANTORS**:

**SEXY HAIR CONCEPTS, LLC**, a California limited liability company

By: _____
Name: _____
Title: _____

**LUXE BEAUTY MIDCO CORPORATION**, a Delaware corporation

By: _____
Name: _____
Title: _____

**ECOLY INTERNATIONAL, INC.**, a California corporation

By: _____
Name: _____
Title: _____

Signature Page to Security Agreement

Exhibit 4 - 181

**BANK OF MONTREAL**, as DIP Collateral Agent

By: _____

Name: _____

Title: _____

## SCHEDULES

| | |
|---|---|
| Schedule 1(b) | Intellectual Property |
| Schedule 2(d) | Commercial Tort Claims |
| Schedule 4(a)(i) | Legal Name, Jurisdiction of Organization/Formation, Principal Place of Business, Chief Executive Office |
| Schedule 4(a)(ii) | Mergers, Consolidations, Changes in Structure, Use of Tradenames |
| Schedule 4(f) | Consignments |
| Schedule 4(g)(v) | Certain Litigation |


## EXHIBITS

| | |
|---|---|
| Exhibit 5(f)(i) | Form of Notice of Grant of Security Interest in Copyrights |
| Exhibit 5(f)(ii) | Form of Notice of Grant of Security Interest in Patents |
| Exhibit 5(f)(iii) | Form of Notice of Grant of Security Interest in Trademarks |
| Exhibit 5(h) | Form of Bailee Letter |

Exhibit 4 - 183

**Schedule 1(b)**

**INTELLECTUAL PROPERTY**

**Registered Intellectual Property Rights**

Trademarks

| Mark | Country | Status | Appln.Reg. No. | Classes/Goods |
|------|---------|--------|----------------|---------------|
| AERO TAN | U.S. | Registered | 2,634,449 | 03 - Temporary tanning spray |
| BIG SEXY HAIR | France | Registered | 073529830 | 03 - Hair care products, namely hair shampoos, hair conditioners, hair lotions, hair creams, hair gels, hair gel foams, hair waxes, hair sprays, hair color, hair dyes, hair rinses and hair mousse |
| BIGSEXYHAIR | U.S. | Registered | 3,539,680 | 03 - Hair care products, namely hair shampoos, hair colors, hair conditioners, hair mousses, hair sprays, hair gels, hair gel foams, hair cremes, hair waxes, hair detanglers, hair balms, hair glosses, hair pomades and hair tonics |
| COOL FACTOR | U.S. | Registered | 3,658,966 | 03 - Hair conditioner |
| CURL POWER | U.S. | Registered | 2,530,633 | 03 - Hair care products for men, women and children, namely, hair shampoos, hair conditioners, hair lotions, hair cremes, hair gels, hair sprays, hair color, hair dyes, hair rinses and hair mousse |
| CURLY SEXY HAIR HEALTHY SEXY HAIR STRAIGHT SEXY HAIR SHORT SEXY HAIR BIG SEXY HAIR SILKY SEXY HAIR | Australia | Registered | 984908 | 03 - Hair care products such as hair shampoos, hair conditioners, hair treatments and hair styling products (including pomades, gels, mousses, hair sprays and waxes) |
| ECOLY (Stylized) | U.S. | Registered | 1,866,675 | 03 - Hair care preparations and products; namely, shampoos, cream rinses, conditioners, sprays, moisturizers, mousses, gels and beautifying oils |
| ECOLY (Stylized) | Germany | Registered | 2094201 | 03 - Hair care preparations and products, namely shampoos, cream conditioner, conditioning sprays, humidification products, foam, gels and beautification oils; |

Exhibit 4 - 184

| Mark | Country | Status | Appln.Reg. No. | Classes/Goods |
|------|---------|--------|----------------|---------------|
| | | | | body care products and beauty care; and beautification oils; body care products and beauty care; non-medical hair care preparations |
| FRESH CONCEPTS | U.S. | Registered | 2,935,449 | 03 - Hair care products for men, women and children, namely hair shampoos, hair conditioners, hair lotions, hair cremes, hair gels, hair sprays, hair color, hair dyes, hair rinses, hair mousse |
| HARD UP | U.S. | Registered | 3,643,072 | 03 - Hair styling gel |
| HEALTHY SEXY | U.S. | Registered | 3,247,540 | 03 - Hair care products, namely hair shampoos, hair conditioners, hair pomades and hair tonics |
| HOT ROD | U.S. | Registered | 3,303,839 | 08 - Electric hair clippers<br><br>09 - Electric hair curling irons, electric hair crimpers, electric hair curlers, electric hair rollers, electric hair straightening irons, electric rotary hair brush for styling a user's hair, electrically heated hair brushes, hot air hair brushes<br><br>11 - Electric blow dryers |
| HOT SEXY HIGHLIGHTS | U.S. | Registered | 2,553,996 | 03 - Hair care products for men, women and children, namely, shampoos, conditioners, hair lotions, hair conditioning creams, hair gels, hair sprays, hair color, hair tint and hair mousse |
| HOT SEXY HIGHLIGHTS | European Union | Registered | 1,968,999 | 03 - Hair care products for men, women and children, namely, shampoos, conditioners, hair lotions, hair conditioning creams, hair gels, hairsprays, hair color, hair tint and hair mousse |
| LIQUID ART | U.S. | Registered | 3,036,101 | 03 - Hair care preparations and products, namely, shampoos, creme rinses, conditioners, sprays, moisturizers, mousses, gels, and beautifying oils |
| NATURA ECOLY HAIR CARE (Stylized) | Canada | Registered | TMA463,652 | Shampoos, conditioners, hair spray, finishing spray, hair gels, mousses and lotions, hair reconditioner |

Exhibit 4 - 185

| Mark | Country | Status | Appln.Reg. No. | Classes/Goods |
|------|---------|--------|----------------|---------------|
| POWDER PLAY | U.S. | Pending | 77/826,729 | 03 - Hair care preparations, namely, powder-based hair products |
| ROCKED OUT | U.S. | Registered | 3,758,872 | 03 - Molding clay for hair |
| ROOT PUMP | U.S. | Registered | 3,643,069 | 03 – Hair spray |
| SEX SYMBOL | Canada | Registered | TMA576,059 | Cosmetics, namely lipstick and lip gloss, nail polish, mascara, eye liner and foundation, and hair care products for men, women and children, namely shampoos, conditioners, hair lotions, hair conditioning creams, hair gels, hair sprays, hair color, hair tint and hair mousse |
| SEX SYMBOL | European Union | Registered | 002134781 | 03 - Cosmetics, namely, lipstick and lip gloss, nail polish, mascara, eye liner and foundation, and hair care products for men, women and children, namely, shampoos, conditioners, hair lotions, hair conditioning creams, hair gels, hair sprays, hair color, hair tint and hair mousse |
| SEXSYMBOL | U.S. | Registered | 2,636,664 | 03 - Cosmetics, namely, lipstick and lip gloss, nail polish, mascara, eyeliner and foundation and hair care products for men, women and children, namely, shampoos, conditioners, hair lotions, hair conditioning creams, hair gels, hair sprays, hair color, hair tint and hair mousse |
| SEXY | Switzerland | Registered | 583,715 | 03 - Hair care products for men, women and children, namely, hair shampoos, hair conditioners, hair lotions, hair creams, hair gels, hair sprays, hair color, hair dyes, hair rinses and hair mousse |
| SEXY | European Union | Registered | 6,292,445 | 03 - Hair care products for men, women and children, namely hair shampoos, hair conditioners, hair lotions, hair creams, hair gels, hair sprays, hair color, hair dyes, hair rinses and hair mousse |
| SEXY | U.S. | Pending | 78/942,914 | 03 - Hair care products, namely hair shampoos, hair colors, hair conditioners, hair mousses, hair sprays, hair gels, hair gel foams, |

Exhibit 4 - 186

| Mark | Country | Status | Appln.Reg. No. | Classes/Goods |
|------|---------|--------|----------------|---------------|
| | | | | hair cremes, hair waxes, hair detanglers, hair balms, hair glosses, hair pomades, dry silicon serum sprays for hair and hair tonics |
| SEXY and Design (Red Star) | Israel | Pending | 219568 | 03 - Hair care products, namely hair shampoos, hair colors, hair conditioners, hair mousses, hair sprays, hair gels, hair gel foams, hair crèmes, hair waxes, hair detanglers, hair balms, hair glosses, hair pomades, dry silicon serum sprays for hair and hair tonics |
| SEXY and Design (Red Star) | U.S. | Registered | 3,478,939 | 03 - Hair care products, namely hair shampoos, hair colors, hair conditioners, hair mousses, hair sprays, hair gels, hair gel foams, hair crèmes, hair waxes, hair detanglers, hair balms, hair glosses, hair pomades, dry silicon serum sprays for hair and hair tonics |
| SEXY BLONDES | U.S. | Registered | 3,441,169 | 03 - Hair coloring preparations and hair care preparations, namely, hair conditioners, hair shampoos, hair lotions, hair cremes, hair rinses, hair mousse, and hair gels |
| SEXY HAIR | Canada | Registered | TMA537,097 | Hair care products for men, women and children, namely, shampoos, conditioners, lotions, creams, gels, sprays, solutions for coloring and for tinting hair and mousse, electric irons for styling hair; hand-held electric hair dryers |
| SEXY HAIR | Brazil | Pending | 825317932 | 03 - hair care products for men, women and children, namely, hair shampoos, hair conditioners, hair lotions, hair creams, hair gels, hair sprays, hair color, hair dyes, hair rinses and hair mousse |
| SEXY HAIR | European Union | Registered | 1,052,380 | 03 - Hair care products for men, women and children, namely shampoos, conditioners, lotions, creams, gels, sprays, solutions for coloring and for tinting hair, and mousse |
| SEXY HAIR | Mexico | Registered | 790,977 | 03 - Hair care products for men, |

Exhibit 4 - 187

| Mark | Country | Status | Appln.Reg. No. | Classes/Goods |
|---|---|---|---|---|
| | | | | women and children, namely, hair shampoos, hair conditioners, hair lotions, hair creams, hair gels, hair sprays, hair color, hair dyes, hair rinses and hair mousse |
| SEXY HAIR | Uruguay | Pending | 411,433 | 03 - Hair care products, namely, hair shampoos, hair conditioners, hair mousses, hair lotions, hair creams, hair gels, hair sprays, hair gel foams, hair creams, hair waxes, hair detangling sprays, hair balms, hair glosses, hair pomades, dry silicon serum sprays for hair and hair tonics |
| SEXY HAIR | Russian Federation | Registered | 281,761 | 03 - Hair care products for men, women and children, namely, hair shampoos, hair conditioners, hair lotions, hair creams, hair gels, hair sprays, hair color, hair dyes, hair rinses and hair mousse |
| SEXY HAIR | Argentina | Registered | 1,922,953 | 03 - Hair care products for men, women and children, namely, hair shampoos, hair conditioners, hair lotions, hair creams, hair gels, hair sprays, hair color, hair dyes, hair rinses and hair mousse |
| SEXY HAIR | U.S. | Registered | 2,403,396 | 03 - Hair care products for men, women and children, namely hair shampoos, hair conditioners, hair lotions, hair cremes, hair gels, hair sprays, hair color, hair dyes, hair rinses, hair mousse |
| SEXY HAIR & DESIGN | European Union | Registered | 5,256,045 | 02 - Paints, varnishes, lacquers; preservatives against rust and against deterioration of wood; colorants; mordants; raw natural resins; metals in foil and powder for painters, decorators, printers and artists<br><br>03 - Bleaching preparations and other substances for laundry use; cleaning, polishing, scouring and abrasive preparations; soaps, perfumery, essential oils, cosmetics, hair lotions; dentifrices<br><br>44 - Medical services; hygienic and beauty care for human beings or animals; agricultural, horticultural or forestry services |

Exhibit 4 - 188

| Mark | Country | Status | Appln.Reg. No. | Classes/Goods |
|------|---------|--------|----------------|---------------|
| SEXYHAIRORGANICS | U.S. | Registered | 3,729,749 | 03 - Hair care products, namely hair shampoos, hair conditioners, hair lotions, hair cremes, hair gels, hair sprays, hair color, hair dyes, hair rinses, hair mousse |
| SHORT SEXY | U.S. | Registered | 3,247,541 | 03 - Hair care products, namely, hair gels, hair gel foams, hair cremes and hair waxes |
| SHORT SEXY HAIR CLEAN SLATE | U.S. | Allowed | 77/620,784 | 03 - Hair shampoo |
| SMOOTH & PROTECT | U.S. | Registered | 3,750,655 | 03 - Hair care products, namely , hair conditioners |
| SOY RENEWAL | U.S. | Registered | 3,865,249 | 03 - Hair care products, namely , hair conditioners |
| SPRAY & PLAY | U.S. | Registered | 3,372,755 | 03 - Hair spray |
| SPRAY & STAY | U.S. | Registered | 3,750,645 | 03 - Hair spray |
| STAY PUT | U.S. | Allowed | 77/620,714 | 03 - Hair care products, namely hair gels |
| STRONGSEXYHAIR | U.S. | Registered | 3,371,913 | 03 - Hair care products, namely hair shampoos, hair conditioners, hair sprays and hair balms |
| TRIBES OF STYLE | U.S. | Registered | 3,120,069 | 41 - Conducting educational exhibitions in the field of hair care services; conducting entertainment exhibitions in the field of hair care services |
| WILDSEXYHAIR | U.S. | Allowed | 77/719,656 | 03 - Hair care products, namely hair gels, hair color, hair dyes, and hair rinses |
| SEXYBATH&BODY | U.S. | Registered | 2,823,999 | 03 - Skin care products, namely liquid body wash, moisturizing lotions, shampoo, conditioner |
| COLOR ME SEXY | U.S. | Registered | 3,457,615 | 03 - Hair shampoo for color-treated hair |
| PIECE OUT | U.S. | Allowed | 85/008,599 | 03 - Hair care products, namely hair mousse |
| DOUBLE DUTY | U.S. | Allowed | 85/004,844 | 03 - Hair care products, namely hair shampoos and hair conditioners |

Exhibit 4 - 189

| Mark | Country | Status | Appln.Reg. No. | Classes/Goods |
|---|---|---|---|---|
| JUST GELLING | U.S. | Allowed | 85/004,849 | 03 - Hair care products, namely hair gels |
| SEXY SKIN | U.S. | Pending | 77/119,862 | 03 - Non-medicated skin care preparations, body butter, skin moisturizers |
| MAKE BELIEVE | Canada | Registered | TMA772886 | Self-tan products, namely non-medicated skin care preparations, namely self tanning spray, self tanning mousse, self tanning lotion, self tanning gels, self tanning foams, self tanning oils, self tan stain remover, skin cleansers, skin toners, skin moisturizers, skin scrubs, skin exfoliators, and sun screens |
| W.M.N. (Stylized) | Canada | Registered | TMA544,399 | Hair care products for men, women and children, namely, shampoos, conditioners, lotions, creams, gels, sprays, solutions for coloring and for tinting hair, mousse; skin care and personal care products for men, women and children, namely, soaps, bath gels, eye gels, shaving gels, shower gels, tooth gels, hand creams, cold creams, skin creams, shaving creams, night creams, face creams, body creams, perfume sprays, deodorant sprays, skin lotions, facial lotions, body lotions, sunblocks, sunscreens, skin conditioners and skin toners |
| MAKE BELIEVE CONCEPTS | Canada | Registered | TMA544,398 | Hair care products for men, women and children, namely shampoos, conditioners, lotions, creams, gels,sprays, solutions for coloring and for tinting hair, and mousse and skin care personal care products for men, women and children, namely, soaps, gels, creams, sprays, lotions, sunblocks and sunscreens, conditioners, toners |

Exhibit 4 - 190

| Mark | Country | Status | Appln.Reg. No. | Classes/Goods |
|------|---------|--------|----------------|---------------|
| THINGS | Canada | Registered | TMA528,479 | Hair care products for men, women and children, namely, shampoos, conditioners, hair lotions, hair conditioning cremes, hair gels, hair sprays, hair color, hair tint, hair mousse; skin care and personal care products for men, women and children, namely, skin soaps, skin cleansing gels, skin cremes, body sprays, skin lotions, sun blocks and sun screens, skin conditioning lotions and skin toners |
| PSY-COLOR-GY | Canada | Registered | TMA544,011 | Hair-care products, namely, shampoos, conditioners, lotions, creams, gels, sprays, solutions for coloring and for tinting hair, mousse; skin care and personal care products, namely, soaps, gels, creams, sprays, lotions, sunblocks, sunscreens, conditioners, toners |
| SEA CRITTERS | Canada | Registered | TMA527,118 | Hair care products, namely, shampoos, conditioners, lotions, creams, gels, sprays, solutions for coloring and for tinting hair, mousse; skin care and personal care products, namely, soaps, gels, creams, sprays, lotions, sunblocks and sunscreens, conditioners, toners |
| FASHION FORMULAS BY ECOLY | Canada | Registered | TMA508,671 | Hair care preparations and products; namely, shampoos, cream rinses, conditioners, sprays, moisturizers, mousses, gels, and beautifying oils |
| SEXYHAIR & Star Design | Germany | Registered | 30354034 | 44 - Dienstleistungen eines Frisörsalons, soweit in Klasse 44 enthalten |
| MAKE BELIEVE CONCEPTS | European Union | Registered | 1,054,386 | 03 - Hair care products for men, women and children, namely shampoos, conditioners, lotions, creams, gels,sprays, solutions for coloring and for tinting hair, and mousse and skin care personal care products for men, women and children, namely, soaps, gels, creams, sprays, lotions, sunblocks and sunscreens, conditioners, toners |

Exhibit 4 - 191

| Mark | Country | Status | Appln.Reg. No. | Classes/Goods |
|---|---|---|---|---|
| SEXY HAIR | European Union | Registered | 8,415,184 | 08 - Hair cutting scissors<br><br>09 - Electric curling irons; electric irons for styling hair; electric hair rollers<br><br>11 - Hair dryers |
| SEXY HAIR | Canada | Registered | TMA537097 | Electric curling irons; electric irons for styling hair; electric hair rollers; hair dryers |
| HEALTHYSEXYHAIR REINVENT | U.S. | Pending | 85/058,244 | 03 - Hair shampoos and hair conditioners |
| HEALTHYSEXYHAIR REINVENT COLOR CARE | U.S. | Pending | 85/048,378 | 03 - Hair shampoos and hair conditioners |
| HEALTHYSEXYHAIR REINVENT COLOR CARE TOP COAT | U.S. | Pending | 85/075,704 | 03 - Hair shampoos and hair conditioners |
| SPRITZ & STAY | U.S. | Pending | 85/045,263 | 03 - Hair spray |
| CONTROL MANIAC | U.S. | Registered | 3,877,127 | 03 - Hair styling products, namely hair gels |
| FRENZY | U.S. | Registered | 3,873,608 | 03 - Hair styling products, namely hair gels |
| WHAT A TEASE | U.S. | Registered | 3,877,126 | 03 - Hair spray |
| SI KA XIAN (in Chinese characters) | China | Pending | 7633641 | 03 - shampoos; conditioners; hair styling; hair colorant |
| SI KA XI (in Chinese characters) | China | Pending | 7633642 | 03 - shampoos; conditioners; hair styling; hair colorant |
| SOY TOUCHABLE | U.S. | Pending | 85/127,900 | 03 - Weightless hairspray |
| SEXY HAIR | U.S. | Pending | 85/110,972 | 09 - electric irons for styling hair<br><br>11 - hand-held electric hair dryers |
| TRIBE OF STYLE | U.S. | Pending | 85/183,084 | 200 - Indicating membership in a(n) to indicate membership in an organization of stylists who have attended or completed educational and entertainment programs in the field of hair care services |
| STRUCTURE IN MOTION | U.S. | Pending | 85/175,294 | 09 - DVDs featuring hair styling and hair-cutting techniques<br><br>16 - publications, namely, |

Exhibit 4 - 192

| Mark | Country | Status | Appln.Reg. No. | Classes/Goods |
|------|---------|--------|----------------|----------------|
|      |         |        |                | brochures, booklets, and teaching materials in the field of hair styling and hair cutting |
|      |         |        |                | 41 - educational services, namely, providing classes, seminars, conferences, workshops in the field of hair styling and hair cutting |

## Common Law Marks

| Mark |
|------|
| BIG SHINE |
| BLOW IT UP |
| CLEAN SLATE |
| CONTROL MANIAC |
| CURLYSEXYHAIR |
| DARN STRAIGHT |
| DENSE |
| DOUBLE HEADER |
| FLIP IT OVER |
| FRENZY |
| FULL ON CURLS |
| GLEAM ME UP |
| HOLD OUT |
| PLASTER |
| PLAY DIRTY |
| POWER STRAIGHT |
| QUICK CHANGE |
| ROOT PUMP PLUS |
| ROUGH & READY |
| SEXYHAIR Red Star Logo |

Exhibit 4 - 193

| |
|---|
| SHATTER |
| SILKYSEXYHAIR |
| SLEPT IN |
| SMOOTH & SEAL |
| SO PUMPED<br>SOY and COCOA Design |
| SOY MELLOW<br>SOY TRI-WHEAT |
| SOYA WANT FLAT HAIR |
| SOYA WANT FULL HAIR |
| SPRAY & PLAY HARDER<br>STRAIGHTSEXYHAIR |
| TRITANIUM COMPLEX |
| TRITANIUM COMPLEX & Design |
| WHAT A BODY |
| WHAT A TEASE |

## Domain Names

| |
|---|
| straightsexyhair.com |
| sexyhair.com |
| ecoly.com |
| sexyhairconcepts.com |

## Copyrights

No Grantor has any registered copyrights.

## Patents

1.      U.S. Patent under Grant/App. Number D412836.

## Out-License Agreements

(all of the listed items were entered into in the ordinary course of business)

Exhibit 4 - 194

1.    Limited license provision in Domestic Distribution Agreement by and between the Borrower and Authur Resnick, d.b.a Salon Direct, dated as of January 1, 2008.

2.    Limited license provision in Domestic Distribution Agreement by and between the Borrower and Four Star Salon Services, dated as of August 31, 2007.

3.    Limited license provision in Domestic Distribution Agreement by and between the Borrower and Malys of California, dated as of March 23, 2007.

4.    Limited license provision in International Distribution Agreement by and between the Borrower and Friends A/S, dated as of September 6, 2007.

5.    Limited license provision in International Distribution Agreement, by and between the Borrower and Complete Hairdressing Supplies PTY. LTD., dated as of November 15, 2005.

6.    Limited license provision in International Distribution Agreement, by and between the Borrower and HairConcepts GmbH, dated as of July 24, 2007.

7.    Limited license provision in International Distribution Agreement, by and between the Borrower and Hairium, Ltd., dated as of January 1, 2010.

8.    Limited license provision in International Distribution Agreement, by and between the Borrower and Soda Brands, Ltd., dated as of June 1, 2008.

9.    Limited license provision in International Distribution Agreement, by and between the Borrower and Charm Distributions, dated as of June, 2007.

10.   Limited license provision in International Distribution Agreement, by and between the Borrower and European Beauty Distribution, dated as of January 1, 2010.

11.   Limited license provision in Domestic Distribution Agreement, by and between the Borrower and Windsor Beauty Supply, Inc., dated as of April 2, 2010.

12.   Limited license provision in International Distribution Agreement, by and between the Borrower and Seeley & Seeley Salon Professional, dated as of January 1, 2010.

13.   Limited license provision in International Distribution Agreement, by and between the Borrower and Kaluga Pro Beauty S.A., dated as of January 1, 2010.

14.   Limited license provision in International Distribution Agreement, by and between the Borrower and Cosmo Group, dated as of July 20, 2009.

15.   Limited license provision in International Distribution Agreement, by and between the Borrower and M.A.P. Corporation, dated as of August 1, 2009.

16.   Limited license provision in International Distribution Agreement, by and between the Borrower and Kaluga Pro Beauty S.A., dated as of January 1, 2010.

Exhibit 4 - 195

17.     Limited license provision in International Distribution Agreement, by and between the Borrower and Plus Hair Limitada, dated as of April 1, 2010.

## In-License Agreements

None.

Exhibit 4 - 196

## <u>Schedule 2(d)</u>

## COMMERCIAL TORT CLAIMS

None.

Exhibit 4 - 197

**Schedule 4(a)(i)**
**LEGAL NAME, JURISDICTION OF ORGANIZATION/FORMATION,
PRINCIPAL PLACE OF BUSINESS AND CHIEF EXECUTIVE OFFICE**

| Legal Name of Grantor | Jurisdiction of Incorporation or Organization | Principal Place of Business | Chief Executive Office |
|---|---|---|---|
| Sexy Hair Concepts, LLC | California | California | 21551 Prairie St. Chatsworth, CA 91311 |
| Ecoly International, Inc. | California | California | 21551 Prairie St. Chatsworth, CA 91311 |
| Luxe Beauty Midco Corporation | Delaware | California | 21551 Prairie St. Chatsworth, CA 91311 |

Exhibit 4 - 198

## Schedule 4(a)(ii)
## MERGERS, CONSOLIDATIONS AND CHANGES IN STRUCTURE

| Grantor | CHANGE |
|---|---|
| Ecoly International, Inc.<br><br>Luxe Beauty Midco Corporation | Luxe Beauty Holdings Corporation and Luxe Beauty Midco Corporation acquired 29.46% and 70.54%, respectively, of the shares of Ecoly International, Inc. on or around March 18, 2008 |
| Luxe Beauty Midco Corporation | Luxe Beauty Midco Corporation was incorporated on or around March 19, 2008 |

Exhibit 4 - 199

**<u>Schedule 4(f)</u>**

**CONSIGNED INVENTORY, ETC.**

Sexy Hair Concepts, LLC stores a significant amount of its finished goods inventory and
components inventory with its suppliers and vendors.

Exhibit 4 - 200

## <u>Schedule 4(g)(v)</u>

## CLAIMS WITH RESPECT TO INTELLECTUAL PROPERTY

The following Actions challenging the legality, validity, enforceability, use or ownership of the Intellectual Property Assets are currently open:

| Party Opposed | Date Opposed | Mark at Issue | Nature of Opposition | Status |
|---|---|---|---|---|
| Susan F. Evans, Esq.<br><br>c/o Henkel Corp.<br>2200 Renaissance Blvd.<br>The Triad, Ste. 200<br>Gulph Mills, PA 19406 | 03/28/2006 | Got2b Sexy | Cease and Desist letter<br><br>Sent by the Debtor | Open- the issue is trademark and trade dress infringement[1] |
| Luwetta West Sexy's<br><br>1226 E. 71st Place<br>Chicago, IL 60619-1306 | 10/26/2008 | SS Sexy's "the Way You Feel" | Trademark Opposition | Open- A Summary Judgment Motion is being prepared |
| Time Products UK, Ltd.<br><br>34 Dover Street<br>London W1S 4NG | 04/29/2010 | Seksy | Cease and Desist letter<br><br>Sent by the Seller | Open- The issue is likelihood of confusion.[2] |

<u>Victoria's Secret</u>
All proceedings (listed in the settlement agreement terminating the appeal before the U.S. District Court for the Southern District of New York) have been terminated except (and pursuant to the settlement agreement): Victoria's Secret Stores Brand Management v. Sexy Hair Concepts, Opposition No. 91,178,324 presently stayed pending disposition of the Victoria's Secret application for registration of SEXY for goods in Class 3 other than hair care preparations. The letter of consent from Borrower to Victoria's Secret has been submitted to the PTO.

---

[1] Henkel responded to the Debtor's letter stating it would make no application for registration. The Debtor responded reserving its rights to take other action. No application for registration has been filed by Henkel. The Debtor is considering other action now that the V. Secret proceedings have terminated.

[2] There is no evidence of use of the mark of the application. The intention is to oppose registration of the mark when/if the mark is published for opposition.

Exhibit 4 - 201

**EXHIBIT 5(f)(i)**
**[FORM OF]**

**NOTICE**

**OF**

**GRANT OF SECURITY INTEREST**

**IN**

**COPYRIGHTS**

United States Copyright Office

Ladies and Gentlemen:

      Please be advised that pursuant to the Security Agreement, dated as of _____, 2010 (as the same may be amended, modified, extended or restated from time to time, the "Security Agreement"), by and among the Grantors party thereto (each an "Grantor" and collectively, the "Grantors") and Bank of Montreal, as DIP Collateral Agent (the "DIP Collateral Agent") for the holders of the Secured Obligations referenced therein, the undersigned Grantor has granted a continuing security interest in and continuing lien upon, the copyrights and copyright applications shown on Schedule 1 attached hereto to the DIP Collateral Agent for the ratable benefit of the holders of the Secured Obligations.

      The Grantors and the DIP Collateral Agent, on behalf of the holders of the Secured Obligations, hereby acknowledge and agree that the security interest in the copyrights and copyright applications set forth on Schedule I attached hereto (i) may only be terminated in accordance with the terms of the Security Agreement and (ii) is not to be construed as an assignment of any copyright or copyright application.

      Very truly yours

_____

[Grantor], a_____

By: _____
Name: _____
Title: _____

Grantor's Address:  **[insert]**

Exhibit 5(f)(i)
Page 1

Exhibit 4 - 202

Acknowledged and Accepted:

BANK OF MONTREAL, as DIP Collateral Agent


By: _____

Name:_____

Title:_____

Exhibit 5(f)(i)
Page 2

Exhibit 4 - 203

**EXHIBIT 5(f)(ii)**

**[FORM OF]**

**NOTICE**

**OF**

**GRANT OF SECURITY INTEREST**

**IN**

**PATENTS**

United States Patent and Trademark Office

Ladies and Gentlemen:

Please be advised that pursuant to the Security Agreement, dated as of _____, 2010 (the "Security Agreement"), by and among the Grantors party thereto (each an "Grantor" and collectively, the "Grantors") and Bank of Montreal, as DIP Collateral Agent (the "DIP Collateral Agent") for the holders of the Secured Obligations referenced therein, the undersigned Grantor has granted a continuing security interest in and continuing lien upon, the patents and patent applications set forth on Schedule 1 attached hereto to the DIP Collateral Agent for the ratable benefit of the holders of the Secured Obligations.

The Grantors and the DIP Collateral Agent, on behalf of the holders of the Secured Obligations, hereby acknowledge and agree that the security interest in the patents and patent applications set forth on Schedule 1 attached hereto (i) may only be terminated in accordance with the terms of the Security Agreement and (ii) is not to be construed as an assignment of any patent or patent application.

Very truly yours

_____

[Grantor], a_____

By: _____
Name: _____
Title: _____

Grantor's Address:  **[insert]**

Exhibit 5(f)(ii)
Page 1

Exhibit 4 - 204

Acknowledged and Accepted:

BANK OF MONTREAL, as DIP Collateral Agent


By: _____
Name:_____
Title:_____

Exhibit 5(f)(ii)
Page 2

Exhibit 4 - 205

**EXHIBIT 5(f)(iii)**
**FORM OF**

**NOTICE**

**OF**

**GRANT OF SECURITY INTEREST**

**IN**

**TRADEMARKS**

United States Patent and Trademark Office

Ladies and Gentlemen:

Please be advised that pursuant to the Security Agreement, dated as of _____, 2010 (the "Security Agreement"), by and among the Grantors party thereto (each an "Grantor" and collectively, the "Grantors") and Bank of Montreal, as DIP Collateral Agent (the "DIP Collateral Agent") for the holders of the Secured Obligations referenced therein, the undersigned Grantor has granted a continuing security interest in and continuing lien upon, the trademarks and trademark applications set forth on Schedule 1 attached hereto to the DIP Collateral Agent for the ratable benefit of the holders of the Secured Obligations.

The Grantors and the DIP Collateral Agent, on behalf of the holders of the Secured Obligations, hereby acknowledge and agree that the security interest in the trademarks and trademark applications set forth on Schedule I attached hereto (i) may only be terminated in accordance with the terms of the Security Agreement and (ii) is not to be construed as an assignment of any trademark or trademark application.

Very truly yours

_____
[Grantor], a_____

By: _____
Name: _____
Title: _____

Grantor's Address:  **[insert]**

Exhibit 5(f)(iii)
Page 1

Exhibit 4 - 206

Acknowledged and Accepted:

BANK OF MONTREAL, as DIP Collateral Agent


By: _____
Name:_____
Title:_____

Exhibit 5(f)(iii)
Page 2

Exhibit 4 - 207

## EXHIBIT 5(h)

## [FORM OF] BAILEE LETTER

_____, 2010

**[Bailee]**

_____

_____

Re:    Debtor-In-Possession Credit Agreement dated as of _____, 2010 (as amended, modified, extended, renewed or replaced, the "Credit Agreement') among Sexy Hair Concepts, LLC, a California limited liability company (the "Borrower"), as Borrower, certain affiliates and subsidiaries, including Luxe Beauty Midco Corporation, a Delaware corporation, and Ecoly International, Inc., a California corporation, as Guarantors, the lenders identified therein (the "Lenders") and Bank of Montreal, as administrative agent (in such capacity, the "DIP Agent").

The following companies (the "Subject Companies") have, or may have, goods with the above-referenced bailee at the above-reference address: (i) Sexy Hair Concepts, LLC, a California limited liability company, (ii) Luxe Beauty Midco Corporation, a Delaware corporation, (iii) Ecoly International, Inc., a California corporation, and (iv) subsidiaries and affiliates of the foregoing that are reasonably identified as such.

Ladies and Gentlemen:

The Subject Companies have delivered inventory or other goods owned by them (the "Goods") to you at the address shown above.

In connection with the Credit Agreement, the Subject Companies and certain of their affiliates executed and delivered a Security Agreement (as the same may be amended, modified, supplemented, extended, renewed, restated or replaced, the "Security Agreement") in favor of Bank of Montreal, as collateral agent (in such capacity, the "DIP Collateral Agent"), pursuant to which the Subject Companies granted liens in favor of the DIP Collateral Agent, on behalf of the Lenders and the other holders of secured obligations, in all of the tangible personal property of the Subject Companies, including, without limitation, the Goods.

You hereby agree that (a) the DIP Collateral Agent's security interest in the Goods shall be senior to any lien, claim or interest you may have therein, (b) you shall not take any action purporting to encumber or transfer any interest in the Goods and (c) you are holding the Goods as bailee for the DIP Collateral Agent for the purpose of perfecting the security interest and lien of the DIP Collateral Agent in the Goods.

You further agree to allow the DIP Collateral Agent to enter upon your premises during regular business hours upon reasonable prior notice for the purpose of

Exhibit 5(h)
Page 1

Exhibit 4 - 208

examining, removing, taking possession of or otherwise dealing with any of the Goods at any time in your possession or copies of any books and records related thereto.

You hereby waive any liens, claims or rights with respect to the Goods that you may have, whether under applicable law, by virtue of any agreement between you and the Subject Companies or otherwise, including, without limitation, any right to assert any defense or claim of offset, to levy upon the Goods or to apply any of the Goods to the payment of any obligations owing to you by the Subject Companies (whether such rights arise under the terms of such agreement, any default thereunder, common law, statute (including the U.S. Bankruptcy Code or any state insolvency law) or otherwise).

By your signature below, you acknowledge receipt of the above notice of the DIP Collateral Agent's security interest and agree to follow all instructions that the DIP Collateral Agent may from time to time hereafter give to you with respect to Goods in your possession or control or located on or in any of your premises. Upon being notified by the DIP Collateral Agent, you are to abide solely by the DIP Collateral Agent's instructions with respect to the Goods and you are not to release the Goods to the Subject Companies or to anyone else except according to written instructions which may thereafter be given to you from time to time by the DIP Collateral Agent. If so instructed by the DIP Collateral Agent, you agree to return to the DIP Collateral Agent all of the Goods in your custody, control or possession.

The Subject Companies agree that you shall have no liability to the Subject Companies if you comply with the DIP Collateral Agent's written direction as described above. The Subject Companies further agree that they will reimburse you for all reasonable costs and expenses incurred as a direct result of your compliance with the terms and provisions of this letter.

**[Signature Page Follows]**

Exhibit 5(h)
Page 2

Exhibit 4 - 209

Please confirm receipt of this letter and your agreement to deliver instructions contained herein by signing a copy of this letter as indicated and return it as soon as possible to: *[The Subject Companies]*.

Very truly yours,

**[THE SUBJECT COMPANIES]**

By: _____

Title: _____


ACKNOWLEDGED AND AGREED this
_____ day of _____, 2010:

**[BAILEE]**

By_____

Title _____


BANK OF MONTREAL, as DIP Collateral
Agent

By: _____

Title:_____

Exhibit 5(h)
Page 3

Exhibit 4 - 210

Exhibit 5

**Exhibit 5**

**Disclosure Pursuant to Federal Rule of Bankruptcy 4001(b)**

Pursuant to Federal Rule of Bankruptcy Procedure 4001(b), the Proposed Order includes the following provisions, located in the referenced paragraphs:

(i)      The Senior Secured Lenders have an interest in the cash collateral, as provided in Exhibit A, paragraph 9, of the Proposed Order;

(ii)     The cash collateral may be used to pay expenses enumerated on the Budget and to pay allowable 506(b) amounts and postpetition charges, as provided in paragraph 1 of the Proposed Order;

(iii)    The material terms of the use of cash collateral are provided in paragraphs 1 and 2 of the Proposed Order; and

(iv)     Adequate protection, in the form of liens, will be provided to the Senior Secured Lenders, as provided in paragraph 4 of the Proposed Order.

17

Exhibit 5 - 211

Exhibit 6

**Exhibit 6**

**Statement Pursuant to Federal Rule of Bankruptcy 4001(c)**

Pursuant to Federal Rule of Bankruptcy Procedure 4001(c), the Proposed Order includes the following provisions, located in the referenced paragraphs:

(i)    a grant of priority and a lien on property of the estate under Bankruptcy Code section 364(c), as provided on pages 3, 6 and 8;

(ii)    the providing of adequate protection or priority for a claim that arose before the commencement of the case, as located in paragraph 4, pages 7-8.

(iii)    a determination of the validity, enforceability, priority of an amount of a claim and a lien that arose before the commencement of the case, as provided in paragraph D, page 2 (subject to the reservational rights/challenge procedures in paragraph 8 on pages 12-13);

(iv)    A modification of the Bankruptcy Code section 362, as provided in paragraphs 5(b), on page 10 and paragraph 18, page 15;

(v)    A modification of the Debtors' rights to seek the use of cash collateral under Bankruptcy Code section 363, as located in paragraph 2(c), page 5, and a modification of the Operating Debtor's right to request authority to obtain credit under Bankruptcy Code section 364, as located in paragraph 3(e), page 7;

(vi)    The establishment of deadlines for filing a plan of reorganization, for approval of a disclosure statement, for a hearing on confirmation, or for entry of a confirmation order, as located in section 7.15 of the DIP Agreement;

(vii)    A release of claims belonging to the estate that could have been asserted or raised under or in connection with the Postpetition Debt, as located in paragraph 21, page 15;

(viii)    An indemnification of the lender by Debtor, as located in paragraph 13, page 14;

(ix)    A waiver of any rights, benefits, or causes of action under Bankruptcy Code section 506(c), as located in paragraph 7, page 12, effective upon entry of the Final Order; and

(x)    A lien on claims and proceeds under Bankruptcy Code sections 544, 547, 548, 549 and

Exhibit 6 - 212

1    553, as located in paragraph 3(d), page 7, but only upon entry of the Final Order and

2    only to secure the Postpetition Debt.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit 6 - 213

Exhibit 7

Attorney or Party Name, Address, Telephone & FAX Numbers, and California State Bar Number

Scott F. Gautier (State Bar No. 211742)
Peitzman, Weg & Kempinsky, LLP
10100 Santa Monica Blvd., Suite 1450
Los Angeles, CA 90067
Telephone: 310-552-3100
Facsimile: 310-552-3101

*Attorney for* Sexy Hair Concepts, LLC

FOR COURT USE ONLY

### UNITED STATES BANKRUPTCY COURT
### CENTRAL DISTRICT OF CALIFORNIA

In re:



SEXY HAIR CONCEPTS, LLC

Debtor.

CHAPTER  11

CASE NUMBER

DATE:
TIME:
COURTROOM:

## STATEMENT PURSUANT TO LOCAL BANKRUPTCY RULE 4001-2
## (CASH COLLATERAL STIPULATIONS)
### (Secured Creditor:  Bank of Montreal, N.A.  )

The Debtor, through a separately filed motion, has requested the approval of a stipulation providing for the use of cash collateral, or post-petition financing, or both.  Attached to the motion as Exhibit  7  is a true and correct copy of the agreement for use of cash collateral or post-petition financing (the "Agreement"), which Agreement contains the following provisions:

| Description of Provision | Page No: | Line No. (If Applicable) |
|---|---|---|
| ☒ Cross-collateralization clauses | Order - 8 | |
| ☒ Provisions or findings of fact that bind the estate or all parties in interest with respect to the validity, perfection or amount of the secured party's lien or debt | Order 2, 3, 5, 8 | |
| ☒ Provisions or findings of fact that bind the estate or all parties in interest with respect to the relative priorities of the secured party's lien and liens held by persons who are not party to the stipulation, or which create a lien senior or equal to any existing lien | Order 2, 6, 8, 16 | |
| ☒ Waivers of 11 U.S.C. § 506(c), unless the waiver is effective only during the period in which the debtor is authorized to use cash collateral or borrow funds | Order 13 | |
| ☒ Provisions that operate, as a practical matter, to divest the debtor in possession of any discretion in the formulation of a plan or administration of the estate or to limit access to the court to seek any relief under other applicable provision of law | Order 15 | |
| ☒ Releases of liability for the creditor's alleged prepetition torts or breaches of contract | Order 3 | |
| ☐ Waivers of avoidance actions arising under the Bankruptcy Code | | |

(Continued on next page)

This form is optional.  It has been approved for use by the U.S. Bankruptcy Court for the Central District of California.

*January 2009*

**F 4001-2**

Exhibit 7 - 214

Statement Pursuant to Local Bankruptcy Rule 4001-2 (Cash Collateral Stipulations) - *Page 2 of* ____   **F 4001-2**

| In re                           (SHORT TITLE) | CHAPTER:  11 |
|---|---|
| SEXY HAIR CONCEPTS, LLC                              Debtor(s). | CASE NO.: |

| **Description of Provision** | **Page No:** | **Line No. (If Applicable)** |
|---|---|---|
| ☒ Automatic relief from the automatic stay upon default, conversion to chapter 7, or appointment of a trustee | Order - 10-11, 15 | _____ |
| ☒ Waivers of procedural requirements, including those for foreclosure mandated under applicable non-bankruptcy law, and for perfection of replacement liens | Order - 10 | _____ |
| ☒ Adequate protection provisions which create liens on claims for relief arising under 11 U.S.C. §§ 506(c), 544, 545, 547, 548 and 549 | Order - 7 (But only upon entry of final order) | _____ |
| ☒ Waivers, effective on default or expiration, of the debtor's right to move for a court order pursuant to 11 U.S.C. § 363(c)(2)(B) authorizing the use of cash collateral in the absence of the secured party's consent | Order - 5, 10 | _____ |
| ☐ Provisions that grant a lien in an amount in excess of the dollar amount of cash collateral authorized under the applicable cash collateral order | _____ | _____ |
| ☐ Provisions providing for the paying down of prepetition principal owed to a creditor | _____ | _____ |
| ☐ Findings of fact on matters extraneous to the approval process | _____ | _____ |

Dated: 12/21/10

| Scott F. Gautier | /s/ Scott F. Gautier |
|---|---|
| *Type Name* | *Signature* |

---

This form is optional.  It has been approved for use by the U.S. Bankruptcy Court for the Central District of California.

*January 2009*

**F 4001-2**

Exhibit 7 - 215