Scott F. Gautier (State Bar No. 211742)
*sgautier@pwkllp.com*
Lorie A. Ball (State Bar No. 210703)
*lball@pwkllp.com*
Thor D. McLaughlin (State Bar No. 257864)
*tmclaughlin@pwkllp.com*
PEITZMAN, WEG & KEMPINSKY LLP
10100 Santa Monica Boulevard, Suite 1450
Los Angeles, CA  90067
Telephone: (310) 552-3100
Facsimile: (310) 552-3101

Proposed Attorneys for Debtor and Debtor-in-Possession

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA

# SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re:<br><br>SEXY HAIR CONCEPTS, LLC, a California limited liability company,<br><br>Debtor and Debtor-in-Possession. | Bk. Case No.:<br><br>Chapter 11<br><br>**EMERGENCY MOTION OF DEBTOR-IN-POSSESSION FOR ORDER APPROVING ASSUMPTION OF ADMINISTAFF AGREEMENT; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>[Declaration of T. Scott Avila filed separately]<br><br>**Hearing:**<br><br>Date: To Be Scheduled by the Court<br>Time: To Be Scheduled by the Court<br>Place: Courtroom<br>　　　21041 Burbank Blvd.<br>　　　Woodland Hills, CA 91367 |

　　　Sexy Hair Concepts, LLC ("SHC" or the "Debtor") hereby moves on an emergency basis (the "Motion") for an order, pursuant to 11 U.S.C. § 365, authorizing the Debtor to assume that certain Client Service Agreement (the "Administaff Agreement") between the Debtor and Administaff Companies II, L.P. ("Administaff").  In support of this Motion, the Debtor hereby submits the attached Memorandum of Points and Authorities, the separately filed Declaration of T. Scott Avila in

1

Support of First Day Motions (the "Avila Declaration") and hereby states the following:

## EMERGENCY RELIEF IS REQUIRED

Pursuant to Local Bankruptcy Rule 2081-1(a) and Local Bankruptcy Rule 9075-1, the Debtor requests that the Court consider the Motion on an emergency basis so that any relief granted may take effect as soon as possible, thereby allowing the Debtor to continue to receive the benefits of the Administaff Agreement, namely the seamless continuation of employment for all of the Debtor's employees and its current employee payroll and benefit system.  Because the Administaff Agreement governs, among other things, the provision of wages and benefits to the Debtor's employees, if the relief requested herein is not granted promptly, the Debtor may begin to lose the employees and positive morale necessary to continue business operations and preserve the value of the Debtor's estate.  Therefore, the Debtor requests that the Court grant the relief requested by this Motion on an emergency basis.

## JURISDICTION AND VENUE

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter relates to the administration of this bankruptcy estate and is accordingly a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).  Venue of this case is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicate for the relief requested herein is section 365 of title 11 of the United States Code (the "Bankruptcy Code").

## RELIEF REQUESTED

By this Motion, the Debtor seeks this Court's approval of the Debtor's assumption of the Administaff Agreement.

Dated: December 21, 2010        PEITZMAN, WEG & KEMPINSKY LLP

          /s/ Scott F. Gautier
Scott F. Gautier
Lorie A. Ball
Thor D. McLaughlin
Proposed Attorneys for Debtor and Debtor-in-Possession

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## FACTUAL BACKGROUND

**A.    GENERAL BACKGROUND FACTS**

The Debtor is an operating company engaged in the distribution and marketing of hair-care products and brands. The Debtor outsources the production and manufacture of its various lines of premier salon products and operates from a single facility in Chatsworth, California that houses its corporate offices and distribution warehouse. The Debtor works with several distributors domestically and internationally, but does not maintain any other offices.

In 2008, the Debtor borrowed funds under a revolving credit and term loan credit facility (the "Senior Credit Facility") pursuant to that certain Credit Agreement dated as of April 9, 2008 (the "Senior Credit Agreement"), among the Debtor, a California limited liability company, as the borrower and, the Debtor's affiliates, Luxe Beauty Holdings Corporation ("Holdings"), Luxe Beauty Midco Corporation ("Midco"), and the Debtor's sole managing member, Ecoly International, Inc. ("Ecoly," together with SHC and Midco, the "Debtors"), as guarantors, the lenders identified therein ("Senior Secured Lenders") and Bank of America, N.A., as Administrative Agent and Collateral Agent. Bank of America, N.A., was later replaced by Bank of Montreal as Administrative Agent and Collateral Agent ("Agent"). Under the Senior Credit Agreement, the Senior Secured Lenders loaned the Debtor and its affiliates approximately $65 million and provided a revolving line of credit of approximately $7 million. In connection with the Senior Credit Agreement, the Debtor and its affiliates entered into that certain Security Agreement that granted Agent, for the benefit of the Senior Secured Lenders, a continuing security interest in all of the assets of the Debtor, Ecoly, Midco and Holdings and a Pledge Agreement that pledged the ownership interests of the Debtor, Ecoly and Midco to Agent, for the benefit of the Senior Secured Lenders. In addition, the Debtor incurred obligations to Northwestern Mutual Life Insurance Company ("NML") under that certain Securities Purchase and Guaranty Agreement, dated April 9, 2008 ("Subordinated Loan Agreement") by and between the Debtor, as borrower, Holdings, Midco and Ecoly, as guarantors, and NML.

In June, 2009, due to the state of the global economy and certain operational issues, the Debtor was unable to make certain installment payments then due and owing under the Senior Credit Agreement. Agent, on behalf of the Senior Secured Lenders, declared, in a notice of default, that payment and other covenant defaults under the Senior Credit Agreement had occurred and were continuing. In addition, the Debtor was also unable to make payments due and owing to NML under the Subordinated Loan Agreement. On July 23, 2009, Agent, on behalf of the Senior Secured Lenders, exercised voting rights with respect to the pledged shares of stock in Midco and Ecoly and, in that purported capacity, (1) removed the directors then serving on the Board of Directors of Midco and Ecoly (the "Board") and appointed new independent boards of directors, and (2) elected Andre Laus to serve as Chief Restructuring Officer. Andre Laus was later replaced by T. Scott Avila as the Chief Restructuring Officer.

Subsequently, Agent, on behalf of the Senior Secured Lenders, indicated its intent to foreclose and liquidate the stock of Ecoly and Midco, and to foreclose and liquidate all assets of the Debtor, to satisfy the obligations due and owing under the Senior Credit Agreement unless the Debtor cured all defaults and repaid all or a significant portion of the outstanding obligations. Following significant discussion and investigation of several alternatives, including a possible refinancing or restructuring of its debt, the Debtor elected to pursue a voluntary sale of substantially all of its assets in order to satisfy its debt obligations. To effectuate this sale, the Debtor hired an investment banker, Imperial Capital, LLC, who contacted over 180 companies and potential investors. The Debtor subsequently commenced negotiations with the current plan sponsor ("Plan Sponsor"). After extensive diligence, negotiations and changes in the transaction structure, the Plan Sponsor determined that given increasing litigation, corporate structural and regulatory risks to the Debtor, the Plan Sponsor would only be willing to consummate a transaction if the Debtor were a debtor-in-possession in a chapter 11 bankruptcy proceeding.

Ultimately (and more fully described in the proposed disclosure statement and the Avila Declaration), the Plan Sponsor and SHC agreed that a transaction be consummated through a plan of reorganization ("Plan"), and pursuant to an investment agreement, in which the Debtor reorganizes

4

("Reorganized Debtor") and the newly issued equity of the Reorganized Debtor is transferred to the Plan Sponsor in exchange for $43 million cash and the assumption of the $35 million of debt ("Transaction"). After taking into consideration the substantial efforts that have taken place over the past year to resolve the Debtors' financial problems, the Board, based upon information and belief that the Plan Sponsor continues to represent the best offer for SHC's assets that will return the most value to the Debtors' creditors and other stakeholders, the Debtor, Midco and Ecoly filed individual petitions for relief under chapter 11 to act as the plan proponent and submit the plan for approval.

**B.    FACTS SPECIFIC TO THE MOTION**

The Debtor employs approximately 75 full time employees (the "Employees"), most of which are based at the Chatsworth location and a minority of whom are sales people located throughout the country. The Employees are central to the operations of the Debtor's business. Performing functions ranging from, without limitation, sales and marketing to warehouse operations, the Employees interact with consumers and distributors and ensure that the Debtor's products are available to be transferred to the distributors and salons that get the product into the hands of consumers.

On August 8, 2007, the Debtor and Administaff entered into that certain Client Service Agreement (the "Administaff Agreement"), which, in general, provides that personnel services, including the payment of wages and benefits to the Employees, will be provided by Administaff.

<u>Administaff's</u> material obligations under the Administaff Agreement are as follows:
- pay wages and provide benefits to the Employees;
- maintain compliance with applicable federal and state tax rules and regulations; and
- procure workers' compensation insurance.

The <u>Debtor's</u> material obligations under the Administaff Agreement are as follows:
- provide direction and control over the Employees in connection with the conduct of the Debtor's business (including hiring and firing);
- pay, through Administaff, commissions, bonuses, and paid time off amounts, among other things; and
- pay a service fee to Administaff every pay period that consists of (i) an amount for

each employee equal to the product of (a) the gross payroll amount for such employee for such pay period, and (b) a percentage determined by Administaff, and (ii) any other charges related to services provided by Administaff to the Debtor.

A true and correct copy of the Administaff Agreement is attached to the Avila Declaration as Exhibit II and is attached hereto as Exhibit 1. Pursuant to the Administaff Agreement, the Debtor has outsourced, among other things, the vast majority of its payroll and employee benefit functions to Administaff. As a consequence, the Debtor has almost no capabilities to perform these functions internally.

To the best of the Debtor's knowledge (i) there is no current default under the Administaff Agreement; (ii) all amounts paid to Administaff in the past 90 days have been paid in the ordinary course of business of the Debtor and Administaff; and (iii) there are no "cure" amounts that would be payable to Administaff prior to, or upon, assumption of the Administaff Agreement.

## II.

## ARGUMENT

### A. THE COURT SHOULD APPROVE THE ASSUMPTION OF THE ADMINISTAFF AGREEMENT

Bankruptcy Code section 365(a) permits debtors in possession to "assume or reject any executory contract or unexpired lease of the debtor," subject to court approval. While the Bankruptcy Code does not provide specific guidelines to apply in evaluating the decision to assume or reject an executory contract, the Ninth Circuit has held that such decisions should be reviewed under the business judgment rule standard. *See Durkin v. Benedor Corp. (In re G.I. Industries, Inc.)*, 204 F.3d 1276, 1282 (9th Cir. 2000); *Agarwal v. Pomona Valley Medical Group, Inc. (In re Pomona Valley Medical Group, Inc.)*, 476 F.3d 665, 670 (9th Cir. 2007). The business judgment rule standard is deferential to the decision of the debtor-in-possession and in its review, "the bankruptcy court should presume that the debtor-in-possession acted prudently, on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the bankruptcy estate." *See id.* at 670.

Here, the Court should approve the Debtor's assumption of the Administaff Agreement because it is in the best interests of the estate and is a sound exercise of the Debtor's business

judgment. The Debtor relies heavily on its employees in the operation of its business, and the retention and satisfaction of its employees is therefore necessary to maintain the business' value during the bankruptcy case. For example, because the Debtor competes in the hair product marketplace, where consumers and salons have access to a wide range of competing brands, the Debtor employs sales, marketing, and educational professionals that work to promote and sell SHC products. These employees are crucial to, among other things, maintaining the Debtor's strong brand, making new sales, and breaking into new segments of the market. Also, the Debtor relies on employees to staff the warehouse that is used to store inventory awaiting transfer to distributors and salons. Without its warehouse employees, the Debtor's logistical capabilities will be severely hampered and the Debtor may prove unable to meet shipment demands by distributors, resulting in lost sales and damage to the Debtor's business reputation.

There are no amounts that need to be paid to assume the Administaff Agreement. By assuming the Administaff Agreement, the Debtor will be able to maintain, among other things, its existing payroll and benefit system with virtually no disruption to its business operations and no affect on the Employees' receipt of wages and benefits. However, if the assumption of the Administaff Agreement is denied, the harm to the Debtor will come swiftly and at great cost. The Debtor would be left to make payroll and provide benefits on an ongoing, post-petition basis; yet, because the payroll and benefit functions have been outsourced for at least the last three years, the Debtor currently has little to no internal capability to execute these tasks. Thus, in the absence of Administaff's services, the Debtor will likely struggle to retain crucial employees and maintain positive employee morale while it works to develop workable internal payroll and benefit systems.

Further, the assumption of the Administaff Agreement will not hamper the Debtor's reorganization efforts. Specifically, the Administaff Agreement provides for SHC to make decisions regarding the hiring and firing of employees. Finally, the fee that Administaff charges for its services is reasonable, given the scope and importance of the duties that it performs for the Debtor.

*///*

*///*

*///*

### III.

### **CONCLUSION**

WHEREFORE, the Debtor respectfully requests that the Court enter an order (a) approving the assumption of the Administaff Agreement, and (b) granting to the Debtor such other and further relief as is just.

Dated: December 21, 2010          PEITZMAN, WEG & KEMPINSKY LLP


                                  By:_____/s/ Scott F. Gautier_____
                                         Scott F. Gautier
                                         Lorie A. Ball
                                         Thor D. McLaughlin
                                  Proposed Attorneys for the Debtor and Debtor-in-Possession